**IN THE**

# United States Court of Appeals

**FOR THE FOURTH CIRCUIT**

---

EASTERN ASSOCIATED COAL CORP.,

*Petitioner,*

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR

and

ARVIS R. TOLER,

*Respondents.*

---

ON PETITION FOR REVIEW OF A DECISION
AND ORDER OF THE BENEFITS REVIEW BOARD,
UNITED STATES DEPARTMENT OF LABOR

---

## JOINT APPENDIX

---

Sarah M. Hurley
U.S. Department of Labor
Office of the Solicitor
Suite N-2605 FBP
200 Constitution Ave., NW
Washington, D.C. 20210
(202) 693-5660

Evan Barret Smith
317 Main Street
Whitesburg, KY 41858
(606) 633-3929

Mark E. Solomons
Laura Metcoff Klaus
GREENBERG TRAURIG LLP
2101 L Street, N.W.
Washington, D.C. 20037
(202) 533-2361

# TABLE OF CONTENTS

| Item | Record Entry | Page No. |
|---|---|---|
| Petition for Review (filed September 5, 2014) | -- | J.A. 1 |
| Index of Certified Case Record, Benefits Review Board dated October 15, 2014 | -- | J.A. 3 |
| Benefits Review Board Errata dated July 17, 2014 | R. 1 | J.A. 9 |
| Benefits Review Board Decision and Order dated June 7, 2014 [corrected to July 7, 2014] | R. 2 | J.A. 11 |
| Administrative Law Judge Decision and Order on Remand on Reconsideration dated August 1, 2013 | -- | J.A. 21 |
| Administrative Law Judge Order on Reconsideration dated April 5, 2013 | -- | J.A. 34 |
| Administrative Law Judge Decision and Order on Remand dated August 30, 2012 | -- | J.A. 37 |
| Benefits Review Board Decision and Order dated July 28, 2011 | -- | J.A. 39 |
| Administrative Law Judge Decision and Order—Denial of Motion to Reconsider dated July 23, 2010 | -- | J.A. 44 |

Administrative Law Judge Decision
and Order dated June 15, 2010     --     J.A. 47

U.S. Court of Appeals for the Fourth
Circuit, Opinion dated August 19, 1998     --     J.A. 54

Benefits Review Board Decision and
Order dated July 29, 1997     --     J.A. 57

Administrative Law Judge Decision and
Order on Remand dated July 30, 1996     --     J.A. 62

Benefits Review Board Decision and
Order dated January 29, 1996     --     J.A. 70

Administrative Law Judge Decision and
Order Denying Benefits dated
September 30, 1994     --     J.A. 75

Director's Exhibit No. 13:
Medical Report of Dr. D. L. Rasmussen
dated March 8, 1993     --     J.A. 85

Director's Exhibit No. 1 at 476-82:
Medical Report of Dr. D.L. Rasmussen
dated March 8, 1993     --     J.A. 90

Director's Exhibit No. 1 at 461-62:
Letter from Dr. D.L. Rasmussen
dated August 6, 1993     --     J.A. 97

Director's Exhibit No. 1 at 381-84:
Letter from Dr. D. L. Rasmussen
dated January 24, 1994     --     J.A. 99

Claimant's Exhibit No. 6:
Report of Dr. DiMeo dated
June 19, 2009     --     J.A. 103

Employer's Exhibit No. 5:
Report of Dr. David M. Rosenberg
dated January 11, 2010                     --                     J.A. 104

Employer's Exhibit No. 12:
Deposition Transcript of
Dr. David M. Rosenberg
dated February 23, 2010                    --                     J.A. 115

Employer's Exhibit No. 6:
Report of Dr. Joseph J. Renn, III
dated February 22, 2010                    --                     J.A. 147

Employer's Exhibit No. 13:
Deposition Transcript of
Dr. Joseph J. Renn, III
dated March 9, 2010                        --                     J.A. 153

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

*RECEIVED*

*2014 SEP -5 PM 3: 01*

*U.S. COURT OF APPEALS*
*FOURTH CIRCUIT*

EASTERN ASSOCIATED COAL
CORPORATION        ,

Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT
OF LABOR and ARVIS R. TOLER,

Respondents.

No. ___14-1923___

PETITION FOR REVIEW OF ORDER OF THE BENEFITS
REVIEW BOARD, UNITED STATES DEPARTMENT OF LABOR

Eastern Associated Coal Corporation herewith petitions this Court for review of the decision and order of the Benefits Review Board, United States Department of Labor, in Toler v. Eastern Associated Coal Corp., et al., BRB No. 13-0531 BLA issued on July 7, 2014.[1]

This Court has jurisdiction of this matter pursuant to Section 21(c) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 921(c).

Respectfully submitted,

Laura Metcoff Klaus
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2362
Klausl@gtlaw.com

---

[1]    The decision was originally issued with a date of June 7, 2014.  On July 17, 2014, the Benefits Review Board issued an Errata correcting the date of issuance to July 7, 2014.

J.A. 1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2014, a copy of the foregoing Petition for Review of Order of the Benefits Review Board, United States Department of Labor was served on the following parties by first-class mail, postage prepaid

> Jeffrey S. Goldberg, Esq.
> Office of the Solicitor
> U.S. Department of Labor
> Suite N-2117
> 200 Constitution Avenue, N.W.
> Washington, D.C. 20210
> Goldberg.jeffrey@dol.gov; BLLS-SOL@dol.gov

> Ms. Sandy Webber
> Community Health of East Tennessee
> 130 Independence Lane
> LaFollette, Tennessee 27766

> Mr. Arvis R. Toler
> P. O. Box 358
> Huntsville, Tennessee 37756

Laura Metcoff Klaus

Benefits Review Board
P.O. Box 37601
Washington, DC 20013-7601



October 15, 2014

Patricia S. Connor, Clerk
U. S. Court of Appeals
 for the Fourth Circuit
1100 East Main Street
Room 501
Richmond, VA  23219-3517

     Re:   CA# 14-1923 – Arvis R. Toler, Respondent v. Eastern Associated
           Coal Corporation, Petitioner and Director, Office of Workers'
           Compensation Programs, Respondent (Case No. 09-BLA-5255)
           (BRB No. 13-0531 BLA)

Dear Ms. Connor:

The above-cited case has been appealed to your court.  Enclosed please find the certified
Index of Documents which comprises the record.

SINCERELY,

BENEFITS REVIEW BOARD

*Thomas O. Shepherd* /VM

Thomas O. Shepherd, Jr.
Clerk of the Boards

## CERTIFICATE

I, Thomas O. Shepherd, Jr., Clerk of the Office of the Appellate Boards, U.S. Department of Labor, do hereby certify that the papers enclosed herewith constitute the record before the Board.

In testimony therefore, the undersigned has hereunder set his hand at Washington, D.C. this Fifteenth day of July, 2014.

By: _____ VM

Thomas O. Shepherd, Jr.
Clerk of the Office of the Appellate Boards

CA# 14-1923:  Arvis R. Toler, Respondent v. Eastern Associated Coal Corporation,
Petitioner and Director, Office of Workers' Compensation Programs,
Respondent (Case No. 09-BLA-5255) (BRB No. 13-0531 BLA)

## INDEX OF DOCUMENTS <span>PAGES</span>

Benefits Review Board's Errata correcting the date of the Board's
Decision and Order dated July 17, 2014.                              1

Benefits Review Board's Decision and Order affirming  the            2-12
administrative law judge's Decision and Order on Remand on
Reconsideration dated July 7, 2014.

Record transmitted from Steven D. Breeskin, dated April 8,           13
2014.

The Director's response brief, from Jeffrey S. Goldberg, dated       14-15
January 29, 2014.

Employer's Petition for Review and brief, from   Laura Metcoff,      16-48
Klaus dated December 24, 2013.

Benefits Review Board's Order denying employer's motion for an       49-50
enlargement of time to file a Petition for Review and brief, dated
December 11, 2013.

Employer's motion for an enlargement of time to file a Petition      51-54
brief, from Laura Metcoff Klaus, dated October 23, 2013.

The Director's change in counsel, from Jeffrey S. Goldberg, dated    55
September 3, 2013.

Benefits Review Board's letter acknowledging employer's             56-57
Notice of Appeal, dated May 6, 2013.

# INDEX OF DOCUMENTS cont'd

Employer's Notice of Appeal of the administrative law judges       58-61
Decision and Order Award Benefits, from Kevin T. Gillen,
dated April 16, 2013.

Administrative Law Judge's Decision and Order Awarding            62-69
Benefits, dated July 31, 2012.

Volume I -    Benefits Review Board materials

Volume II -   Administrative Law Judges materials

Volume III -  Claimant's exhibits:        1 through 7
              Employer's exhibits:        1 through 12

Volume IV -   Director's exhibits:        2 through 30

Volume V -    Director's exhibits:        1

# SERVICE SHEET

CA# 14-1923:     Arvis R. Toler, Respondent v. Eastern Associated Coal Corporation,
Petitioner and Director, Office of Workers' Compensation Programs,
Respondent (Case No. 09-BLA-5255) (BRB No. 13-0531 BLA)

Copies were sent to the following:

Patricia S. Connor, Clerk                                    UPS
U. S. Court of Appeals
 for the Fourth Circuit
1100 East Main Street
Room 501
Richmond, VA  23219-3517

Laura M. Klaus, Esq.                                          Certified
Greenberg Traurig LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037

Sandy Webber                                                   Certified
Community Health of East Tennessee
130 Independence Lance
LaFollette, TN 37766

Mr. Arvis R. Toler                                             Certified
P.O. Box 348
Huntsville, TN 3775626601

Jeffery S. Goldberg, Esq.                                     Certified
U.S. Department of Labor
Office of the Solicitor
200 Constitution Avenue, N.W.
Suite N-2117, NDOL
Washington, DC.  20210

## SERVICE SHEET cont'd

Mr. Michael Chance
District Director
U.S. Department of Labor
200 Constitution Avenue, N.W.
Suite C-3515, NDOL
Washington, DC 20210

Honorable Daniel F. Solomon
U.S. Department of Labor
Office of Administrative Law Judges
800 K Street, NW, Suite 400-N
Washington, DC 20001



## ERRATA

JUL 17 2014

TO ALL PARTIES OF THE RECORD IN:


***ARVIS R. TOLER v. EASTERN ASSOCIATED COAL CORPORATION
and DIRECTOR, OWCP,*** BRB No. 13-0531 BLA (July 7, 2014)

On July 7, 2014, the Board issued its Decision and Order in the above-captioned case. The cover page contained the incorrect date. Please substitute the enclosed corrected page.

By Order of the Board:

Thomas O. Shepherd, Jr.
Clerk of the Appellate Boards

Benefits Review Board
P.O. Box 37601
Washington, DC 20013-7601



BRB No. 13-0531 BLA

| | | |
|---|---|---|
| ARVIS R. TOLER | ) | |
| | ) | **NOT PUBLISHED** |
| Claimant-Respondent | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EASTERN ASSOCIATED COAL | ) | |
| CORPORATION | ) | **JUL 07 2014** |
| | ) | DATE ISSUED:_____ |
| Employer-Petitioner | ) | |
| | ) | |
| DIRECTOR, OFFICE OF WORKERS' | ) | |
| COMPENSATION PROGRAMS, UNITED | ) | |
| STATES DEPARTMENT OF LABOR | ) | |
| | ) | |
| Party-in-Interest | ) | DECISION and ORDER |

Appeal of the Decision and Order on Remand on Reconsideration of Daniel F. Solomon, Administrative Law Judge, United States Department of Labor.

Laura Metcoff Klaus (Greenberg Traurig LLP), Washington, D.C., for employer.

Jeffrey S. Goldberg (M. Patricia Smith, Solicitor of Labor; Rae Ellen James, Associate Solicitor; Michael J. Rutledge, Counsel for Administrative Litigation and Legal Advice), Washington, D.C., for the Director, Office of Workers' Compensation Programs, United States Department of Labor.

Before: HALL, Acting Chief Administrative Appeals Judge, SMITH and BOGGS, Administrative Appeals Judges.

HALL, Acting Chief Administrative Appeals Judge:

Employer appeals the Decision and Order on Remand on Reconsideration (2009-BLA-05255) of Administrative Law Judge Daniel F. Solomon rendered on a claim filed pursuant to the provisions of the Black Lung Benefits Act, as amended, 30 U.S.C. §§901-

Benefits Review Board
P.O. Box 37601
Washington, DC 20013-7601



BRB No. 13-0531 BLA

| | | |
|---|---|---|
| ARVIS R. TOLER | ) | **NOT PUBLISHED** |
| Claimant-Respondent | ) | |
| v. | ) | |
| EASTERN ASSOCIATED COAL CORPORATION | ) | DATE ISSUED: ___JUN 0 7 2014___ |
| Employer-Petitioner | ) | |
| DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR | ) | |
| Party-in-Interest | ) | DECISION and ORDER |

Appeal of the Decision and Order on Remand on Reconsideration of Daniel F. Solomon, Administrative Law Judge, United States Department of Labor.

Laura Metcoff Klaus (Greenberg Traurig LLP), Washington, D.C., for employer.

Jeffrey S. Goldberg (M. Patricia Smith, Solicitor of Labor; Rae Ellen James, Associate Solicitor; Michael J. Rutledge, Counsel for Administrative Litigation and Legal Advice), Washington, D.C., for the Director, Office of Workers' Compensation Programs, United States Department of Labor.

Before: HALL, Acting Chief Administrative Appeals Judge, SMITH and BOGGS, Administrative Appeals Judges.

HALL, Acting Chief Administrative Appeals Judge:

Employer appeals the Decision and Order on Remand on Reconsideration (2009-BLA-05255) of Administrative Law Judge Daniel F. Solomon rendered on a claim filed pursuant to the provisions of the Black Lung Benefits Act, as amended, 30 U.S.C. §§901-

944 (2012)(the Act). This case involves a miner's subsequent claim[1] filed on February 20, 2008, and is before the Board for the second time.[2]

In his initial decision, the administrative law judge accepted employer's stipulations to twenty-seven years of coal mine employment,[3] and that claimant is totally disabled by a respiratory or pulmonary impairment pursuant to 20 C.F.R. §718.204(b)(2). Applying amended Section 411(c)(4),[4] the administrative law judge found that claimant worked in underground coal mine employment for at least sixteen years. In view of the findings of more than fifteen years of qualifying coal mine employment, and total disability, the administrative law judge determined that claimant invoked the Section 411(c)(4) presumption of total disability due to pneumoconiosis. The administrative law judge further found that employer failed to rebut the presumption. Accordingly, the administrative law judge awarded benefits.

Upon review of employer's appeal, the Board vacated the administrative law judge's decision, and remanded the case so that the parties could submit evidence in response to the change in the law due to the reinstatement of Section 411(c)(4) after the hearing. *Toler v. E. Associated Coal Corp.*, BRB No. 10-0640 BLA, slip op. at 3-4 (July

---

[1] Claimant's prior claim, filed on February 4, 1993, was finally denied because claimant did not establish the existence of pneumoconiosis. *Toler v. E. Associated Coal Corp.*, BRB No. 96-1499 BLA (July 29, 1997)(unpub.), *aff'd*, No. 97-2148 (4th Cir. Aug. 19, 1998)(unpub.).

[2] The Board set forth the full procedural history of this case in its last decision. *Toler v. E. Associated Coal Corp.*, BRB No. 10-0640 BLA, slip op. at 2-3 (July 28, 2011)(unpub.).

[3] The record indicates that claimant's coal mine employment was in West Virginia. Director's Exhibits 5, 7. Accordingly, this case arises within the jurisdiction of the United States Court of Appeals for the Fourth Circuit. *See Shupe v. Director, OWCP*, 12 BLR 1-200, 1-202 (1989)(en banc).

[4] Congress enacted amendments to the Black Lung Benefits Act, which apply to claims filed after January 1, 2005, that were pending on or after March 23, 2010. Relevant to this case, Congress reinstated Section 411(c)(4) of the Act, which provides a rebuttable presumption that a miner is totally disabled due to pneumoconiosis in cases where fifteen or more years of qualifying coal mine employment and a totally disabling respiratory impairment are established. 30 U.S.C. §921(c)(4)(2012). The Department of Labor revised the regulations to implement the amendments to the Act. The revised regulations became effective on October 25, 2013, and are codified at 20 C.F.R. Parts 718, 725 (2014).

J.A. 12

28, 2011)(unpub.). In remanding the case for the administrative law judge to reopen the record, the Board rejected employer's argument that the administrative law judge had to "render pre-judgment rulings" before he could refer to the preamble to the 2001 regulatory revisions when weighing the medical opinion evidence. *Toler*, slip op. at 4 n.4. Additionally, the Board denied employer's request that the case be reassigned to a different administrative law judge on remand. *Toler*, slip op. at 4-5.

On remand, following the submission of additional evidence and briefs,[5] the administrative law judge again credited claimant with twenty-seven years of coal mine employment, of which at least sixteen years were spent in underground coal mine employment, and found that claimant is totally disabled by a respiratory or pulmonary impairment pursuant to 20 C.F.R. §718.204(b)(2). Rejecting employer's argument that principles of finality precluded the application of amended Section 411(c)(4) to claimant's subsequent claim, the administrative law judge found that claimant invoked the Section 411(c)(4) presumption of total disability due to pneumoconiosis, thereby establishing a change in the applicable condition of entitlement pursuant to 20 C.F.R. §725.309. The administrative law judge further found that employer did not rebut the presumption. Accordingly, the administrative law judge awarded benefits.

On appeal, employer argues that principles of res judicata and the separation of powers barred the administrative law judge from applying Section 411(c)(4) to claimant's subsequent claim. Further, employer contends that the administrative law judge erred in his analysis of the medical evidence in finding that employer failed to rebut the Section 411(c)(4) presumption. Finally, employer requests that the case be reassigned to a different administrative law judge on remand.[6] Claimant has not responded to this

---

[5] On remand, the administrative law judge reopened the record for sixty days for the submission of additional evidence. When no new evidence was submitted, he reinstated his original decision awarding benefits. Employer moved for reconsideration, noting that the order reopening the record was never served on employer's counsel. The administrative law judge granted reconsideration, and reopened the record for sixty days for the submission of evidence, with thirty days thereafter in which to submit briefs. Employer timely submitted a supplemental medical report from Dr. Rosenberg. After the time for submitting evidence expired, claimant submitted an additional medical report, which employer challenged as untimely, and which the administrative law judge excluded. Following the submission of briefs, the administrative law judge issued his Decision and Order on Remand on Reconsideration, which is the subject of this appeal.

[6] We affirm, as unchallenged on appeal, the administrative law judge's finding of twenty-seven years of coal mine employment, at least sixteen of which were in underground coal mine employment, and his finding that claimant is totally disabled by a

3

appeal. The Director, Office of Workers' Compensation Programs (the Director), has filed a limited response, urging the Board to reject employer's arguments that the application of Section 411(c)(4) to this subsequent claim violated principles of res judicata and the separation of powers.

The Board's scope of review is defined by statute. The administrative law judge's Decision and Order must be affirmed if it is rational, supported by substantial evidence, and in accordance with applicable law. 33 U.S.C. §921(b)(3), as incorporated by 30 U.S.C. §932(a); *O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc.*, 380 U.S. 359 (1965).

In order to establish entitlement to benefits in a miner's claim pursuant to 20 C.F.R. Part 718, claimant must establish that he suffers from pneumoconiosis, that the pneumoconiosis arose out of coal mine employment, and that the pneumoconiosis is totally disabling. 30 U.S.C. §901; 20 C.F.R. §§718.3, 718.202, 718.203, 718.204. Where a miner files a claim for benefits more than one year after the final denial of a previous claim, the subsequent claim must also be denied unless the administrative law judge finds that "one of the applicable conditions of entitlement . . . has changed since the date upon which the order denying the prior claim became final." 20 C.F.R. §725.309(c)(1);[7] *White v. New White Coal Co.*, 23 BLR 1-1, 1-3 (2004). The "applicable conditions of entitlement" are "those conditions upon which the prior denial was based." 20 C.F.R. §725.309(c)(3). Claimant's last claim was denied because he did not establish the existence of pneumoconiosis. Consequently, to obtain review of the merits of his current claim, claimant had to submit new evidence establishing the existence of pneumoconiosis. 20 C.F.R. §725.309(c)(3),(4).

### Application of Amended Section 411(c)(4)

Employer contends that, because claimant filed a prior claim and lost, and the United States Court of Appeals for the Fourth Circuit affirmed that decision, res judicata "preclude[s] the relitigation of that claim," via the application of amended Section 411(c)(4). Employer's Brief at 14. Employer's contention lacks merit. Claimant does not seek to relitigate or reopen his prior claim. He filed a subsequent claim, which is a new assertion of entitlement, based on new evidence. *Lisa Lee Mines v. Director, OWCP* [*Rutter*], 86 F.3d 1358, 1362, 20 BLR 2-227, 2-235 (4th Cir. 1996)(en banc)("A new

---

respiratory or pulmonary impairment pursuant to 20 C.F.R. §718.204(b)(2). *See Skrack v. Island Creek Coal Co.*, 6 BLR 1-710, 1-711 (1983).

[7] The Department of Labor revised the regulation at 20 C.F.R. §725.309, effective October 25, 2013. The applicable language formerly set forth at 20 C.F.R. §725.309(d) is now set forth at 20 C.F.R. §725.309(c).

black lung claim is not barred, as a matter of ordinary [res judicata,] by an earlier denial, because the claims are not the same. The health of a human being is not subject to once-in-a-lifetime adjudication."). The administrative law judge's adjudication of claimant's subsequent claim left the prior denial of benefits undisturbed. We therefore reject employer's argument that res judicata compels the denial of claimant's subsequent claim.

Employer argues further that applying amended Section 411(c)(4) to claimant's subsequent claim violates the constitutional separation of powers principle by retroactively nullifying the final decision of the Article III court that affirmed the denial of claimant's prior claim. Employer's Brief at 14-16, *citing Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995). However, as discussed supra, a subsequent claim is not the same cause of action as the original denied claim, and does not reopen the prior claim. *See Rutter*, 86 F.3d at 1362, 20 BLR at 2-235. Thus, unlike the legislation at issue in *Plaut*,[8] amended Section 411(c)(4) as applied to claimant's subsequent claim does not disturb the final judgment of a federal court. As the Director notes, the United States Court of Appeals for the Sixth Circuit recently rejected the identical separation of powers argument in a case involving the application of amended Section 422(*l*) of the Act, 30 U.S.C. §932(*l*), to a survivor's subsequent claim:

> Petitioner claims that the Board's retroactive application of the [statutory] amendments contravenes the general principle that "Congress cannot deprive final judicial judgments by Article III courts of their conclusive effect." As noted above however, the Board's decision to award benefits in response to [claimant's] subsequent claim did nothing to alter, undermine, disturb or overturn the . . . prior denial of her 2003 claim; nor does it challenge this Court's affirmance of that decision. Therefore, Petitioner's separation of powers argument . . . fails.

---

[8] In *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), the plaintiffs' original action for securities fraud under Section 10(b) of the Securities Exchange Act had been dismissed as time-barred, under the Supreme Court's construction of the statute of limitations in *Lampf v. Gilbertson*, 501 U.S. 350 (1991). No appeal was taken and the decision dismissing the action became final. *Plaut*, 514 U.S. at 214. Thereafter, Congress amended the Securities Exchange Act to return the statute of limitations to what it was on June 19, 1991, one day before the *Lampf* decision, and made the new limitations period applicable to suits that had already been dismissed as time-barred under *Lampf*, allowing plaintiffs, upon motion, to reinstate their dismissed claims. *Plaut*, 514 U.S. at 214-15. Upon review, the Supreme Court struck down the reinstatement provision as a violation of the separation of powers principle, because it "retroactively command[ed] the federal courts to reopen final judgments...." 514 U.S. at 219.

*Consolidation Coal Co. v. Maynes*, 739 F.3d 323, 328 (6th Cir. 2014). Therefore, we reject employer's argument that the administrative law judge's application of Section 411(c)(4) to claimant's subsequent claim violated the separation of powers principle.

## Invocation of the Section 411(c)(4) Presumption and Establishing a Change in an Applicable Condition of Entitlement

Employer argues that the administrative law judge erred by finding the existence of pneumoconiosis by presumption, thus relieving claimant of his burden to prove a change in the applicable condition of entitlement. Employer's Brief at 18. We disagree. Claimant's presumed total disability due to pneumoconiosis under Section 411(c)(4), based on invocation of the presumption, satisfies his initial burden to demonstrate a change in the applicable condition of entitlement at 20 C.F.R. §725.309. *Consolidation Coal Co. v. Director, OWCP [Bailey]*, 721 F.3d 789, 794 (7th Cir. 2013)(holding that the elements of entitlement may be established by the Section 411(c)(4) presumption for purposes of demonstrating a change in an applicable condition of entitlement). Therefore, we affirm the administrative law judge's finding that claimant invoked the Section 411(c)(4) presumption and established a change in the applicable condition of entitlement pursuant to 20 C.F.R. §725.309.

## Rebuttal of the Section 411(c)(4) Presumption

Because claimant invoked the presumption of total disability due to pneumoconiosis at Section 411(c)(4), the burden of proof shifted to employer to establish rebuttal by disproving the existence of both clinical and legal pneumoconiosis,[9] or by proving that claimant's pulmonary or respiratory impairment "did not arise out of, or in connection with," coal mine employment. 30 U.S.C. §921(c)(4); *see Barber v. Director, OWCP*, 43 F.3d 899, 900-01, 19 BLR 2-61, 2-65-66 (4th Cir. 1995); *Rose v. Clinchfield Coal Co.*, 614 F.2d 936, 939, 2 BLR 2-38, 2-43-44 (4th Cir. 1980). The administrative law judge found that employer failed to establish rebuttal by either method.

Employer asserts that the administrative law judge applied an improper rebuttal standard under Section 411(c)(4), by requiring employer to rule out coal mine dust exposure as a cause of claimant's disabling respiratory impairment. Employer's Brief at

---

[9] "Clinical pneumoconiosis" consists of "those diseases recognized by the medical community as pneumoconioses, *i.e.*, the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment." 20 C.F.R. §718.201(a)(1). "Legal pneumoconiosis" includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment. 20 C.F.R. §718.201(a)(2).

6

28. Contrary to employer's argument, the administrative law judge correctly explained that, because claimant invoked the Section 411(c)(4) presumption, the burden shifted to employer to establish rebuttal by disproving the existence of pneumoconiosis, or by proving that claimant's totally disabling respiratory or pulmonary impairment did not arise out of, or in connection with, coal mine employment. 30 U.S.C. §921(c)(4); Decision and Order on Remand at 13. Moreover, the Fourth Circuit has explicitly stated that in order to meet its rebuttal burden, employer must "effectively . . . rule out" any contribution to claimant's pulmonary impairment by coal mine dust exposure.[10] *Rose*, 614 F.2d at 939, 2 BLR at 2-43-44. Thus, we reject employer's argument that the administrative law judge applied an improper rebuttal standard.

In considering whether employer disproved the existence of legal pneumoconiosis, the administrative law judge considered the medical opinions of Drs. Renn and Rosenberg, who opined that claimant does not have pneumoconiosis, but suffers from disabling chronic obstructive pulmonary disease (COPD) that is due solely to smoking.[11] Employer's Exhibits 5-6, 12-13; Dr. Rosenberg's Supplemental Report, May 28, 2013 (Unstamped Exhibit). The administrative law judge found that the opinions of Drs. Renn and Rosenberg "as to the etiology of [c]laimant's impairment [were] not persuasive," because their reasoning for eliminating coal mine dust exposure as a source of claimant's COPD was at odds with the medical science accepted by the Department of Labor (DOL) in the preamble to the 2001 regulatory revisions. Decision and Order on Remand at 11. Therefore, the administrative law judge found that employer failed to disprove the existence of legal pneumoconiosis.

Employer argues that the administrative law judge substituted his judgment for that of the physicians in analyzing the opinions of Drs. Renn and Rosenberg. Employer's Brief at 19, 21-28. We disagree. The administrative law judge noted that Drs. Renn and Rosenberg eliminated coal mine dust exposure as a source of claimant's COPD, in part, because they found a significant reduction in claimant's FEV1/FVC ratio which, in their opinions, is characteristic of obstruction due to smoking, but not of lung disease caused by coal mine dust exposure. Employer's Exhibits 5-6, 12-13; Unstamped Exhibit at 3-4.

---

[10] Similarly, the implementing regulation that was promulgated after the administrative law judge's decision requires the party opposing entitlement in a miner's claim to establish "that no part of the miner's respiratory or pulmonary total disability was caused by pneumoconiosis as defined in [20 C.F.R.] §718.201." 20 C.F.R. §718.305(d)(1)(ii).

[11] The administrative law judge also considered the medical opinion of Dr. Burrell, who diagnosed claimant with chronic obstructive pulmonary disease due to both cigarette smoking and coal mine dust exposure. Director's Exhibits 13, 14.

J.A. 17

The administrative law judge permissibly found that the reasoning Drs. Renn and Rosenberg used to eliminate coal mine dust exposure as a source of claimant's COPD was inconsistent with the medical science accepted by DOL, recognizing that coal mine dust exposure can cause clinically significant obstructive disease, which can be shown by a reduction in the FEV1/FVC ratio. *See Westmoreland Coal Co. v. Cochran*, 718 F.3d 319, 323 (4th Cir. 2013) (Traxler, C.J., dissenting); *Harman Mining Co. v. Director, OWCP [Looney]*, 678 F.3d 305, 314-15, 25 BLR 2-115, 2-130 (4th Cir. 2012); 65 Fed. Reg. 79,920, 79,943 (Dec. 20, 2000).

Employer contends that the administrative law judge ignored the fact that Dr. Rosenberg cited medical studies published after the preamble, to support his opinion "regarding the significance of the FEV1% and the impact of cigarette smoking on the cause of emphysema based on particle size and particle content." Employer's Brief at 24. Contrary to employer's contention, Dr. Rosenberg's reliance on more recent medical studies did not require the administrative law judge to conclude that advances in science have negated the medical literature addressing the effects of coal mine dust exposure on the lungs, that was endorsed by the DOL in the preamble. *See Cochran*, 718 F.3d at 324 (observing that neither of employer's medical experts "testified as to scientific innovations that archaized or invalidated the science underlying the Preamble").

Moreover, the administrative law judge found that, even if he accepted Dr. Rosenberg's view that a more recently published study showed that an earlier study cited by DOL had underestimated the effects of cigarette smoking on lung function, Dr. Rosenberg did not adequately explain why claimant's years of coal mine dust exposure did not also contribute to, or aggravate, his COPD, along with smoking. Decision and Order on Remand at 10. The administrative law judge acted within his discretion in evaluating the credibility of Dr. Rosenberg's opinion. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 536, 21 BLR 2-323, 2-341 (4th Cir. 1998); *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 440-41, 21 BLR 2-269, 2-275-76 (4th Cir. 1997). The Board is not empowered to reweigh the evidence. *Anderson v. Valley Camp of Utah, Inc.*, 12 BLR 1-111, 1-113 (1989). We therefore affirm the administrative law judge's finding that employer failed to disprove the existence of legal pneumoconiosis. The failure to disprove legal pneumoconiosis precludes a rebuttal finding that claimant does not have pneumoconiosis.[12] *See Barber*, 43 F.3d at 901, 19 BLR at 2-67; *Rose*, 614 F.2d at 939, 2 BLR at 2-43-44. Accordingly, we affirm the administrative law judge's determination

---

[12] Consequently, we need not address employer's arguments regarding the administrative law judge's finding that employer also failed to disprove the existence of clinical pneumoconiosis. Employer's Brief at 19-21; *see Larioni v. Director, OWCP*, 6 BLR 1-1276, 1-1278 (1984).

J.A. 18

that employer did not rebut the Section 411(c)(4) presumption by disproving the existence of pneumoconiosis.

The administrative law judge next addressed whether employer established that claimant's disabling pulmonary or respiratory impairment "did not arise out of, or in connection with," coal mine employment, pursuant to 30 U.S.C. §921(c)(4). The administrative law judge found that Dr. Rosenberg's disability causation opinion was "flawed" for the same reasons the administrative law judge gave for discounting the physician's opinion as to the existence of legal pneumoconiosis. Decision and Order on Remand at 11. Additionally, the administrative law judge discounted the opinions of Drs. Renn and Rosenberg, because "they both failed to diagnose [c]laimant with pneumoconiosis[,] contrary to [his] findings." *Id.*

Employer argues that the administrative law judge erred in finding that it did not rule out a relationship between claimant's disability and his coal mine employment. Employer's Brief at 28. Contrary to employer's contention, the administrative law judge permissibly discounted the disability causation opinions of Drs. Renn and Rosenberg, because the physicians did not diagnose claimant with legal pneumoconiosis, contrary to the administrative law judge's finding that employer failed to disprove legal pneumoconiosis. *See Toler v. E. Assoc. Coal Corp.*, 43 F.3d 109, 116, 19 BLR 2-70, 2-83 (4th Cir. 1995); *see also Island Creek Ky. Mining v. Ramage*, 737 F.3d 1050, 1062 (6th Cir. 2013); *Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013). Therefore, we affirm the administrative law judge's finding that employer failed to rebut the Section 411(c)(4) presumption by establishing that claimant's disabling impairment did not arise out of, or in connection with, coal mine employment. *See Rose*, 614 F.2d at 939, 2 BLR at 2-43.

Claimant invoked the Section 411(c)(4) presumption that he is totally disabled due to pneumoconiosis, and employer did not rebut the presumption. Therefore, we affirm the award of benefits. 30 U.S.C. §921(c)(4). Employer's request to reassign the case is, therefore, moot. Employer's Brief at 30.

J.A. 19

Accordingly, the administrative law judge's Decision and Order on Remand on Reconsideration is affirmed.

SO ORDERED.


_Betty Jean Hall_
BETTY JEAN HALL, Acting Chief
Administrative Appeals Judge


I concur:

_Roy P. Smith_
ROY P. SMITH
Administrative Appeals Judge


BOGGS, Administrative Appeals Judge, concurring:

I agree with my colleagues that neither res judicata nor the separation of powers principle bars the application of amended Section 411(c)(4) to claimant's subsequent claim. Further, I concur in the result on the basis that the administrative law judge permissibly determined that employer had not rebutted the Section 411(c)(4) presumption because he found that employer's physicians, Drs. Renn and Rosenberg, did not adequately address whether coal mine dust exposure aggravated claimant's COPD. *See* 20 C.F.R. §718.201(a)(2); *Mingo Logan Coal Co. v. Owens*, 724 F.3d 550, 558 (4th Cir. 2013)(Niemeyer, J., concurring). Thus, regardless of the rebuttal standard, the administrative law judge permissibly found that the opinions of employer's physicians as to the etiology of claimant's COPD were not credible. *Id.* Consequently, I concur in the result.


_Judith S. Boggs_
JUDITH S. BOGGS
Administrative Appeals Judge

**U.S. Department of Labor**

Office of Administrative Law Judges
800 K Street, NW, Suite 400-N
Washington, DC 20001-8002

(202) 693-7300
(202) 693-7365 (FAX)



**Issue Date: 01 August 2013**

In the matter of
**ARVIS R. TOLER,**
      **Claimant**

v.
                                **CASE NO.: 2009-BLA-05255**

**EASTERN ASSOCIATED COAL CORP.**
      **Employer**

    **and**

**DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS**
      **Party In Interest**

Appearances:      Sandy Webber
                 For the Claimant
           Laura Metcoff Klaus, Esquire and William Prochot, Esquire
                 For the Employer
           Matthew Sheppard, Esquire
                 For the Director

Before:        DANIEL F. SOLOMON
                Administrative Law Judge

# DECISION AND ORDER ON REMAND
### *ON RECONSIDERATION*

     This proceeding arises from a claim for benefits under the Black Lung Benefits Act ("the Act"), 30 U.S.C. § 901, *et. seq.* After a hearing was held in this case, Section 1556 of Public Law No. 111-148 amended the Act with respect to the entitlement criteria for certain claims that were filed after January 1, 2005, and were pending on or after March 23, 2010, the effective date of the amendments. Section 1556 reinstated the presumption at Section 411(c)(4) of the Act, 30 U.S.C. §921(c)(4). Under Section 411(c)(4), if a claimant establishes at least fifteen years of qualifying coal mine employment, and that he has a totally disabling respiratory impairment, there is a rebuttable presumption that he is totally disabled due to pneumoconiosis. 30 U.S.C. §921(c)(4).

On June 15, 2010 I issued a Decision and Order awarding benefits to the miner, arguably without ruling on Employer's motion to the extend the deadline I set for filing briefs to address the impact of the amendments.[1] The Benefits Review Board ("BRB"), on July 28, 2011, issued a Decision and Order vacating my decision. The BRB held that I appropriately considered this claim under the amended version of Section 411(c)(4) of the Act, but remanded the case back to me with instructions to allow for the submission of evidence by the parties to address the change in law.

On March 9, 2012 I entered an Order on Remand leaving the record open to May 7, 2012 to receive additional evidence as directed by the BRB and setting a deadline for briefs at June 7, 2012 and June 19, 2012 for reply briefs.[2] On August 30, 2012 I issued a Decision and Order on Remand. I noted that Employer did not file any additional evidence or a brief, and again awarded benefits to the miner.

Employer filed a Motion for Reconsideration to Vacate Decision and to Recuse, and on April 5, 2013 I issued an Order on Reconsideration. In the Order I noted that counsel for Employer was not included in the Service Sheet on my Order to Brief from March 2012. I entered that Employer's counsel be included on the service sheet, that the record would remain open to June 7, 2013 to receive additional evidence as directed by the BRB (with each party limited to one additional report), and that evidence summaries and briefs would be filed by July 8, 2013, with July 18, 2012 for reply briefs.

On June 7, 2013 Employer submitted a medical report by Dr. Rosenberg dated May 28, 2013. On June 18, 2013 Claimant filed new evidence. I entered an Order on July 8, 2013 granting Employer's motion to strike Claimant's new evidence, which was filed after the June 7, 2013 deadline set in the Order on Reconsideration. I also set the deadline for briefs as July 18, 2013 and reply briefs as July 30, 2013. Claimant submitted his Response to Order on Reconsideration and Employer submitted its Brief on Remand on July 18, 2013.

## DISCUSSION AND ANALYSIS

Because the claim was filed after April 1, 1980, it is governed by the regulations at 20 C.F.R. Part 718. Under these regulations, the claimant bears the burden of demonstrating each of the following elements by a preponderance of the evidence: (1) the miner suffers from pneumoconiosis; (2) the pneumoconiosis arose from coal mine employment; (3) the miner has a totally disabling respiratory impairment; and (4) the impairment is caused by pneumoconiosis. 20 C.F.R. §§ 718.202-718.204; *Baumgartner v. Director, OWCP*, 9 B.L.R. 1-65 (1986) (en banc); *Gee v. W.G. Moore & Sons*, 9 B.L.R. 1-4 (1986) (en banc). Each of these elements must be established in order for the claimant to be entitled to benefits under the Act.[3]

---

[1] The record shows that I ordered that the parties had until May 31, 2010. The decision is dated June 15, 2010.
[2] Although Laura Metcoff Klaus, Esquire was noted on the caption page of the briefing schedule, she apparently was not served. I would expect that as she was noted, the other parties should have sent copies of their briefs to her.
[3] In my Decision and Order I found that Claimant was last employed in coal mine work in the state of Tennessee and that the law of the United States Court of Appeals for the Sixth Circuit controls. *See* Decision and Order, DX 1; Transcript, TR, at 40; *Shupe v. Director, OWCP*, 12 BLR 1-200, 1-202 (1989)(en banc). However, after a review, I now find that the Fourth Circuit case law applies. Since Claimant filed this application for benefits after January 1, 1982, Part 718 applies.

J.A. 22

## Applicability of PPACA

In my Decision and Order awarding benefits, I found that Claimant has established the applicability of the rebuttable presumption that he is totally disabled due to pneumoconiosis. According to 20 C.F.R. § 718.305, if a miner was employed for fifteen years or more in underground coal mines, and if there is a chest X-ray submitted in connection with the claim and it is interpreted as negative with respect to the requirements of §718.304, and if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that the miner is totally disabled due to pneumoconiosis. In my Decision and Order I accepted Employer's stipulations that Claimant worked at least 27 years in coal mine employment, at least 16 underground, Eastern Associated Coal Corporation is the responsible operator, and that Claimant is totally disabled due to pneumoconiosis. The parties do not object to this finding.

Employer requests, in its Brief on Remand, that I reconsider my decision to apply the 15-year presumption in this case. Employer argues that because Claimant filed a prior claim and lost, ordinary principles of finality preclude the relitigation of the claim and principles of separation of powers preclude application of the ACA in these circumstances. Employer advises me that Claimant's prior claim was denied because he failed to establish that he had pneumoconiosis, this record contains no medical support for the view that Claimant had a disease that was latent or progressive, there is no presumption that pneumoconiosis is progressive or latent, and Claimant relied on the medical opinion that was submitted and rejected by the ALJ, the BRB and the Fourth Circuit in the prior case.

I reject Employer's argument that principles of finality preclude Claimant's subsequent claim. 20 C.F.R. § 725.309 provides that a miner can file a subsequent claim for benefits after a prior denial. It is true that evidence admitted in the subsequent claim must demonstrate an element of entitlement adjudicated against the miner in the prior claim, and that only medical data generated *after* denial of the prior claim may be considered in meeting this threshold standard. 20 C.F.R. § 725.309; *see also Cline v. Westmoreland Coal Co.*, 21 B.L.R. 1-69 (1997) (it was proper for the Administrative Law Judge to refuse to consider evidence "in existence at the time the (prior) claim was denied on grounds that such evidence 'is not applicable in determining whether there has been a change in condition since the denial'"). However, the 15-year presumption can be used to show a change in condition. In *Consolidation Coal Co. v. Director, OWCP [Bailey]*, ___ F.3d ___, Case No. 11-3637 (7th Cir. June 27, 2013), the circuit court upheld an award of benefits based on application of the 15-year presumption in a subsequent miner's claim filed after enactment of the Patient Protection and Affordable Care Act (PPACA), Pub. L. No. 111-148 § 1556 (2010), where the miner's two pre-PPACA claims were denied. The court stated:

> A subsequent claim inquiry must show that 'one of the applicable conditions of entitlement' as set out in 20 C.F.R. § 725.309(d). Section 725.202(d) lists the elements of a claim, including that the claimant has pneumoconiosis as set out in § 717.202, and that this pneumoconiosis contributes to the claimant's total

J.A. 23

disability, as set out in § 718.204. These sections set out the elements of entitlement and incorporate regulatory definitions of those elements.

There is nothing in any of these sections that precludes the use of the 15-year presumption to show a change in condition. Indeed, these sections specifically mention that the elements of pneumoconiosis and disability causation, respectively, can be established by the 15-year presumption.

*Slip op.* at pp. 7-8. Indeed, the BRB held that I "appropriately considered this claim under the amended version of Section 411(c)(4) of the Act, based on [my] finding that employer stipulated, and the record established, that claimant had at least fifteen years of qualifying coal mine employment and suffered a totally disabling respiratory impairment."

I also note that in ***Workman v. Eastern Associated Coal Corp.***, 23 B.L.R. 1-22, BRB No. 02-0727 BLA (Aug. 19, 2004) (order on recon) (en banc), the BRB ruled that because the potential for progressivity and latency is inherent in every case, a miner who proves the presence of pneumoconiosis that was not manifest at the cessation of his coal mine employment, or who proves that his pneumoconiosis is currently disabling when it was previously not, has demonstrated that the disease from which he suffers is of a progressive nature. In amending § 718.201, the DOL concluded that chronic dust diseases of the lung and its sequelae arising out of coal mine employment "may be latent and progressive, albeit in a minority of cases." *See* 64 Fed. Reg. 54978-79 (Oct. 8, 1999); 65 Fed. Reg. 79937-44, 79968-72 (Dec. 20, 2000); 68 Fed. Reg. 69930-31 (Dec. 15, 2003).

Once the presumption is invoked, the burden shifts to the party opposing entitlement to demonstrate by a preponderance of the evidence either: (1) the miner's disability does not, or did not, arise out of coal mine employment; or (2) the miner does not, or did not, suffer from pneumoconiosis. If the party opposing entitlement meets this burden, then the presumptions are rebutted and Claimant is not entitled to benefits under 20 C.F.R. § 718.305. On the other hand, if the burden is not met, then Claimant is awarded benefits. The BRB holds that standards for rebuttal under 20 C.F.R. § 718.305(d) are similar to the rebuttal standards at 20 C.F.R. § 727.203(b). ***DeFore v. Alabama By-Products Corp.***, 12 B.L.R. 1-27 (1988). To rebut the presumption by proving that the miner's totally disabling impairment is unrelated to the miner's coal mine employment, the party opposing entitlement must rule out any connection between the miner's impairment and his coal mine employment. ***Rose v. Clinchfield Coal Co.***, 614 F.2d 936, 939 (4th Cir. 1980); ***DeFore, supra.*** The party opposing entitlement need not establish the precise etiology of the totally disabling impairment, however.

<u>Existence of Pneumoconiosis</u>

Under the amended regulations, "pneumoconiosis" is defined to include both clinical and legal pneumoconiosis:

(a) For the purpose of the Act, "pneumoconiosis" means "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments,

- 4 -

arising out of coal mine employment.' This definition includes both medical, or "clinical", pneumoconiosis and statutory, or "legal", pneumoconiosis.

> (1) Clinical Pneumoconiosis. "Clinical pneumoconiosis" consists of those diseases recognized by the medical community as pneumoconioses, *i.e.*, the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment. The definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, silicosis or silicotuberculosis, arising out of coal mine employment.

> (2) Legal Pneumoconiosis. "Legal pneumoconiosis" includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment. This definition includes, but is not limited to, any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment.

> (b) For purposes of this section, a disease "arising out of coal mine employment" includes any chronic pulmonary disease or respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment.

> (c) For purposes of this definition, "pneumoconiosis" is recognized as a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure.

20 C.F.R. § 718.201. The existence of pneumoconiosis may be established by any one or more of the following methods: (1) chest x-rays; (2) autopsy or biopsy; (3) by operation of presumption; or (4) by a physician exercising sound medical judgment based on objective medical evidence. 20 C.F.R. § 718.202(a). The Administrative Law Judge must weigh all evidence together under 20 C.F.R. 718.202(a) to determine whether the miner suffers from pneumoconiosis. *Island Creek Coal Co. v. Compton*, 211 F.3d 203 (4th Cir. 2000).

First, X-ray evidence can establish the presence of pneumoconiosis. The Board has held that an administrative law judge is not required to defer to the numerical superiority of x-ray evidence, *Wilt v. Wolverine Mining Co.*, 14 B.L.R. 1-70 (1990), although it is within my discretion to do so, *Edmiston v. F & R Coal Co.*, 14 B.L.R. 1-65 (1990). Moreover, when two or more X-ray reports are in conflict, "consideration shall be given to the radiological qualifications of the physicians interpreting such X-rays." 20 C.F.R. § 718.202(a)(1). Thus, it is proper to accord greater weight to the interpretation by a dually-qualified B-reader and Board-certified radiologist than to the interpretation by a B-reader. *Roberts v. Bethlehem Mines Corp.*, 8 B.L.R. 1-211 (1985); *Sheckler v. Clinchfield Coal Co.*, 7 B.L.R. 1-128 (1984).

J.A. 25

There are two interpretations of an X-ray dated 4/02/2008. Dr. Ahmed interpreted the X-ray as positive for pneumoconiosis (s/t, 1/0) while Dr. Scott interpreted it as negative for pneumoconiosis. DX 14; EX 2. Both are dually qualified. Claimant submitted two positive interpretations of an X-ray dated 7/14/2008, by Drs. Miller (1/1, t/s) and Alexander (1/1, s/t). Employer submitted two interpretations of the same X-ray, by Drs. Scott and Wheeler. Dr. Wheeler specified that there are no parenchymal or pleural abnormalities consistent with pneumoconiosis, but also noted that there was a "probable half round mass on right side t11 (2cm high and 1.5 cm wide) and ill defined asymmetrical density in lower left apex which could be artifact, mass or infiltrate." He recommended "get CT scan to excluded mass or infiltrate," which indicates that his X-ray interpretation is equivocal and provisional. *See* EX 3. Dr. Scott interpreted the X-ray as negative for pneumoconiosis. EX 4. Each of the physicians interpreting this X-ray is dually qualified. In sum, the interpretations of the X-ray dated 4/02/2008 are at equipoise. The interpretations of the X-ray dated 7/14/2008 weigh in favor of a finding of clinical pneumoconiosis because two dually qualified physicians interpreted it as positive, one dually qualified physician interpreted it as negative, and one physician offered an equivocal and provisional interpretation. Therefore, Employer has failed to establish, by a preponderance of the X-ray evidence, that Claimant does not have clinical pneumoconiosis.[4]

In this case, there is no biopsy or autopsy evidence available and there is no evidence that Claimant has complicated pneumoconiosis.

The presence of pneumoconiosis may be demonstrated through use of "other evidence," as set forth at 20 C.F.R. § 718.107. Evidence submitted under § 718.107 includes, but is not limited to, CT-scans and digital x-rays. A party proffering evidence under this regulatory provision must also satisfy the requirements of 20 C.F.R. § 718.107(b) and present medical evidence "that the test or procedure is medically acceptable and relevant to establishing or refuting a claimant's entitlement to benefits. 20 C.F.R. § 718.107. "[O]ther evidence" is weighed under 20 C.F.R. § 718.202(a)(4) along with medical reports and treatment and hospitalization records. *Webber v. Peabody Coal Co.*, 23 B.L.R. 1-123 (2006)(en banc) (J. Boggs, concurring). Employer submitted a negative interpretation by Dr. Scott of an X-ray dated 12/11/2009. EX 1. However, this report, which is not on an ILO form, appears to be an interpretation of a digital X-ray as it is titled "Chest PA/Laterl (On CD-ROM)." *Id.* As such, this interpretation must be weighed with "other evidence," not with the chest X-rays. Employer also submitted several CT-scans interpreted as negative for pneumoconiosis by Drs. Scott and Wheeler. *See* EX 7-11. Dr. Scott provided, along with his interpretation, a discussion of the medical acceptability "for localization and detection of lung disease including patterns compatible with black lung and other pneumoconioses." *See* EX 7. Along with indicating that there is no presence of clinical pneumoconiosis, the CT scans document Claimant's emphysema..

Pneumoconiosis may be demonstrated by a documented and reasoned medical opinion under 20 C.F.R. § 718.202(a)(4). A "documented" opinion sets forth the clinical findings,

---

[4] Employer in its brief on remand, mentioned X-rays submitted in Claimant's prior claim. As a general rule, more weight is given to the most recent evidence because pneumoconiosis is a progressive and irreversible disease. *Stanford v. Dir., OWCP*, 7 B.L.R. 1-541 (1984); *Tokarcik v. Consolidated Coal Co.*, 6 B.L.R. 1-166 (1983); *Call v. Dir., OWCP*, 2 B.L.R. 1-146 (1979). For that reason, I will discuss only the evidence that was submitted after Claimant's most recent claim for benefits.

observations, facts and other data on which the physician based the diagnosis. *Fields v. Island Creek Coal Co.*, 10 B.L.R. 1-19 (1987). An opinion may be considered adequately documented if it is based on items such as a physical examination, symptoms, and the patient's history. *See Hoffman v. B&G Construction Co.*, 8 B.L.R. 1-65 (1985); *Hess v. Clinchfield Coal Co.*, 7 B.L.R. 1-295 (1984). A "reasoned" opinion is one in which the Administrative Law Judge finds the underlying documentation adequate to support the physician's conclusions. *Fields, supra.* Indeed, whether a medical report is sufficiently documented and reasoned is for the Administrative Law Judge as the finder-of-fact to decide. *Clark v. Karst-Robbins Coal Co.*, 12 B.L.R. 1-149 (1989) (en banc).

The medical opinions submitted in this claim address both clinical and legal pneumoconiosis. Employer argues, in its Brief on Remand, that the presumption is rebutted in this case because the medical opinions demonstrate that Claimant's "respiratory condition results from his decades-long smoking habit, not coal workers pneumoconiosis." Employer's Brief at 16.

In my decision and order awarding benefits, I determined that Employer failed to rebut the presumption. Specifically, I found that the medical opinions of Drs. Rosenberg and Renn, which were submitted by Employer, were flawed, and that Employer did not provide direct evidence that coal mine employment can be ruled out as a cause of the total disability. Neither Employer expert accounted for the stipulated 27 year history of coal mine employment in rendering a diagnosis.

Dr. Rosenberg opined that Claimant's totally disabling respiratory or pulmonary impairment is related to his smoking history, not his coal mine dust exposure. Dr. Renn also opined that Claimant's impairment did not arise from his coal mine employment. I found that Dr. Rosenberg's opinion was flawed because the papers he cited did not address the new regulations which amended the definition of pneumoconiosis to include legal pneumoconiosis and he misinterpreted a study by Attfield and Houdous. Dr. Renn's opinion was flawed because his predicate as to industrial bronchitis has been disputed, he did not consider that pneumoconiosis is latent and can aggravate another condition, he relied on reversibility even though bronchodilators did not completely reverse the condition, and he also misinterpreted the findings of Attfield and Houdous. I also found that, "[m]ore importantly . . . neither Dr. Rosenberg nor Dr. Renn fully considered the 27 year history of coal mine employment in rendering a diagnosis."

Dr. Burrell, in his medical exam for OWCP, opined that Claimant has clinical pneumoconiosis (based on a chest X-ray category s/t, 1/0) and legal pneumoconiosis (chronic obstructive pulmonary disease. DX 14. He attributed both to Claimant's "28 years exposure to environmental hazardous dust in coal mining employment and 30 years history of tobacco use." *Id.* In my Decision and Order awarding benefits, I noted that Dr. Burrell attributed Claimant's impairment to both smoking tobacco and coal mine dust exposure.

The BRB has directed me to allow for the submission of evidence by the parties to address the change in law. The only new evidence in the record is a medical report by Dr. Rosenberg dated May 28, 2013.

J.A. 27

In preparing his supplemental report, Dr. Rosenberg reviewed x-rays by Drs. Wheeler and Scott from 2008, pulmonary function studies from 1991-2009, arterial blood gas studies from 2008 and 2009, Dr. Renn's report and deposition, and my June 15, 2010 Decision and Order. In his summation, he noted a smoking history of at least a pack of cigarettes a day for 37 years, coal mine employment for 28 years (16 years underground), shortness of breath with cough and sputum production, pulmonary function studies show "severe airflow obstruction with a markedly decreased FEV1, as well as FEV1/FVC ratio and "severely reduced diffusing capacity measurements," and "Radiographically, he does not have micronodulairty, with hyperinflation being noted." He opined that Claimant does not have clinical pneumoconiosis because "clearly Mr. Toler does not have micronodularity related to past coal mine dust exposure." Claimant does not have a restrictive impairment, either, because his total lung capacity measurements were normal. Claimant does have chronic obstructive pulmonary disease, and it is totally disabling. However, this disease is entirely related to Claimant's cigarette smoking.

Dr. Rosenberg asserted that he is able to distinguish between the effects of coal dust and cigarette smoking by looking at the FEV1/FVC ratio. He explained that studies relied on by the DOL establish that while FEV1 decreases in relation to coal mine dust exposure, the FEV1/FVC ratio is generally preserved. Other studies show that with smoking-related forms of COPD, the FEV1/FVC ratio is generally reduced. This explanation, he argues, shows that his opinion does not conflict with the notion that coal dust can cause disabling obstruction. Here, Claimant's PFTs show a "Severe decline" in his FEV1/FVC ratio, which indicates that his obstruction is entirely related to cigarette smoking.

He stated that his conclusion is not undermined by the Attfield and Houdos study, and he does not dispute that Attfield and Houdos found that coal dust can cause decrements in lung function. Attfield and Houdous, however, do not say that a doctor is precluded from distinguishing between the effects of cigarette smoking and coal dust exposure. Moreover, they do not establish that coal dust and cigarette smoking cause equal decrements in function. According to Dr. Rosenberg, Attfield and Houdos's study shows that cigarette smoking causes 100% greater decrease in airflow in relationship to coal dust exposure occurring after 1969. Thus, another indicator that Claimant's impairment is due entirely to smoking is that most of Claimant's coal dust exposure occurred after 1969.

Dr. Rosenberg also laid out several flaws in the Attfield and Houdos study. First, he argued that a recent study by Kohansal published after the preamble indicates that they seriously underestimated the effects of cigarette smoking on lung function; "Cigarette smoking is thus typically much more destructive [than coal mine dust exposure], demonstrating larger decrements than Attfield initially believed." Kohansal's study, he argues, is based on a superior methodology and is more consistent with other medical literature establishing that cigarette smoking causes greater decrement in lung function than coal dust exposure. Dr. Rosenberg also explains that the Attfield and Houdos study is internally inconsistent in that Attfield and Houdos' data does not support the conclusion that coal dust exposure and cigarette smoking are associated with equally additive effects on impairment.

J.A. 28

Dr. Rosenberg also explained how he can distinguish the effects of cigarette smoking and coal dust exposure on emphysema, specifically. Typically, emphysema related to cigarette smoking is more diffuse than emphysema related to coal dust. Because the components contained with coal dust and cigarette smoke are vastly different, the disruption and alteration of tissue structures by these two agents within the lung would be "quite disparate," cigarette smoke penetrates more deeply into alveolar structures than coal dust, and "the diffuse emphysematous process that characterizes that related to cigarette smoking is supported by an associated diffusing capacity (DLCO) reduction" while with coal mine dust exposure generally the diffusing capacity is preserved. Here, Claimant had a "severely reduced diffusing capacity measurement, which indicates widespread destruction of the alveolar capillary bed." Thus, Claimant's impairment, showing presence of diffuse emphysematous process, is "uncharacteristic of legal CWP" and "is classic for a smoking related form of obstruction." Additionally, the degree of air trapping is minimally increased with coal miners, while this "is not the degree found in" Claimant.

Finally, Dr. Rosenberg argued that Claimant does not have industrial bronchitis as no doctor has diagnosed him with it, and "even if he had that condition in 1993 when he left mining, it would have resolved shortly after removal from the irritant." He added that "the effects of damage done by Claimant's cigarette smoking habit seem to get worse with time because as he ages, he loses residual lung capacity and thus is feeling the effects of prior damage as he ages."

He concluded that he has "fully considered Mr. Toler's 27 years in reaching my conclusions, but there is simply nothing in the test results or applicable medical literature, whether from the preamble or more recent studies, that provide any basis for attributing any of Mr. Toler's problems to coal dust."

After reviewing Dr. Rosenberg's supplemental report, I again find that his opinion is not persuasive. First, Dr. Rosenberg erred in relying on Claimant's reduction in FEV1/FVC ratio to find that Claimant's obstructive impairment was caused by smoking, not coal dust exposure. In the preamble to the amended regulations, the DOL stated:

> Epidemiological studies have shown that coal miners have an increased risk of developing COPD. COPD may be detected from decrements in certain measures of lung function, especially FEV1 and the ratio of FEV1/FVC. Decrements in lung function associated with exposure to coal mine dust are severe enough to be disabling . . . whether or not pneumoconiosis is also present.

65 Fed. Reg. 79,943 (Dec. 20, 2000). [5]

---

[5] Although not precedent, I note that the BRB in *Miller v. McCoy Caney Coal Co.*, BRB No. 12-0391 BLA (Mar. 28, 2013) (unpub.) held that an Administrative Law Judge correctly determined that Dr. Rosenberg's premise that coal dust exposure causes only a minimal decrease in FEV1/FVC ratio is flawed in that it contradicts legislative fact, as found by the DOL. *See also Alvis Smith v. Kentland Elkhorn Coal*, BRB No. 09-0862 BLA (October 28, 2010). Likewise, Dr. Renn determined the FEV1/FVC ratio was too low to be associated with anything other than tobacco smoking. —His FEV1/FVC ratio was 47 percent in 1991 and then it was in the low 40 percent range in 2008 and 2009. His opinion is similarly flawed.

J.A. 29

Dr. Rosenberg's assertion that Claimant's reduced diffusing capacity establishes that his emphysema is unrelated to coal dust exposure and is related entirely to smoking is also inconsistent with the DOL's findings in the preamble to its amended regulations.[6] According to the DOL, medical literature supports a finding that:

> . . . dust-induced emphysema and smoke-induced emphysema occur through similar mechanisms—namely, the excess release of destructive enzymes from dust- (or smoke-) stimulated inflammatory cells in association with a decrease in protective enzymes in the lung.

65 Fed. Reg. 79,943 (Dec. 20, 2000). The DOL also noted:

> Centrilobular emphysema . . . was significantly more common among the coal workers. The severity of the emphysema was related to the amount of dust in the lungs. These findings held even after controlling for age and smoking habits.

65 Fed. Reg. 79,941 (Dec. 20, 2000).

Dr. Rosenberg criticized the Attfield and Houdos study for underestimating the effects of cigarette smoking on lung function, and he stated that, based on study he did not attach to his medical opinion, "Cigarette smoking is . . . typically much more destructive [than coal mine dust exposure]." However, even if cigarette smoking played a role in Claimant's obstructive impairment, Dr. Rosenberg still fails to adequately explain why Claimant's impairment could not have been aggravated by his coal dust exposure. Although he references the Kohansal study, I was not furnished a copy of that document. I am not advised whether the study considered the effects from multiple exposures, including mining. There is no discussion whether the Kohansal study addresses legal pneumoconiosis.[7] Therefore, this logic is not persuasive. I am persuaded that the logic establishes a false dichotomy among smoking and mining.

Employer objects to my reference to the preamble to the amended regulations. However, in *J.O. [Obush] v. Helen Mining Co.*, 24 B.L.R. 1-117, 1-125 to 1-126 (2009), the BRB held that a determination of whether a medical opinion is supported by accepted scientific evidence, as determined by the DOL in the preamble to the amended regulations, is a valid criterion in deciding whether to credit the opinion. The Third Circuit affirmed the BRB's holding on appeal. *Helen Mining Co. v. Director, OWCP [Obush]*, 650 F.3d 248 (3rd Cir. 2011) ("[t]he ALJ's reference to the preamble to the regulations, . . . unquestionably supports the reasonableness of his decision to assign less weight to (one expert's) opinion"). As discussed above, I determined that Dr. Rosenberg's medical opinion is not supported by accepted scientific evidence, as determined by the DOL in the preamble to the amended regulations.

In sum, the preponderance of the X-ray evidence favors a finding of clinical pneumoconiosis while the "other evidence" (CT scans and digital X-ray) weighs against such a finding. Thus, this evidence is inconclusive as to clinical pneumoconiosis. In addition, for the

---

[6] *See Miller, supra.*

[7] If the Kohansal study shows that cigarette smoking contributes more to a loss of FEV1 than coal dust, even if true, it would not "rule out" pneumoconiosis.

J.A. 30

reasons set forth above, the opinions of Drs. Rosenberg (including his supplemental report) and Renn as to the etiology of Claimant's impairment are not persuasive. Dr. Burrell's determination that the exposure by coal mine employment and by smoking tobacco led to Claimant's impairment is as logical because, as stated above, Dr. Rosenberg's opinion does not account for the stipulated 27 years of mining exposure. Therefore, Employer has not provided a reasoned opinion that pneumoconiosis is ruled out.

<u>Cause of Totally Disabling Respiratory or Pulmonary Impairment</u>

The second way Employer can rebut the presumption is to show that Claimant's respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine. To rebut the presumption under the second method, the party opposing entitlement must "rule out" any connection between the miner's impairment and his coal mine employment. *See generally **D.B. v. C0lley Coal Co. [Breeding]**,* BRB No. 08-0425 (Feb. 22, 2009) (unpub.) (applying regulatory counterpart, 20 C.F.R. §718.305), citing ***Stiltner v. Island Creek Coal Co.***, 86 F.3d 337 (4th Cir. 1996) (relating to different but similar presumption).

Pneumoconiosis must be a "substantially contributing cause" to the miner's total disability. 20 C.F.R. § 718.204(c)(1). The regulations define "substantially contributing cause" as follows:

> (i) Has a material adverse effect on the miner's respiratory or pulmonary condition; or

> (ii) Materially worsens a totally disabling respiratory or pulmonary impairment which is caused by a disease or exposure unrelated to coal mine employment.

20 C.F.R. § 718.204(c)(1).

Dr. Burrell opined that Claimant's "Chronic pulmonary disease," which he attributed to coal mine dust exposure and tobacco abuse, "is the major disabling factor." EX 14. Although Claimant has "ASHD with CAD, s/p angioplasty and stent placement," this is "not of significant degree to prevent performance of previous coal mine work." *Id.*

Dr. Rosenberg, in his supplemental report, opined that Claimant is totally disabled from a pulmonary perspective because of his COPD, but the COPD is totally related to his past smoking history. As discussed above, I find Dr. Rosenberg's reasoning flawed. Moreover, I accord little weight to the opinions of Drs. Rosenberg and Renn on this issue as they both failed to diagnose Claimant with pneumoconiosis contrary to my findings. *See **Toler v. E. Associated Coal Co.**,* 43 F.3d 109 (4th Cir.1995). Therefore, Employer has not rebut the presumption by demonstrating that Claimant's impairment did not arise out of his coal mine employment.

In sum, Employer has not met its burden to demonstrate, by a preponderance of the evidence, that Claimant's disability did not arise out of coal mine employment or that Claimant does not suffer from pneumoconiosis. Employer has failed to rebut the presumption that Claimant is totally disabled due to pneumoconiosis. Therefore, the presumption stands and Claimant is entitled to benefits.

# RECUSAL

Employer alleged bias on my part before the BRB, and requested reassignment to a different Administrative Law Judge on remand. The BRB denied Employer's request because a review of the hearing transcript "does not reveal evidence of partiality, bias or prejudice against employer." In its September 28, 2012 Motion for Reconsideration, Employer stated that it requested my recusal "based on the ALJ's antipathy toward EEACC's rights." According to Employer, I ignored its notice of appearance in this matter and request to submit new evidence, and although I left the record open to submit additional evidence "that gesture was a hollow one where it was not served on the lawyers for EACCC who made that request."

C.F.R. § 725.352(a) prohibits an adjudication officer from conducting "any proceedings in a claim in which he or she is prejudiced or partial, or where he or she has any interest in the matter pending for decision" and provides that "A decision to withdraw from the consideration of a claim shall be within the discretion of the adjudication officer." The BRB has held that charges of bias or prejudice are not to be made lightly, and must be supported by concrete evidence. *Cochran v. Consolidation Coal Co.*, 16 B.L.R. 1-101, 107 (1992).

Employer points to the lack of service of my Order to Brief on its counsel. As I noted in my Order on Reconsideration, Employer's counsel, Laura Metcoff Klaus, was actually listed as counsel on my Order to Brief. Although she was not included on the Service Sheet, this was not my error. In my Order on Reconsideration I entered that Ms. Klaus shall be included on the service sheet and left the record open again to receive additional evidence as directed by the BRB. Thus, the error upon which Employer's motion to recuse is based has been corrected. As the BRB noted, in its Decision and Order remanding the case to me, adverse, or even erroneous, rulings in a proceeding are not, by themselves, sufficient to show bias on the part of the administrative law judge. *Toler v. Eastern Associated Coal Corp.*, BRB No. 10-0650 BLA (Jul. 28, 2011) (unpub.) (citing *Orange v. Island Creek Coal Co.*, 786 F.2d 724, 8 B.L.R. 2-192 (6th Cir. 1986); *Liteky v. United States*, 510 540, 55 (1994); *Troup v. Reading Anthracite Coal Co.*, 22 B.L.R. 1-11, 1-23 (1999); *Cochran v. Consolidation Coal Co.*, 16 B.L.R. 1-101, 1-107 (1992)). I find that Employer has failed to establish bias or prejudice in this case. Therefore, Employer's motion for recusal is denied.

J.A. 32

# ORDER

It is hereby **ORDERED** that the living miner's claim of Arvis R. Toler is **GRANTED**.



Digitally signed by Daniel Solomon
DN: CN=Daniel Solomon,
OU=Administrative Law Judge, O=Office
of Administrative Law Judge,
L=Washington, S=DC, C=US
Location: Washington DC

**DANIEL F. SOLOMON**
**ADMINISTRATIVE LAW JUDGE**

**NOTICE OF APPEAL RIGHTS**: If you are dissatisfied with the decision, you may file an appeal with the Benefits Review Board ("Board"). To be timely, your appeal must be filed with the Board within thirty (30) days from the date on which the decision is filed with the district director's office. *See* 20 C.F.R. §§ 725.478 and 725.479. The address of the Board is: Benefits Review Board, U.S. Department of Labor, P.O. Box 37601, Washington, DC 20013-7601. Your appeal is considered filed on the date it is received in the Office of the Clerk of the Board, unless the appeal is sent by mail and the Board determines that the U.S. Postal Service postmark, or other reliable evidence establishing the mailing date, may be used. *See* 20 C.F.R. § 802.207. Once an appeal is filed, all inquiries and correspondence should be directed to the Board. After receipt of an appeal, the Board will issue a notice to all parties acknowledging receipt of the appeal and advising them as to any further action needed. At the time you file an appeal with the Board, you must also send a copy of the appeal letter to Associate Solicitor, Black Lung and Longshore Legal Services, U.S. Department of Labor, 200 Constitution Ave., NW, Room N-2117, Washington, DC 20210. *See* 20 C.F.R. § 725.481. If an appeal is not timely filed with the Board, the decision becomes the final order of the Secretary of Labor pursuant to 20 C.F.R. § 725.479(a).

J.A. 33

**U.S. Department of Labor**

Office of Administrative Law Judges
800 K Street, NW, Suite 400-N
Washington, DC 20001-8002

(202) 693-7300
(202) 693-7365 (FAX)



**Issue Date: 05 April 2013**

*In the Matter of*
**ARVIS R. TOLER**
    Claimant

    v.

**EASTERN ASSOCIATED COAL CORP**
    Employer

    and

**DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS**
    Party-in-Interest

Case No. **2009-BLA-05255**

APPEARANCES:
    Sandra Webber, Lay Representative
        For Claimant
    Laura Metcoff Klaus, Esquire
        For the Employer
    Matthew Sheppard, Esquire
        For the Director

BEFORE:    DANIEL F. SOLOMON
          Administrative Law Judge

# ORDER on RECONSIDERATION

    This case was remanded from the Benefits Review Board to me pursuant to the provisions of Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §§901 *et seq.* (the Act). Subsequent to the hearing in this case, Section 1556 of Public Law No. 111-148 amended the Act with respect to the entitlement criteria for certain claims that were filed after January 1, 2005, and were pending on or after March 23, 2010, the effective date of the amendments. Relevant to this claim, Section 1556 reinstated the presumption at Section 411(c)(4) of the Act, 30 U.S.C. §921(c)(4). Under Section 411(c)(4), if a claimant establishes at least fifteen years of qualifying coal mine employment, and that he has a totally disabling respiratory impairment, there is a rebuttable presumption that he is totally disabled due to pneumoconiosis. 30 U.S.C. §921(c)(4). I entered an Order March 1, 2012 and an Order in this case on August 21, 2012, but although she was listed as counsel on my Order to Brief, Laura Metcoff Klaus, Esquire, was not included on the Service Sheet. On October 2, 2012, Ms. Klaus filed a request for Reconsideration, and although I asked that the file be returned, it was not returned to me until today.

The Board ruled that that I appropriately considered this claim under the amended version of Section 411(c)(4) of the Act, based on a finding that Employer stipulated, and the record established, that claimant had at least fifteen years of qualifying coal mine employment and suffered a totally disabling respiratory impairment.

However, I am advised that Employer retains a right to develop the evidence further. I am directed to allow for the submission of evidence by the parties to address the change in law. Any additional evidence submitted must be consistent with the evidentiary limitations. If evidence exceeding those limitations is offered, it must be justified by a showing of good cause. . If I find that Claimant has established invocation of the presumption at Section 411(c)(4), I should then consider whether employer has satisfied its burden to rebut the presumption. In order to rebut the presumption by disproving the existence of pneumoconiosis, the party opposing entitlement must establish that the miner does not have pneumoconiosis as defined in 20 C.F.R. § 718.201 (2010). Because that definition includes both clinical and legal pneumoconiosis, to rebut the presumption, the opposing party must establish that the miner does not suffer from either form of the disease. See *Pavesi v. Director, OWCP*, 758 F.2d 956, 965 (3d Cir. 1985); *Shonbom v. Director, OWCP*, 8 BLR 1-434, 1-435-36 (1986).

To rebut the presumption by proving that the miner's totally disabling impairment is unrelated to the miner's coal mine employment, the party opposing entitlement must rule out any connection between the miner's impairment and his coal mine employment. *Rose v. Clinchfield Coal Co.*, 614 F.2d 936, 939 (4th Cir. 1980); *Defore v. Alabama By-Products Corp.*, 12 BLR 1-27, 1-29 (1988). The party opposing entitlement need not establish the precise etiology of the totally disabling impairment, however. It is sufficient to prove that the impairment is unrelated to coal mine employment. 20 C.F.R. § 718.305(d) (2010); see also *Tanner v. Freeman United Coal Co.*, 10 BLR 1-85, 1-87 (1987).

I note that Claimant did not participate in the proceedings before the Board. THE CLAIMANT IS REMINDED THAT HE HAS THE RIGHT TO BE REPRESENTED IN THIS MATTER AND IS ENCOURAGED TO GET A LAWYER.

Therefore, I enter the following:

1. Ms. Klaus shall be included on the Service Sheet.

2. The record will remain open to June 7, 2013 to receive additional evidence as directed by the Board. Each party will be limited to one additional report.

J.A. 35

3.  New evidence summaries and simultaneous briefs will be filed by all parties on July 8, 2013.  The record will remain open to July 18, 2012 for reply briefs.


SO ORDERED




Digitally signed by Daniel Solomon
DN: CN=Daniel Solomon,
OU=Administrative Law Judge, O=Office
of Administrative Law Judges,
L=Washington, S=DC, C=US
Location: Washington DC

**DANIEL F. SOLOMON**
**ADMINISTRATIVE LAW JUDGE**

J.A. 36

**U.S. Department of Labor**   Office of Administrative Law Judges
800 K Street, NW, Suite 400-N
Washington, DC 20001-8002

(202) 693-7300
(202) 693-7365 (FAX)



**Issue Date: 30 August 2012**

*In the Matter of*
**ARVIS R. TOLER**
  Claimant
  v.

**EASTERN ASSOCIATED COAL CORP**        Case No. **2009-BLA-05255**
  Employer

  and

**DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS**
  Party-in-Interest

APPEARANCES:
      Sandra Webber, Lay Representative
          For Claimant
      Paul Frampton, Esquire
          For the Employer
      Matthew Sheppard, Esquire
          For the Director

BEFORE:     DANIEL F. SOLOMON
            Administrative Law Judge

## DECISION AND ORDER ON REMAND
### *AWARD OF BENEFITS*

This case was remanded from the Benefits Review Board to me pursuant to the provisions of Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §§901 *et seq.* (the Act). Subsequent to the hearing in this case, Section 1556 of Public Law No. 111-148 amended the Act with respect to the entitlement criteria for certain claims that were filed after January 1, 2005, and were pending on or after March 23, 2010, the effective date of the amendments. Relevant to this claim, Section 1556 reinstated the presumption at Section 411(c)(4) of the Act, 30 U.S.C. §921(c)(4). Under Section 411(c)(4), if a claimant establishes at least fifteen years of qualifying coal mine employment, and that he has a totally disabling respiratory impairment, there is a rebuttable presumption that he is totally disabled due to pneumoconiosis. 30 U.S.C. §921(c)(4).

The Board ruled that that I appropriately considered this claim under the amended version of Section 411(c)(4) of the Act, based on a finding that Employer stipulated, and the

SEP 04 2012

record established, that claimant had at least fifteen years of qualifying coal mine employment and suffered a totally disabling respiratory impairment.

However, I was advised that Employer retains a right to develop the evidence further. I was directed to allow for the submission of evidence by the parties to address the change in law. In order to rebut the presumption by disproving the existence of pneumoconiosis, the party opposing entitlement must establish that the miner does not have pneumoconiosis as defined in 20 C.F.R. § 718.201 (2010). Because that definition includes both clinical and legal pneumoconiosis, to rebut the presumption, the opposing party must establish that the miner does not suffer from either form of the disease. See *Pavesi v. Director, OWCP*, 758 F.2d 956, 965 (3d Cir. 1985); *Shonbom v. Director, OWCP*, 8 BLR 1-434, 1-435-36 (1986).

Although I left the record open to give the parties an opportunity to provide further evidence as directed by the Board, and although Claimant filed a brief, Employer has chosen not to do so.

Previously, I found that neither Dr. Rosenberg nor Dr. Renn, Employers experts, fully considered the 27 year history of coal mine employment in rendering a diagnosis.

As nothing further has been offered, I again find that their opinions are flawed. Moreover, the Employer did not provide direct evidence that coal mine employment can be ruled out as a cause of total disability.

### CONCLUSION
Claimant established entitlement to the presumption under § 1556, amended to the Act on March 23, 2010. Employer has not rebutted that
    (A) Claimant does not, or did not, have pneumoconiosis, or that
    (B) His respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine.

# ORDER

It is hereby **ORDERED** that the living miner's claim of **ARVIS R. TOLER** is **GRANTED**. Augmentation benefits for one dependent are authorized.

SO ORDERED



Digitally signed by Daniel Solomon
DN: CN=Daniel Solomon,
OU=Administrative Law Judge, O=Office
of Administrative Law Judges,
L=Washington, S=DC, C=US
Location: Washington DC

**DANIEL F. SOLOMON**
**ADMINISTRATIVE LAW JUDGE**

J.A. 38

**U.S. Department of Labor**     Benefits Review Board
P.O. Box 37601
Washington, DC 20013-7601

BRB No. 10-0640 BLA



ARVIS R. TOLER )
)
    Claimant-Respondent )
)
v. )
)
EASTERN ASSOCIATED COAL )
CORPORATION )
)
    and )
)
OLD REPUBLIC INSURANCE COMPANY )   DATE ISSUED: **JUL 2 8 2011**
)
    Employer/Carrier- )
    Petitioners )
)
DIRECTOR, OFFICE OF WORKERS' )
COMPENSATION PROGRAMS, UNITED )
STATES DEPARTMENT OF LABOR )
)
    Party-in-Interest )   DECISION and ORDER

Appeal of the Decision and Order and the Decision and Order - Denial of Motion to Reconsider of Daniel F. Solomon, Administrative Law Judge, United States Department of Labor.

Laura Metcoff Klaus (Greenberg Traurig LLP), Washington, D.C., for employer.

Jeffrey S. Goldberg (M. Patricia Smith, Solicitor of Labor; Rae Ellen James, Associate Solicitor; Michael J. Rutledge, Counsel for Administrative Litigation and Legal Advice), Washington, D.C., for the Director, Office of Workers' Compensation Programs, United States Department of Labor.

Before: DOLDER, Chief Administrative Appeals Judge, SMITH and HALL, Administrative Appeals Judges.

PER CURIAM:

J.A. 39

Employer appeals the Decision and Order, and the Decision and Order - Denial of Motion to Reconsider (09-BLA-5255), of Administrative Law Judge Daniel F. Solomon awarding benefits on a subsequent claim[1] filed pursuant to the provisions of the Black Lung Benefits Act, 30 U.S.C. §§901-944 (2006), *amended by* Pub. L. No. 111-148, §1556, 124 Stat. 119 (2010)(to be codified at 30 U.S.C. §§921(c)(4) and 932(*l*))(the Act). Subsequent to the hearing in this case, Section 1556 of Public Law No. 111-148 amended the Act with respect to the entitlement criteria for certain claims that were filed after January 1, 2005, and were pending on or after March 23, 2010, the effective date of the amendments. Relevant to this claim, Section 1556 reinstated the presumption at Section 411(c)(4) of the Act, 30 U.S.C. §921(c)(4). Under Section 411(c)(4), if a claimant establishes at least fifteen years of qualifying coal mine employment, and that he has a totally disabling respiratory impairment, there is a rebuttable presumption that he is totally disabled due to pneumoconiosis. 30 U.S.C. §921(c)(4).

By Order dated April 16, 2010, the administrative law judge directed the parties to address the impact of the amendments on this case by May 20, 2010, and to file any reply briefs by May 31, 2010. Claimant responded by filing two briefs, dated April 19, 2010 and May 20, 2010. Employer requested additional time to file a brief after employer's receipt of the hearing transcript. On June 15, 2010, the administrative law judge issued his Decision and Order without ruling on employer's motion, noting that employer "has had sufficient time to file the brief due before May 31, and has not responded to Claimant's brief." Decision and Order at 2. The administrative law judge accepted employer's stipulations that claimant was totally disabled and had twenty-seven years of coal mine employment. Because claimant filed his claim after January 1, 2005, his claim was pending on March 23, 2010, and the administrative law judge determined that claimant worked at least sixteen years as an underground miner, the administrative law judge found that claimant was entitled to invocation of the Section 411(c)(4) presumption of total disability due to pneumoconiosis, and that the evidence of record was insufficient to establish rebuttal of the presumption. On July 23, 2010, the administrative law judge denied the motions for reconsideration filed by employer and the Director, Office of Workers' Compensation Programs (the Director). While employer argued that the record should be reopened to permit the development of evidence responding to the change in law, the administrative law judge found that employer "provided no proffer as to what evidence it might have provided. . . .[i]f it has such evidence, it has other options." Decision and Order – Denial of Motion to Reconsider at 2. Noting that the hearing

---

[1] Claimant's previous claim, filed on February 4, 1993, was denied for failure to establish the existence of pneumoconiosis. *Toler v. Eastern Assoc. Coal Corp.*, BRB No. 96-1499 BLA (July 29, 1997)(unpub.), *aff'd, Toler v. Eastern Assoc. Coal Corp.*, No. 97-2148 (4th Cir. Aug. 19, 1998)(unpub.). Claimant filed his subsequent claim on February 26, 2008. Director's Exhibit 3.

2

transcript was served on May 3, 2010, the administrative law judge indicated that employer had sufficient time to file its brief before May 31, 2010.[2]

Employer appeals, arguing that the administrative law judge erred in disallowing employer an opportunity to respond to the change in the law, thereby depriving employer of due process. Employer argues that the record must be reopened to allow for the submission of evidence responsive to the changes in the law resulting from the amendments to the Act. Additionally, employer assigns error to the administrative law judge's weighing of the medical opinions with references to the scientific views and commentary adopted by the Department of Labor in the preamble to the revised regulations. Employer urges the Board to vacate the award of benefits and direct reassignment of this case to a different administrative law judge on remand. Claimant has not responded to the appeal. The Director has indicated that he will not respond to the appeal unless requested to do so by the Board.

The Board's scope of review is defined by statute. The administrative law judge's Decision and Order must be affirmed if it is rational, supported by substantial evidence, and in accordance with applicable law.[3] 33 U.S.C. §921(b)(3), as incorporated by 30 U.S.C. §932(a); *O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc.*, 380 U.S. 359 (1965).

Initially, we hold that the administrative law judge appropriately considered this claim under the amended version of Section 411(c)(4) of the Act, based on his finding that employer stipulated, and the record established, that claimant had at least fifteen years of qualifying coal mine employment and suffered a totally disabling respiratory impairment. However, our practice in cases affected by the amendments to the Act has

---

[2] The motion for reconsideration filed by the Director, Office of Workers' Compensation Programs (the Director), on July 2, 2010, requested the administrative law judge to amend the Decision and Order of June 15, 2010, to specify an onset date for payment of benefits, in accordance with 20 C.F.R. §725.503(b). In response to employer's motion for reconsideration, however, the Director averred that the motion should be granted to the extent that employer requested to be allowed an opportunity to respond to the change in the law at Section 411(c)(4) of the Act, 30 U.S.C. §921(c)(4), with evidence related to the change in the law. *See* Director's Response of July 14, 2010 at 2-3.

[3] This case arises within the jurisdiction of the United States Court of Appeals for the Fourth Circuit, as claimant was employed in the coal mining industry in West Virginia. *See Shupe v. Director, OWCP*, 12 BLR 1-200, 1-202 (1989)(*en banc*); Director's Exhibits 3, 4, 5; Hearing Transcript at 43.

J.A. 41

been to require the administrative law judge to allow for the submission of additional evidence by the parties to address the change in law. *See Harlan Bell Coal Co. v. Lemar*, 904 F.2d 1042, 1047-50, 14 BLR 2-1, 2-7-11 (6th Cir. 1990); *Tackett v. Benefits Review Board*, 806 F.2d 640, 642, 10 BLR 2-93, 2-95 (6th Cir. 1986). Additionally, the administrative law judge issued his Decision and Order without ruling on employer's motion for an enlargement of time to respond. Accordingly, we conclude that employer's failure to respond by May 31, 2010 to the administrative law judge's Order of April 16, 2010, or to reply to claimant's briefs, did not constitute a waiver of employer's due process right to respond with evidence relevant to its burden to rebut the presumption at amended Section 411(c)(4) of the Act, 30 U.S.C. §921(c)(4). Consequently, we vacate the administrative law judge's Decision and Order, and his Decision and Order - Denial of Motion to Reconsider, and remand this case to the administrative law judge for further findings.[4] On remand, the administrative law judge must allow for the submission of evidence by the parties to address the change in law. *See Morrison v. Tenn. Consol. Coal Co.*, F.3d , 2011 WL 2739770 (6th Cir. 2011); *Lemar*, 904 F.2d at 1047-50, 14 BLR at 2-7-11; *Tackett*, 806 F.2d at 642, 10 BLR at 2-95. Any additional evidence submitted must be consistent with the evidentiary limitations. 20 C.F.R. §725.414. If evidence exceeding those limitations is offered, it must be justified by a showing of good cause. 20 C.F.R. §725.456(b)(1). On remand, if the administrative law judge finds that claimant has established invocation of the presumption at amended Section 411(c)(4), 30 U.S.C. §921(c)(4), he should then consider whether employer has satisfied its burden to rebut the presumption.

Finally, we turn to employer's allegations of bias on the part of the administrative law judge. Employer contends that the administrative law judge's various rulings and comments "raise questions as to [his] impartiality or ability to provide 'just' proceedings." Employer's Brief at 8. We disagree. Adverse, or even erroneous, rulings in a proceeding are not, by themselves, sufficient to show bias on the part of the

---

[4] Because of our disposition herein, we would ordinarily decline to address any specific arguments as to the merits of the case. We reject as a matter of law, however, employer's argument that an administrative law judge must render pre-judgment rulings with respect to the preamble to the regulations. The Board has held that, in considering medical opinion evidence on the issues of legal pneumoconiosis and disability causation, an administrative law judge permissibly examines whether the medical rationales expressed were consistent with the conclusions contained in the medical literature and scientific studies relied upon by the Department of Labor (DOL) in drafting the definition of legal pneumoconiosis. *See* 20 C.F.R. §§718.201(a)(2), 718.202(a)(4); 65 Fed. Reg. 79940-45 (Dec. 20, 2000); *Crockett Collieries, Inc. v. Barrett*, 478 F.3d 350, 23 BLR 2-472 (6th Cir. 2007); *Freeman United Coal Mining Co. v. Summers*, 272 F.3d 473, 483 n.7, 22 BLR 2-265, 2-281 n.7 (7th Cir. 2001).

4

administrative law judge. *See Orange v. Island Creek Coal Co.*, 786 F.2d 724, 8 BLR 2-192 (6th Cir. 1986); *see also Liteky v. United States*, 510 U.S. 540, 555 (1994); *Troup v. Reading Anthracite Coal Co.*, 22 BLR 1-11, 1-23 (1999); *Cochran v. Consolidation Coal Co.*, 16 BLR 1-101, 1-107 (1992). As our review of the hearing transcript and the administrative law judge's decisions in this matter does not reveal evidence of partiality, bias or prejudice against employer, we deny employer's request that the case be reassigned to a different administrative law judge on remand.

Accordingly, the administrative law judge's Decision and Order and his Decision and Order - Denial of Motion to Reconsider are vacated, and the case is remanded to the administrative law judge for further consideration consistent with this opinion.

SO ORDERED.


NANCY S. DOLDER, Chief
Administrative Appeals Judge


ROY P. SMITH
Administrative Appeals Judge


BETTY JEAN HALL
Administrative Appeals Judge

**U.S. Department of Labor**     Office of Administrative Law Judges
800 K Street, NW, Suite 400-N
Washington, DC 20001-8002

(202) 693-7300
(202) 693-7365 (FAX)



*Issue Date: 23 July 2010*

*In the Matter of*
**ARVIS R. TOLER**
    Claimant
    v.

**EASTERN ASSOCIATED COAL CORP**     Case No. **2009-BLA-05255**
    Employer

    and

**DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS**
    Party-in-Interest

APPEARANCES:
    Sandra Webber, Lay Representative
        For Claimant
    Paul Frampton, Esquire
        For the Employer
    Matthew Sheppard, Esquire
        For the Director

BEFORE:    DANIEL F. SOLOMON
        Administrative Law Judge

## DECISION AND ORDER

### DENIAL OF MOTION TO RECONSIDER

This proceeding arises from a request for benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.* This is the second application. Claimant filed his initial claim for benefits miner filed his first claim on February 4, 1993, The administrative law judge accepted the parties' stipulations that Claimant established twenty-seven years of coal mine employment and had one dependent for the purpose of benefits augmentation, that the claim was timely filed, and that employer was the responsible operator.

This claim was filed February 26, 2008 and heard March 17, 2010 in Knoxville, Tennessee. I entered thirty one Director's Exhibits, DX 1- DX 29, seven Claimant's exhibits, "CX"1-CX 7, and thirteen two Employer's exhibits, "EX" 1- EX 13. On March 23, 2010, the President signed the "Patient Protection and Affordable Care Act." Subsequently, I entered an Order to file simultaneous added comments addressing the new law by May 20, 2010. The record remained open until May 31, 2010, to give the parties an opportunity to submit reply briefs, if necessary. Claimant filed two briefs in this case. Although Employer requested additional time to file a brief after the service of the hearing transcript, it was served May 3

and Employer has had sufficient time to file the brief due before May 31, and did not respond to Claimant's brief.

During the hearing, the Employer stipulated that the Claimant had 27 years of coal mine employment and that he was totally disabled. The Claimant worked at least 16 years as an underground miner. I entered a Decision and Order in favor of Claimant. I found that Employer did not meet a shifting burden of proof to rule out pneumoconiosis as a cause of total disability.

Because I did not receive a brief from Employer, I proceeded to evaluate the record evidence. Both Director and Employer request reconsideration. That request is denied. The Employer provided no proffer as to what evidence it might have provided. If it has such evidence, it has other options.

Although Director alleges that there is no discussion as to onset, the onset of total disability was established in the 1993 record and the Claimant's entitlement begins as of the date of application, February 26, 2008, by operation of law.

## CONCLUSION

Claimant established entitlement to the presumption under § 1556, amended to the Act on March 23, 2010. Employer has not rebutted that

(A) Claimant does not, or did not, have pneumoconiosis, or that

(B) His respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine.

## ORDER

It is hereby **ORDERED** that the requests for reconsideration in the living miner's claim of **ARVIS R. TOLER** are **DENIED**.

*N. F. Solomon*

DANIEL F. SOLOMON
Administrative Law Judge

**NOTICE OF APPEAL RIGHTS:** If you are dissatisfied with the decision, you may file an appeal with the Benefits Review Board ("Board"). To be timely, your appeal must be filed with the Board within thirty (30) days from the date on which the decision is filed with the district director's office. *See* 20 C.F.R. §§ 725.478 and 725.479. The address of the Board is: Benefits Review Board, U.S. Department of Labor, P.O. Box 37601, Washington, DC 20013-7601. Your appeal is considered filed on the date it is received in the Office of the Clerk of the Board, unless the appeal is sent by mail and the Board determines that the U.S. Postal Service postmark, or other reliable evidence establishing the mailing date, may be used. *See* 20 C.F.R. § 802.207. Once an appeal is filed, all inquiries and correspondence should be directed to the Board. After receipt of an appeal, the Board will issue a notice to all parties acknowledging receipt of the appeal and advising them as to any further action needed. At the time you file an appeal with the Board, you must also send a copy of the appeal letter to Associate Solicitor, Black Lung and

J.A. 45

Longshore Legal Services, U.S. Department of Labor, 200 Constitution Ave., NW, Room N-2117, Washington, DC 20210. *See* 20 C.F.R. § 725.481. If an appeal is not timely filed with the Board, the decision becomes the final order of the Secretary of Labor pursuant to 20 C.F.R. § 725.479(a).

J.A. 46

**U.S. Department of Labor**

Office of Administrative Law Judges
800 K Street, NW, Suite 400-N
Washington, DC 20001-8002

(202) 693-7300
(202) 693-7365 (FAX)



*Issue Date: 15 June 2010*

In the Matter of
**ARVIS R. TOLER**
    Claimant
       v.

**EASTERN ASSOCIATED COAL CORP**
    Employer

    and

**DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS**
    Party-in-Interest

Case No. **2009-BLA-05255**

APPEARANCES:
    Sandra Webber, Lay Representative
        For Claimant
    Paul Frampton, Esquire
        For the Employer
    Matthew Sheppard, Esquire
        For the Director

BEFORE:    DANIEL F. SOLOMON
           Administrative Law Judge

## DECISION AND ORDER

This proceeding arises from a request for benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.* This is the second application. Claimant filed his initial claim for benefits miner filed his first claim on February 4, 1993. The administrative law judge accepted the parties' stipulations that Claimant established twenty-seven years of coal mine employment and had one dependent for the purpose of benefits augmentation, that the claim was timely filed, and that employer was the responsible operator.

This claim was heard March 17, 1010 in Knoxville, Tennessee. I entered thirty one Director's Exhibits, DX 1- DX 29, seven Claimant's exhibits, "CX"1-CX 7, and thirteen two Employer's exhibits, "EX" 1- EX 13. On March 23, 2010, the President signed the "Patient Protection and Affordable Care Act." In part, the statute contains:

    SEC. 1556. EQUITY FOR CERTAIN ELIGIBLE SURVIVORS.
    (a) REBUTTABLE PRESUMPTION.—Section 411(c)(4) of the Black Lung Benefits Act (30 U.S.C. 921(c)(4)) is amended by striking the last sentence.
    (b) CONTINUATION OF BENEFITS.—Section 422(l) of the Black Lung Benefits Act (30 U.S.C. 932(l)) is amended by striking ,,,,except with respect to a claim filed under this part on or after the effective date of the Black Lung

Benefits Amendments of 1981"".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to claims filed under part B or part C of the Black Lung Benefits Act (30 U.S.C.921 et seq., 931 et seq.) after January 1, 2005, that are pending on or after the date of enactment of this Act.

Subsequently, I entered an Order to file simultaneous added comments addressing the new law by May 20, 2010. The record remained open until May 31, 2010, to give the parties an opportunity to submit reply briefs, if necessary. Claimant filed two briefs in this case. Although Employer requested additional time to file a brief after the service of the hearing transcript, Employer has had sufficient time to file the brief due before May 31, and has not responded to Claimant's brief.

Claimant was last employed in coal mine work in the state of Tennessee, the law of the United States Court of Appeals for the Sixth Circuit controls. See Decision and Order, DX 1; Transcript, "TR", at 40. See *Shupe v. Director, OWCP*, 12 BLR 1-200, 1-202 (1989)(en banc). Since Claimant filed this application for benefits after January 1, 1982, Part 718 applies.

During the hearing, the Employer stipulated that the Claimant had 27 years of coal mine employment and that he was totally disabled. The Claimant worked at least 16 years as an underground miner.

## APPLICABLE STANDARDS

Because the Claimant filed this application for benefits after March 31, 1980, the regulations set forth at part 718 apply. *Saginaw Mining Co. v. Ferda*, 879 F.2d 198, 204, 12 B.L.R. 2-376 (6th Cir. 1989).

To receive black lung disability benefits under the Act, a miner must prove that (1) he suffers from pneumoconiosis, (2) the pneumoconiosis arose out of coal mine employment, (3) he is totally disabled, and (4) his total disability is caused by pneumoconiosis. *Gee v. W.G. Moore and Sons*, 9 B.L.R. 1-4 (1986) (en banc); *Baumgartner v. Director*, OWCP, 9 B.L.R. 1-65 (1986) (en banc). *See Mullins Coal Co., Inc. of Virginia v. Director*, OWCP, 484 U.S. 135, 141, 11 B.L.R. 2-1 (1987). The failure to prove any requisite element precludes a finding of entitlement. *Anderson v. Valley Camp of Utah, Inc.*, 12 B.L.R. 1-111 (1989); *Perry v. Director*, OWCP, 9 B.L.R. 1-1 (1986) 1-1 (1986) (en banc).

If a miner was employed for fifteen years or more in one or more underground coal mines, and if there is a chest roentgenogram submitted in connection with such miner's, his widow's, his child's, his parent's, his brother's, his sister's, or his dependent's claim under this subchapter and it is interpreted as negative with respect to the requirements of paragraph (3) of this subsection, and if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis, that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis. In the case of a living miner, a wife's affidavit may not be used by itself to establish the presumption. The Secretary shall not apply all or a portion of the requirement of this paragraph that the miner work in an underground mine where he determines that conditions of a miner's employment in a coal mine other than an underground mine were substantially similar to conditions in an underground mine. The Secretary may rebut such presumption only by establishing that

- 2 -

J.A. 48

(A) such miner does not, or did not, have pneumoconiosis, or that

(B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine.

## STIPULATIONS AND WITHDRAWAL OF ISSUES

1. Timeliness is a jurisdictional matter that can not be waived. 30 U.S.C. § 932(f), provides that "[a]ny claim for benefits by a miner under this section shall be filed within three years after whichever of the following occurs later": (1) a medical determination of total disability due to pneumoconiosis; or (2) March 1, 1978. The Secretary of Labor's implementing regulations at 20 C.F.R. § 725.308 sets forth in part, as follows:

(a) A claim for benefits filed under this part by, or on behalf of, a miner shall be filed within three years after a medical determination of total disability due to pneumoconiosis which has been communicated to the miner or a person responsible for the care of the miner, or within three years after the date of enactment of the Black Lung Benefits Act of 1977, whichever is later. There is no time limit on the filing of a claim by the survivor of a miner.

(c) There shall be a rebuttable presumption that every claim for benefits is timely filed. However, except as provided in paragraph (b) of this section, the time limits in this section are mandatory and may not be waived or tolled except upon a showing of extraordinary circumstances.

I have reviewed all of the evidence in the record and no evidence exists to rebut the presumption.

2. The Employer agreed that the Claimant worked at least twenty seven (27) years in coal mine employment. DX 1, TR 30-31.

3. Claimant is totally disabled from a respiratory impairment. TR 31.

4. Eastern Associated Coal Corporation is the responsible operator. TR 40.

After a review of the stipulations and the record, they are accepted.

## REMAINING ISSUE

Whether the Employer can establish that Claimant does not suffer from pneumoconiosis?

## BURDEN OF PROOF

"Burden of proof," as used in this setting and under the Administrative Procedure Act[1] is that "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." "Burden of proof" means burden of persuasion, not merely burden of production. 5 U.S.C. § 556(d).[2] The drafters of the APA used the term "burden of proof" to mean the burden

---

[1] 33 U.S.C. § 919(d) ("[N]otwithstanding any other provisions of this chapter, any hearing held under this chapter shall be conducted in accordance with [the APA]; 5 U.S.C. § 554(c)(2). Longshore and Harbors Workers' Compensation Act ("LHWCA") 33 U.S.C. § 901-950, is incorporated by reference into Part C of the Black Lung Act pursuant to 30 U.S.C. § 932(a).

[2] The Tenth and Eleventh Circuits held that the burden of persuasion is greater than the burden of production, *Alabama By-Products Corp. v. Killingsworth*, 733 F.2d 1511, 6 B.L.R. 2-59 (11th Cir. 1984); *Kaiser Steel Corp. v. Director*, OWCP [Sainz], 748 F.2d 1426, 7 B.L.R. 2-84 (10th Cir. 1984). These cases arose in the context where an interim presumption is triggered, and the burden of proof shifted from a Claimant to an Employer/carrier.

- 3 -

of persuasion. *Director, OWCP, Department of labor v. Greenwich Collieries [Ondecko]*, 512 U.S. 267, 18 B.L.R. 2A-1 (1994).[3]

A Claimant has the general burden of establishing entitlement and the initial burden of going forward with the evidence. The obligation is to persuade the trier of fact of the truth of a proposition, not simply the burden of production; the obligation to come forward with evidence to support a claim. Therefore, the Claimant cannot rely on the Director to gather evidence. The Claimant bears the risk of non-persuasion if the evidence is found insufficient to establish a crucial element. *Oggero v. Director, OWCP*, 7 B.L.R. 1-860 (1985).

## SUBSEQUENT CLAIMS

After the expiration of one year from the denial of benefits, the submission of additional material or another claim is considered a subsequent claim and adjudicated under the provisions of 20 C.F.R. § 725.309(d). That subsequent claim will be denied unless the claimant can demonstrate that at least one of the conditions of entitlement upon which the prior claim was denied (applicable condition of entitlement) has changed and is now present. 20 C.F.R. § 725.309(d)(3). If a claimant does demonstrate a change in one of the applicable conditions of entitlement, then generally findings made in the prior claim(s) are not binding on the parties. 20 C.F.R. § 725.309(d)(4). Consequently, the relevant inquiry in a subsequent claim is whether evidence developed after the prior adjudication supports a finding of a previously denied condition of entitlement.

To receive black lung disability benefits under the Act, a claimant must prove four basic conditions, or elements, related to his physical condition. First, the miner must establish the presence of pneumoconiosis.[4] Second, if a determination has been made that a miner has pneumoconiosis, it must be determined whether the miner's pneumoconiosis arose, at least in part, out of coal mine employment.[5] Third, the miner has to demonstrate he is totally disabled. And fourth, the miner must prove the total disability is due to pneumoconiosis. Based on those four principal conditions of entitlement, the adjudication of a subsequent claim involves the identification of the condition(s) of entitlement a claimant failed to prove in the prior claim and then an evaluation of whether, through newly developed evidence, a claimant is able to now prove the condition(s) of entitlement. In the prior decision the Claimant failed to establish pneumoconiosis.

## *FINDINGS OF FACT*

I note that all of the testimony and histories show that Claimant worked in excess of 15 years in underground mining. To rebut the presumption by proving that the miner's totally disabling impairment is unrelated to the miner's coal mine employment, the party opposing entitlement must rule out any connection between the miner's impairment and his coal mine employment. *Rose v. Clinchfield Coal Co.*, 614 F.2d 936, 939 (4th Cir. 1980); *Defore v. Alabama By-Products Corp.*, 12 BLR 1-27, 1-29 (1988). The party opposing entitlement need not establish the precise etiology of the totally disabling impairment, however.

Dr. Rosenberg determined that the Claimant is totally disabled. EX 12, 12-13. He maintains that the Claimant does not have either clinical or legal pneumoconiosis, however, as all of the impairment is related to the smoking history. The lungs are bigger than normal, with a

---

[3] Also known as the risk of non-persuasion, *see* 9 J. Wigmore, Evidence § 2486 (J. Chadbourn rev. 1981).
[4] 20 C.F.R. § 718.202.
[5] 20 C.F.R. § 718.203(a).

- 4 -

total lung capacity of 135% of predicted, with obstructive lung disease. He acknowledged that legal pneumoconiosis there is a symmetrical reduction of the FEV1 with the FVC such that the FEV1 divided by the FVC generally is preserved. "This has been shown in various research studies by Morgan, Suter and Hurley, Attfield and Hodous, as well as Cimich-Ward and Bates.".

Dr. Rosenberg also noted a contrast research in smoking related obstructive lung disease indicates that that ratio generally is down with obstructive lung disease. The normal ratio is 70% or 11 higher. Claimant's was around 22 to 24%. "So basically the pattern of the obstruction, the marked decrease in FEV1 with a marked decrease in the FEV1/FVC ratio is classic for a smoke-related form of obstruction." Id. 14-15.

Dr. Renn noted the length of the cough claimed in the medical record. He noted that in 2008 "it was just that he had a cough with light colored sputum. And in 2009 it was that he had a cough with sputum production.... wheezing is noted by all of the physicians. And so that is a prominent system that has to be taken into consideration. He noted that chronic bronchitis or industrial bronchitis as a result of exposure to coal mine dust lasts during the period of exposure, and it lasts throughout the time of exposure and then it disappears after the person is no longer exposed, it disappears within six months to a year after they're no longer exposed. "That is not the history of Mr. Toler." He said that the record shows that the Claimant was a smoker, "if the chronic bronchitis becomes established, it will never disappear even though they quit smoking." EX 13, 20-21. He also stated that further, the chronic bronchitis from tobacco smoke can have a reversible component to it. In reviewing the Claimant's test results, Dr. Renn determined his FEV1/FVC ratio was way too low to be associated with anything other than tobacco smoking. "His FEV1/FVC ratio was 47 percent in 1991 and then it was in the low 40 percent range in 2008 and 2009. The diffusing capacity that was performed in 1991 was 41 percent, and the diffusing capacity that was performed in 2009, although it was 53 percent, that diffusing capacity was not valid. It was not valid because for a valid diffusing capacity, it has to be at least 85 percent on inhalation of the vital capacity that's already been recorded, and it was not that. The 1991 diffusing capacity at 41 percent of the predicted is far too low to have resulted from coal workers' pneumoconiosis." EX 13, 21-24.

On the other hand, Dr. Burrell noted the exposure by coal mine employment and by smoking tobacco led to disability. DX 14.

In 2001, the Department of Labor amended the regulations to include:

> (2) Legal Pneumoconiosis. "Legal pneumoconiosis" includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment. This definition includes, but is not limited to, any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment.

20 CFR § 718.201 (a)(2). COPD connotes an obstructive pulmonary disease. In addition, the following was also added:

> (b) For purposes of this section, a disease "arising out of coal mine employment" includes any chronic pulmonary disease or respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment.
> (c) For purposes of this definition, "pneumoconiosis" is recognized as a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure.

20 CFR § 718.201 (b) and (c).

J.A. 51

At the time that regulations were promulgated, the Department of Labor noted that smokers who mine have an additive risk for developing significant obstruction. 65 Federal Register, No. 245, 79940 (December 20, 2000) None of the papers that Dr. Rosenberg refer to address the new regulations, which were sustained in *National Mining Ass'n v. Chao*, 160 F.Supp.2d 47 (D.D.C. 2001) and by regulation at 68 Federal Register No. 240, p. 69930 (December 15, 2003). The Court sustained amending the definition of pneumoconiosis to include legal pneumoconiosis. 20 CFR§ 718.201(a).

The Secretary noted the work of Morgan, Suter and Hurley, Attfield and Hodous, but made legislative facts as to the fact that risk of chronic bronchitis clearly increases with increasing dust exposure and that smokers who mine have an additive risk of developing chronic bronchitis. Even in the absence of smoking, coal mine dust exposure is clearly associated with clinically significant airways obstruction and chronic bronchitis. The risk is additive with cigarette smoking. In fact, the Attfield and Hodous study, cited by Dr. Rosenberg, "Pulmonary function of U.S. coalminers related to dust exposure estimates," *Am Rev Respir Dis* 145:605–609 (1992) can be used to refute his conclusions. The reports analyzed pulmonary function data (specifically,FEV1, FVC and FEV1/FVC ratio) drawn from Round 1 of the National Study of Coal Workers' Pneumoconiosis, along with job-specific cumulative dust exposure estimates for U.S. underground coal miners, to determine whether there was an exposure-response relationship. This group of 7,139 miners worked both before and after 1970, when federally-mandated dust control standards were implemented. Allowing for decrements due to age and smoking history, Attfield and Hodous demonstrated a clear relationship between dust exposure and a decline in pulmonary function of about 5 to 9 milliliters a year, even in miners with no radiographic evidence of clinical coal workers' pneumoconiosis. These results were similar to those found in studies of British coal miners.

Therefore, if he relies on the Attfield and Hodous study, Dr. Rosenberg's theory is flawed. According to the Department of Labor, while lower dust exposure should reduce both the occurrence and the severity of lung disease, the kinds of diseases will remain the same. "Indeed, Attfield and Hodus specifically chose to use data from miners with presumably higher dust exposures so as to facilitate the detection of exposure-response relationships. ….In any event, analysis of data from miners who worked only in dust controlled conditions confirm the connection between coal mine dust exposure and obstructive lung disease." 65 Federal Register, No. 245, December 20, 2000 at 79940. As to the theory expressed by Dr. Renn, his predicate as to industrial bronchitis has been disputed. ALJs have been sustained in finding that industrial bronchitis is pneumoconiosis. *Boggs v. Director*, 867 F.2d 611 (Table) (6ᵗʰ Cir., 1989); Industrial bronchitis was CWP: *Florence Mining Co. v. Director, OWCP*, 188 Fed.Appx. 105 (3ʳᵈ. Cir.,2006); *Sea ""B" Mining Co.* v. Dunford, 188 Fed.Appx. 191, (4ᵗʰ Cir., 2006); *Cyprus Cumberland Resources v. Director*, 170 Fed.Appx. 787 (3ʳᵈ. Cir., 2006); *Dante Coal Co. v. Director*, 164 Fed.Appx. 338 (4ᵗʰ Cir., 2006). There is an unpublished case wherein a Circuit court that affirmed the opposite, *Pittsburg & Midway Coal Minin Co. v. Sanchez*, 18 Fed.Appx. 722 (10ᵗʰ Cir., 2001).

In this variation, Dr. Renn asserts once the pulmonary function studies are from smoking "it will never disappear even though they quit smoking." I find although he opinioned otherwise, this does not consider that pneumoconiosis is latent and can aggravate another condition. Indeed, it is reasonable that there is no way to distinguish smoking and coal mining from testing. Moreover, although Dr. Renn relies on "reversibility," the record shows that bronchodilation did not completely reverse the condition. Again, Dr. Renn also mis-interpreted the findings of

- 6 -

Attfield and Hodous, who in essence, argue that there is no way to render a distinction based on the pulmonary function studies. I find that it is more plausible that both smoking and mining contributed. See *Cornett v. Benham Coal, Inc.*, 227 F.3d 569, 576 (6th Cir. 2000).

More importantly, I find that neither Dr. Rosenberg nor Dr. Renn fully considered the 27 year history of coal mine employment in rendering a diagnosis.

Therefore, I find that their opinions are flawed. Moreover, the Employer did not provide direct evidence that coal mine employment can be ruled out as a cause of total disability.

### CONCLUSION

Claimant established entitlement to the presumption under § 1556, amended to the Act on March 23, 2010. Employer has not rebutted that

(A) Claimant does not, or did not, have pneumoconiosis, or that

(B) His respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine.

# ORDER

It is hereby **ORDERED** that the living miner's claim of **ARVIS R. TOLER** is **GRANTED.** Augmentation benefits for one dependent are authorized.


DANIEL F. SOLOMON
Administrative Law Judge

**NOTICE OF APPEAL RIGHTS:** If you are dissatisfied with the decision, you may file an appeal with the Benefits Review Board ("Board"). To be timely, your appeal must be filed with the Board within thirty (30) days from the date on which the decision is filed with the district director's office. *See* 20 C.F.R. §§ 725.478 and 725.479. The address of the Board is: Benefits Review Board, U.S. Department of Labor, P.O. Box 37601, Washington, DC 20013-7601. Your appeal is considered filed on the date it is received in the Office of the Clerk of the Board, unless the appeal is sent by mail and the Board determines that the U.S. Postal Service postmark, or other reliable evidence establishing the mailing date, may be used. *See* 20 C.F.R. § 802.207. Once an appeal is filed, all inquiries and correspondence should be directed to the Board. After receipt of an appeal, the Board will issue a notice to all parties acknowledging receipt of the appeal and advising them as to any further action needed. At the time you file an appeal with the Board, you must also send a copy of the appeal letter to Associate Solicitor, Black Lung and Longshore Legal Services, U.S. Department of Labor, 200 Constitution Ave., NW, Room N-2117, Washington, DC 20210. *See* 20 C.F.R. § 725.481. If an appeal is not timely filed with the Board, the decision becomes the final order of the Secretary of Labor pursuant to 20 C.F.R. § 725.479(a).

J.A. 53

UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| ARVIS TOLER, *Petitioner,* v. EASTERN ASSOCIATED COAL CORPORATION; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, *Respondents.* | No. 97-2148 |

On Petition for Review of an Order
of the Benefits Review Board.
(96-1499-BLA)

Submitted: July 28, 1998

Decided: August 19, 1998

Before ERVIN, HAMILTON, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

## COUNSEL

S.F. Raymond Smith, RUNDLE & RUNDLE, L.C., Pineville, West Virginia, for Petitioner. Mark E. Solomons, Laura Metcoff Klaus, ARTER & HADDEN, Washington, D.C., for Respondents.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Arvis Toler seeks review of a decision of the Benefits Review Board (Board) affirming an administrative law judge's (ALJ) decision to deny his application for black lung benefits. The ALJ denied benefits in this case based on his finding that Toler failed to establish the presence of pneumoconiosis. The Board affirmed the ALJ's finding of no pneumoconiosis and denial of benefits. After reviewing the record, we find no reversible error and affirm the order of the Board.

This Court reviews the Board's decision only for errors of law and to ensure that the Board adhered to the correct standard of review. *See Doss v. Director, Office of Workers' Compensation Programs*, 53 F.3d 654, 658 (4th Cir. 1995). Therefore, this Court affirms the Board's decision if the Board properly decided that the ALJ's findings are supported by substantial evidence. *See id.* at 659. To determine whether the ALJ's findings are supported by substantial evidence, this Court undertakes an independent review of the record. *See Dehue Coal Co. v. Ballard*, 65 F.3d 1189, 1193 (4th Cir. 1995). However, review is confined to the grounds upon which the Board based its decision. *See Grigg v. Director, Office of Workers' Compensation Programs*, 28 F.3d 416, 418 (4th Cir. 1994).

On appeal, Toler contends that the reports credited by the ALJ finding no pneumoconiosis were impermissibly based solely on negative X-rays and that the employer's physicians' assertions that the nature of Toler's particular obstructive impairment was inconsistent with pneumoconiosis are hostile to the premises of the Federal Black Lung Act. We find both claims to be without merit. The ALJ primarily relied on Drs. Zaldivar and Tuteur, who both found that Toler did not have pneumoconiosis. Despite Toler's assertion to the contrary, the record discloses that these opinions were based not solely on negative X-ray evidence, but also on laboratory data documenting a

purely obstructive disease, the presence of the "premiere" cause of emphysema, and Toler's long-term and continued cigarette smoking.

With respect to Toler's second contention, we also find that the ALJ did not impermissibly rely on Dr. Tuteur's opinion which was based on the erroneous assumption that obstructive disorders cannot be caused by coal mine employment. *See Warth v. Southern Ohio Coal Co.*, 60 F.3d 173 (4th Cir. 1995). Our review does not disclose that Dr. Tuteur's opinion was based on such an assumption, given his statement that "coal dust can result in obstructive impairment when massive fibrosis from coal dust inhalation is present." Because substantial evidence supports the Board's finding that Toler did not establish pneumoconiosis, we do not address Toler's assertion that the Board erred in not finding that Toler's pneumoconiosis contributed to his total disability.

Accordingly, the decision of the Board is affirmed. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and oral argument would not aid the decisional process.

*AFFIRMED*

**U.S. Department of Labor**        Benefits Review Board
                                    P.O. Box 37601
                                    Washington, DC 20013-7601



BRB No. 96-1499 BLA
OWCP No. ████5366

ARVIS TOLER                          )
                                     )
    Claimant-Petitioner        )        **NOT-PUBLISHED**
                                     )
  v.                             )
                                     )
EASTERN ASSOCIATED COAL              )
CORPORATION                          )        JUL 2 9 1997
                                     )        DATE ISSUED: _____
    Employer-Respondent        )
                                     )
                                     )
DIRECTOR, OFFICE OF WORKERS'         )
COMPENSATION PROGRAMS, UNITED        )
STATES DEPARTMENT OF LABOR           )
                                     )
    Party-in-Interest          )        DECISION and ORDER

Appeal of the Decision and Order on Remand of Christine McKenna, Administrative Law Judge, United States Department of Labor.

S. F. Raymond Smith (Rundle & Rundle), Pineville, West Virginia, for claimant.

Laura Metcoff Klaus (Arter & Hadden), Washington, D.C., for employer.

Before: SMITH, DOLDER and McGRANERY, Administrative Appeals Judges.

PER CURIAM:

Claimant[1] appeals the Decision and Order on Remand (94-BLA-281) of Administrative Law Judge Christine McKenna denying benefits on a claim filed pursuant to the provisions of Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §901 *et seq.* (the Act). In the initial Decision and Order, the administrative law judge found that claimant failed to establish the existence of

---

[1] Claimant is Arvis Toler, the miner, who filed a claim for benefits on February 4, 1993. Director's Exhibit 1.

J.A. 57

pneumoconiosis pursuant to 20 C.F.R. §718.202(a)(1), (4). Accordingly, benefits were denied. On appeal, the Board affirmed the administrative law judge's findings regarding length of coal mine employment, responsible operator status and pursuant to 20 C.F.R. §§ 725.308, 718.202(a)(1)-(3), vacated the administrative law judge's findings pursuant to 20 C.F.R. §718.202(a)(4), and remanded the case for the administrative law judge to reconsider the medical opinions of Drs. Tuteur and Zaldivar in light of the holding of the United States Court of Appeals for the Fourth Circuit in *Warth v. Southern Ohio Coal Co.*, 60 F.3d 173, 19 BLR 2-265 (4th Cir. 1995) and to reweigh Dr. Rasmussen's opinion. *Toler v. Eastern Assoc. Coal Corp.*, BRB No. 95-0434 BLA (Jan. 29, 1996)(unpub.).

On remand, the administrative law judge again found that claimant failed to establish the existence of pneumoconiosis pursuant to Section 718.202(a)(4). Accordingly, benefits were denied. In the instant appeal, claimant contends that the administrative law judge again erred in relying on the opinions of Drs. Tuteur and Zaldivar and in weighing Dr. Rasmussen's opinion. Employer responds urging affirmance of the administrative law judge's Decision and Order. The Director, Office of Workers' Compensation Programs (the Director), responds declining to participate in this appeal.

The Board's scope of review is defined by statute. If the administrative law judge's findings of fact and conclusions of law are supported by substantial evidence, are rational and are consistent with applicable law, they are binding upon this Board and may not be disturbed. 33 U.S.C. §921(b)(3), as incorporated into the Act by 30 U.S.C. §932(a); *O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc.*, 380 U.S. 359 (1965).

In order to establish entitlement pursuant to 20 C.F.R. Part 718, claimant must establish that he has pneumoconiosis, that such pneumoconiosis arose out of coal mine employment, and that such pneumoconiosis is totally disabling. *See* 20 C.F.R. §§718.3, 718.202, 718.203, 718.204; *Director, OWCP v. Mangifest*, 826 F.2d 1318, 10 BLR 2-220 (3d Cir. 1987); *Strike v. Director, OWCP*, 817 F.2d 395, 10 BLR 2-45 (7th Cir. 1987); *Grant v. Director, OWCP*, 857 F.2d 1102, 12 BLR 2-1 (6th Cir. 1988); *Anderson v. Valley Camp of Utah, Inc.*, 12 BLR 1-111 (1989); *Baumgartner v. Director, OWCP*, 9 BLR 1-65 (1986); *Roberts v. Bethlehem Mines Corp.*, 8 BLR 1-211 (1985). Failure to prove any of these requisite elements compels a denial of benefits. *See Anderson, supra; Baumgartner, supra; Perry v. Director, OWCP*, 9 BLR 1-1 (1986).

After consideration of the administrative law judge's Decision and Order on Remand, the arguments raised on appeal and the evidence of record, we conclude that the administrative law judge's findings of fact and conclusions of law are supported by substantial evidence and contain no reversible error therein. Claimant contends that the administrative law judge erred in crediting the opinions of Drs. Zaldivar and Tuteur because their opinions, that claimant does not have pneumoconiosis, are based on negative x-rays and the obstructive nature of his impairment. Claimant's Brief at 8-9. The United States Court of Appeals for the Fourth Circuit, within whose jurisdiction this claim arises, in *Warth*,

2

*supra,* held that an administrative law judge may not rely on an opinion where the physician based that opinion on the erroneous assumption that obstructive disorders cannot be caused by coal mine employment. *Warth, supra.*

Dr. Rasmussen, in reports dated March 3, 1993 and August 6, 1993, opined that claimant has pneumoconiosis. Director's Exhibit 10, 18. Dr. Tuteur, in a report dated June 3, 1994, states:

> The pattern of a severe obstructive defect associated with exercise induced hypoxemia is typical of and regularly occurs with advanced emphysema. When coal workers' pneumoconiosis is sufficiently advanced to produce impairment of pulmonary function, one expects to find a restrictive ventilatory defect (not present here) and/or impairment of gas exchange. Though the impairment of gas exchange does occur during exercise, it is best explained by the cigarette-smoke-induced advance emphysema. Emphysema does not occur with coal workers' pneumoconiosis unless progressive massive fibrosis is present. This clearly is not the case.

Employer's Exhibit 5. Dr. Tuteur further states:

> In summary, Mr. Toler does not have clinically-significant, physiologically-significant, or radiographically-significant coal workers' pneumoconiosis. With reasonable medical certainty, his clinical symptoms, physical examination findings, physiologic impairment, and serial chest radiographs are totally explained by the advanced tobacco-smoke-caused chronic obstructive pulmonary disease and the advanced arteriosclerotic heart disease manifested clinically by angina pectoris and myocardial infarctions as well as progressive breathlessness.

Employer's Exhibit 5.

The administrative law judge permissibly found that Dr. Tuteur did not base his opinion upon the assumption that coal dust can not result in obstructive lung disease, but in fact stated that "coal dust can result in obstructive impairment when massive fibrosis from coal dust inhalation is present." Decision and Order on Remand at 6; *Lafferty v. Cannelton Industries, Inc.*, 12 BLR 1-190 (1989). The administrative law judge also permissibly found that Dr. Tuteur's opinion is well documented, well reasoned and persuasive. Decision and Order on Remand at 6; *Clark v. Karst-Robbins Coal Co.*, 12 BLR 1-149 (1989)(*en banc*).

Dr. Zaldivar, who examined claimant on September 23, 1993, stated:

3

Mr. Toler is obviously still smoking as judged by the high carboxyhemoglobin level obtained by Dr. Rasmussen and also obtained in my office. Mr. Toler also complains of cardiac disease. Mr. Toler has severe emphysema caused by his life-long history of smoking. Mr. Toler does not have any evidence of pneumoconiosis. Individuals who smoke as much as Mr. Toler has and still does, develop just as severe emphysema as Mr. Toler has developed without ever stepping into a coal mine. . .Mr. Toler is severely impaired due to emphysema caused by smoking. Mr. Toler does not have coal workers' pneumoconiosis.

Employer's Exhibit 1. In a record review dated June 2, 1994, Dr. Zaldivar stated:

In conclusion, my opinion after reviewing all of these records remains the same as given on my report of October 20, 1993. Mr. Toler has continued to smoke in spite of his assertion to the contrary. He has shown a progressive decrement of his breathing tests with more airway obstruction present at this time than in 1989. This progression of the disease is a result of his ongoing smoking habit. From the pulmonary standpoint he is impaired and impairment is due to the smoking. Mr. Toler does not have coal workers' pneumoconiosis.

Employer's Exhibit 6.

The administrative law judge permissibly found that Dr. Zaldivar's opinion is not invalid under *Warth* and noted that Dr. Zaldivar relied heavily on the negative x-ray evidence, the laboratory data documenting a purely obstructive disease, and the presence of the "premiere" cause of emphysema, long-term and continued cigarette smoking. Decision and Order on Remand at 6; *see Warth, supra; Lafferty, supra*. The administrative law judge concluded by stating:

Dr. Rasmussen's opinion is clearly the most favorable to the claimant and the most "friendly" to the notion that obstructive lung impairments can arise from coal dust exposure. Nevertheless, the question here is whether *this* patient's obstructive lung disease arose from coal mine employment. Claimant bears the burden of proving by a preponderance of the evidence that his illness comes within the definition. . .Given the paucity of positive x-ray evidence, Dr. Rasmussen's opinion must amount to a preponderance of the evidence in order for claimant to prevail.

Decision and Order on Remand at 7. The administrative law judge then permissibly found that Dr. Rasmussen's opinion, that claimant has pneumoconiosis, does not constitute a preponderance of the evidence. Decision and Order on Remand at 7; *Edmiston v. F & R Coal Co.*, 14 BLR 1-65 (1990); *Lafferty, supra*.

4

The administrative law judge, within his discretion as finder-of-fact, properly considered all the relevant evidence of record and permissibly found that the preponderance of the medical opinion evidence did not support a finding that claimant established the existence of pneumoconiosis pursuant to Section 718.202(a)(4). Decision and Order on Remand at 7-8; Director's Exhibits 10, 18; Employer's Exhibits 1, 5, 6; *Edmiston, supra*; *Lafferty, supra*; *Piccin v. Director, OWCP*, 6 BLR 1-616 (1983). The administrative law judge is empowered to weigh the evidence and to draw his own inferences therefrom, *see Maypray v. Island Creek Coal Co.*, 7 BLR 1-683 (1985), and the Board may not reweigh the evidence or substitute its own inferences on appeal. *See Clark, supra*; *Anderson, supra.* Thus, we affirm the administrative law judge's finding that claimant failed to establish the existence of pneumoconiosis pursuant to Section 718.202(a)(4) and the denial of benefits.

Accordingly, the administrative law judge's Decision and Order on Remand denying benefits is affirmed.

SO ORDERED.


ROY P. SMITH
Administrative Appeals Judge


NANCY S. DOLDER
Administrative Appeals Judge


REGINA C. MCGRANERY
Administrative Appeals Judge

Office of Administrative Law Judges
800 K Street, N.W.
Washington, D.C. 20001-8002



In the Matter of )
)
ARVIS TOLER, )
)
    Claimant, )
)
vs. )
)
EASTERN ASSOCIATED COAL )
COMPANY, )
)
    Employer, )
)
and )
)
DIRECTOR, OFFICE OF WORKERS' )
COMPENSATION PROGRAMS, )
)
    Party-in-Interest. )
_____ )

Date issued: **JUL 30 1996**

Case No. 94-BLA-281
OWCP No. ███-5366

**DECISION AND ORDER ON REMAND**

    This matter is before the undersigned administrative law judge pursuant to the Decision and Order issued January 29, 1996 by the Benefits Review Board, remanding for the purpose of re-weighing the medical opinion evidence, specifically: (1) reconsideration of the opinions of Drs. Zaldivar and Tuteur under 20 C.F.R. §718.202(a)(4) in light of the Fourth Circuit's holding in Warth v. Southern Ohio Coal Co., 60 F.3d 173 (4th Cir. 1995); and (2) re-evaluation of Dr. Rasmussen's opinion insofar as it relates to the x-ray evidence and to the legitimate role that length of coal mine employment plays in arriving at a diagnosis of pneumoconiosis.

    The issue at hand is whether the medical opinion evidence establishes the existence of the disease as defined in the statute and regulations. The Board has left undisturbed my previous finding that the x-ray evidence standing alone fails to establish the existence of pneumoconiosis. There is no dispute that Mr. Toler suffers from a severe obstructive pulmonary illness and that he is totally disabled as a result of that illness. If it constitutes pneumoconiosis, that is, a respiratory illness causally linked to coal mine employment, Mr. Toler's claim must be granted.

DECISION AND ORDER ON REMAND
Toler v. Eastern Associated Coal Corp.
Case No. 94-BLA 281, OWCP No. ███-5366

1

J.A. 62

DISCUSSION

1.  **The medical opinions in light of Warth v. Southern Ohio Coal Co.**

It is well established in the Fourth Circuit that the legal definition of pneumoconiosis is much broader than the clinical or medical definition. The statutory and regulatory program allows compensation for a variety of respiratory problems, so long as they bear a causal relationship to coal mine employment. <u>Hobbs v. Clinchfield Coal Co.</u>, 45 F.3d 819, 821 (4th Cir. 1995); <u>Robinson v. Pickands Mather & Co.</u>, 914 F.2d 35, 39 (4th Cir. 1990). The Court established in <u>Warth v Southern Ohio Coal Co.</u>, 60 F.3d 173 (4th Cir. 1995) that because chronic obstructive lung disease is encompassed within the definition of pneumoconiosis, a medical opinion based on an assumption that such a disorder cannot be caused by coal mine employment is entitled to little, if any, weight. In other words, the medical opinion cannot foreclose the possibility of a causal connection.

In addition, the regulations at 20 C.F.R. §718.202(a)(4) require that a medical opinion be well reasoned and documented in order to be persuasive: "A 'documented' report sets forth the clinical findings, observations, facts, <u>etc.</u>, on which the doctor has based his diagnosis. A report is 'reasoned' if the documentation supports the doctor's assessment of the miner's health." <u>Fields v. Island Creek Coal Co.</u>, 10 BLR 1-19, 1-22 (1987). I turn to the opinions of Drs. Rasmussen, Zaldivar and Tuteur with these principles in mind, in order to determine whether the claimant has established the existence of pneumoconiosis under §718.202(a)(4).

**A. Dr. Rasmussen**: Dr. Donald Rasmussen examined Mr. Toler on March 8, 1993. He diagnosed coal workers' pneumoconiosis due to the claimant's more than 27 years of work in the mines, as well as the positive x-ray reading [1/1 p/q all six zones] by Dr. Speiden. He also found severe chronic obstructive pulmonary disease as a result of both coal dust and cigarette smoking. It was his opinion that the patient suffers "very severe, totally disabling respiratory insufficiency as reflected by the severe ventilatory impairment, the reduced diffusing capacity, the marked impairment in oxygen transfer and hypoxia during light exercise." [DX 10].

Later, OWCP had the x-ray of March 8, 1993 re-read by Drs. Cole and Francke, who found it negative for pneumoconiosis, and inquired of Dr. Rasmussen further [DX 18]. Dr. Rasmussen responded that Drs. Speiden, Cole and Francke are all highly qualified to read chest x-rays for pneumoconiosis, and that their difference of opinion was striking. However, he noted that the x-ray is a poor tool for excluding the presence of pneumoconiosis and may indeed fail to reveal evidence of significant pneumoconiosis. He cited a study showing positive findings on autopsy in patients whose pre-mortem films revealed no pneumoconiosis whatsoever. He concluded:

DECISION AND ORDER ON REMAND
Toler v. Eastern Associated Coal Corp.
Case No. 94-BLA 281, OWCP No. ███5366

2

J.A. 63

Based on this patient's significant occupational dust exposure and Dr. Speiden's x-ray findings, and considering the imperfection of the x-ray, it is my opinion that this patient does have coalworkers' pneumoconiosis which arose from his coal mine employment.

I further believe that there is clear evidence indicating the patient's coal dust exposure has played a very significant role in causing his disabling lung disease since it is now well established that chronic obstructive lung disease including pulmonary emphysema may clearly be the consequence of coal mine exposure. [DX 19]

**B. Dr. Zaldivar**: Dr. George Zaldivar examined Mr. Toler on September 29, 1993. He also reviewed certain medical information, including the reports of Dr. Rasmussen discussed above. Dr. Zaldivar noted no radiographic or other evidence of pneumoconiosis, based on x-ray, functional testing and clinical examination of September 29, 1993, although he was aware that Dr. Speiden had read the film of March 8, 1993 as positive for pneumoconiosis.[1] He concluded that the claimant has severe emphysema due to his life-long history of smoking, and that indeed he was still smoking at the time of the examination in September 1993. He remarked that "Individuals who smoke as much as Mr. Toler has and still does, develop just as severe emphysema as Mr. Toler has developed without ever stepping into a coal mine." [EX 1].

**Counterpoints**: Both Rasmussen and Zaldivar reviewed and commented on one another's reports. Dr. Rasmussen's rebuttal to Dr. Zaldivar is dated January 24, 1994 and appears at CX 1; he also reviewed a letter from Dr. Anthony Flaim. Dr. Rasmussen stated that disagreements among B readers are quite common concerning the presence or absence of pneumoconiosis on chest x-rays. He repeated his opinion that the x-ray is a poor diagnostic tool "for determining the presence or absence of pneumoconiosis."[2] Turning then to the cause of Mr. Toler's emphysema, Dr. Rasmussen stated "it is well known, of course, that cigarette smoking is a potent cause of emphysema. It is also, however, well known that pulmonary emphysema may be the consequence of coal dust exposure," citing numerous scientific studies, a number of which are from Europe. Dr. Rasmussen cited these articles for the general proposition that focal emphysema -- that is, the emphysema that occurs in the presence of a coal macule -- is in fact simply a form of centrilobular emphysema; as well as for the proposition that even where radiographic findings characteristic of coal dust exposure are absent,

---

[1]Dr. Zaldivar noted that the 3/8/93 film had been read as negative by Drs. Cole and Francke [EX 1]. Six other B readers, who are also board-certified radiologists, have read this film as negative as well [EX 2 and 3].

[2]Citing the same study referenced above that compared negative pre-mortem x-ray interpretations with post-mortem autopsy results that revealed the presence of the disease.

DECISION AND ORDER ON REMAND
Toler v. Eastern Associated Coal Corp.
Case No. 94-BLA 281, OWCP No. ███5366

3

J.A. 64

coal workers with sufficient coal dust exposure to cause chronic bronchitis and emphysema are at premature risk of death.

Dr. Zaldivar's rebuttal to Dr. Rasmussen is dated June 2, 1994 and appears at EX 6. In addition to critiquing the bases of Dr. Rasmussen's opinion, Dr. Zaldivar reviewed certain other information about Mr. Toler, including treating records for his heart disease, and the letter from Dr. Flaim. Dr. Zaldivar spent considerable energy dissecting two of the numerous scientific studies on which Dr. Rasmussen relied. One such article, he noted, involved an uncontrolled population study based on questionnaires to the miners themselves and not on examinations by physicians; and ventilatory studies taken under uncontrolled field -- rather than laboratory -- conditions such that the test results were unverifiable. Another study was cited by Dr. Rasmussen for the conclusion that miners in British collieries had a higher mortality rate due to bronchitis and emphysema because of their coal mine employment. Dr. Zaldivar pointed out that this study involved a review of thousands of death certificates of miners whose exposure to dust was not known but merely estimated; which did not address the connection between smoking and emphysema and bronchitis (focussing primarily on the connection with lung cancer); and which did not sort out the smoking habits among the miners studied.

In addition to refuting the conclusions of the scientific articles cited by Dr. Rasmussen, Dr. Zaldivar reviewed additional x-ray interpretations, ventilatory studies, and carboxyhemoglobin test records concerning the claimant. He reiterated his original conclusion that Mr. Toler does not suffer from pneumoconiosis, but that he does suffer from a significant progressing airway obstruction due to smoking. [EX 6].

**C. Dr. Tuteur**. At the employer's request, Dr. Peter Tuteur reviewed numerous medical records concerning the claimant, including the original and supplemental reports of Dr. Rasmussen and Zaldivar discussed above, except that he did not have in his possession Dr. Zaldivar's report of June 2, 1994. Dr. Tuteur provided his opinion in a report dated June 3, 1994 [EX 5]. Dr. Tuteur reviewed and discussed the findings at length, and concluded that the findings in total were consistent with chronic bronchitis and emphysema, not with pneumoconiosis:

> This dataset and the diagnoses of coronary artery disease as well as chronic obstructive pulmonary disease fully account for symptoms, physical examination findings, pulmonary function abnormalities, and chest radiographs. On this basis, there are no convincing data leading to the diagnosis of clinically-significant, physiologically-significant, or radiographically-significant coal workers' pneumoconiosis.

DECISION AND ORDER ON REMAND
Toler v. Eastern Associated Coal Corp.
Case No. 94-BLA 281, OWCP No. █████5366

4

J.A. 65

Of particular note is this expert's discussion of the significance of ventilatory test values -- showing no restrictive component -- in the absence of persistent impairment of gas exchange at rest but in the presence of noticeable exercise-induced hypoxemia. According to Dr. Tuteur, this pattern is typical not of pneumoconiosis but of advanced emphysema. Typically, he said, a coal dust-induced respiratory problem does not result in emphysema until massive fibrosis is present, a condition not present in Mr. Toler's case. Rather, the impairment of gas exchange seen in arterial blood gas results here was "best explained by the cigarette-smoke-induced advanced emphysema." He found Mr. Toler totally disabled as a result of two primary disease processes: arteriosclerotic heart disease, and advanced chronic obstructive pulmonary disease manifested by chronic bronchitis and emphysema caused by smoking.

Dr. Tuteur remarked that chronic obstructive pulmonary disease, as well as heart disease, are not conditions related to, aggravated by, or caused by the inhalation of coal mine dust or the development of coal workers' pneumoconiosis. He addressed specifically the contention of Dr. Rasmussen that severe airways obstruction results from coal workers' pneumoconiosis. Referring to one of the articles on which Dr. Rasmussen relied (a 1992 report by Dr. Attfield) to establish a causal connection between obstructive pulmonary disease and coal dust, he noted that when one applies normal controls for pulmonary function (which the Attfield group did not do), the decline in $FEV_1$ among non-smoking miners is actually statistically identical to the decline among non-smoking non-miners; while there is a more rapid decline in $FEV_1$ among smoking miners. Thus, far from supporting the conclusion in the Attfield article, the data actually undermine it, according to Dr. Tuteur. From this he concluded that smoking, rather than coal dust, produces the obstructive pulmonary defect [EX 5].

**D. Discussion.** The court's holding in Warth requires that the weight of Dr. Tuteur's and Dr. Zaldivar's opinions be significantly discounted to the extent they are based on the assumption that breathing coal mine dust does not cause chronic obstructive lung disease. Warth can be read to stand for the proposition that a causal connection exists between obstructive lung disease and coal dust as a matter of law by statute and regulation, regardless of the reasoning and underlying bases for a medical opinion.

Such a reading would be nonsensical, however, in that it would relieve the factfinder from any duty to look beyond the expert's bottom-line conclusion. I conclude that this was not the intent of the court in Warth. Rather, the factfinder must evaluate the evidence in each case to determine the soundness of an expert's conclusion. As the Seventh Circuit explained in Blakely v. Amax Coal Co., 54 F.3d 1313 (7th Cir. 1995), the contention that coal dust exposure does not cause obstructive impairment and that in a smoker, cigarettes are the culprit,

DECISION AND ORDER ON REMAND
Toler v. Eastern Associated Coal Corp.
Case No. 94-BLA 281, OWCP No. ███5366

5

J.A. 66

" ... neither falls into a traditionally hostile category nor contravenes the Act's definition of pneumoconiosis. The Act and its regulations define "pneumoconiosis" broadly and do not establish that dust exposure from coal mine work can necessarily cause obstructive pulmonary disease or impairment. ... Rather, the facts and medical opinions in each specific case answer this question."

With respect to Dr. Tuteur, I find that his opinion does not rest on the erroneous assumption that coal dust cannot result in obstructive lung disease. To the contrary, he comments that coal dust *can* result in obstructive impairment when massive fibrosis from coal dust inhalation is present. However, there is no evidence of massive fibrosis in Mr. Toler's case. Rather, Dr. Tuteur's assumption appears to be that a coal dust-induced respiratory problem is initially and primarily restrictive in terms of functional impairment, and does not cause an obstructive impairment until it significantly and pervasively affects large proportions of the lung.

In other respects, I find the opinion of Dr. Tuteur well documented, well reasoned and persuasive. He is well qualified to render his opinion, given his credentials as a pulmonary specialist, the thoroughness of his review of the evidence, and the thoroughness of his rationale. At a minimum, his pointing out that at least one study on which Dr. Rasmussen relied did not apply a commonly-used control for pulmonary function, casts doubt on the contention that the claimant suffers from a coal dust-induced respiratory illness.

In addition, Dr. Tuteur reviewed, assembled and distilled considerable information about this particular patient rather than engaging in a sweeping assumption that contravenes the statute and regulation. For example, he discussed the significance of symptoms such as breathlessness (which is symptomatic of pneumoconiosis though non-specific), in conjunction with chronic daily productive cough, intermittent wheezing, and physiologic and radiographic abnormalities consistent with emphysema and *not* regularly present due to pneumoconiosis. He further commented on the significance of impaired gas exchange on exercise. As I read his opinion, Dr. Tuteur's analysis had to do not so much with whether obstructive impairments can in general arise from coal dust, but with whether coal dust had anything to do with this particular patient's lung problems.

Similarly, Dr. Zaldivar's opinion is not invalid under Warth. He relied heavily on the negative x-ray evidence, the laboratory data documenting a purely obstructive disease, and the presence of the "premiere" cause of emphysema, long-term and continued cigarette smoking. Moreover, he concluded independently of Dr. Tuteur that the studies on which Dr. Rasmussen relied were flawed.

**DECISION AND ORDER ON REMAND**
Toler v. Eastern Associated Coal Corp.
Case No. 94-BLA 281, OWCP No. ███5366

6

Dr. Rasmussen's opinion is clearly the most favorable to the claimant and the most "friendly" to the notion that obstructive lung impairments can arise from coal dust exposure. Nevertheless, the question here is whether *this* patient's obstructive lung disease arose from coal mine employment. Claimant bears the burden of proving by a preponderance of the evidence that his illness comes within the definition of "pneumoconiosis." Director, OWCP v. Greenwich Collieries, ___ U.S. ___, 114 S.Ct 1151, 18 BLR 2A-1 (1994); Cole v. East Kentucky Collieries, ___ BLR ___, BRB No. 94-398 (June 27, 1996). Given the paucity of positive x-ray evidence, Dr. Rasmussen's opinion must amount to a preponderance of the evidence in order for claimant to prevail. In this regard, I find that his opinion does not constitute a preponderance of the evidence.

2. **Reconsideration of Dr. Rasmussen's opinion.**

Addressing the Board's concerns in its remand order, I shall attempt to re-characterize Dr. Rasmussen's opinion. Dr. Rasmussen's opinion evolved over time as shown in his three reports. In his report of March 8, 1993 [DX 10], he relied on two factors to find pneumoconiosis: the positive x-ray interpretation of Dr. Speiden and the length of Mr. Toler's coal mine employment [DX 10]. When confronted with two negative readings by board-certified B readers, Dr. Rasmussen responded in a report dated August 6, 1993 that pointed out the limits of the chest x-ray as a diagnostic tool, citing a 1992 article by Vallyathan et al. Despite the imperfection of the x-ray, however, he continued to rely on Dr. Speiden's positive interpretation and the claimant's significant exposure to occupational dust.[3] He stated, without elaboration, that it was well established that chronic obstructive lung disease, including pulmonary emphysema, "may clearly be the consequence of coal mine dust exposure." [DX 19]. In his report of January 24, 1994, Dr. Rasmussen repeated that the x-ray is a poor tool for ruling pneumoconiosis in or out, and, apparently retreating from his reliance on radiographic evidence, cited numerous scientific articles in support of his conclusion [CX 1].

I note that Dr. Tuteur approved the citation of the Vallyathan article, and agreed with its conclusion, that "pathologically significant coal workers' pneumoconiosis may exist among some miners with normal chest radiographs." [EX 5] However, the lack of radiographic evidence of disease cannot rationally be a basis for finding that the disease is present. The only reasonable inference one can draw from the lack of evidence is that the disease is neither ruled in or out by the chest x-rays. If that is so, the remaining bases for Dr. Rasmussen's opinion are the length of coal mine employment and the scientific literature. Length of coal mine employment, while not diagnostic in and of itself, may nevertheless be a legitimate factor for an expert to consider in determining the likelihood of a diagnosis and its connection to occupational exposure. Church v.

---

[3]Dr. Rasmussen's reliance on Dr. Speiden's interpretation rather than those that followed does not, of course, invalidate his conclusion, nor preclude its consideration under 20 C.F.R. §718.202(a)(4). Church v. Eastern Associated Coal Corp., 20 BLR 1-8, 1-13 (1996); Taylor v. Director, OWCP, 9 BLR 1-22, 1-24 (1986).

DECISION AND ORDER ON REMAND
Toler v. Eastern Associated Coal Corp.
Case No. 94-BLA 281, OWCP No. ████5366

7

Eastern Associated Coal Corp., 20 BLR 1-8, 1-13 (1996).[4] The issue is whether the two factors -- length of coal mine employment and citation to certain scientific studies -- suffice to establish that claimant's lung disease is occupational in origin. As discussed at length in my original Decision and Order of September 30, 1994, I find that the opinions of Drs. Tuteur and Zaldivar cast doubt on Dr. Rasmussen's conclusions, and further that his opinions rely on some circular reasoning. For example, Dr. Rasmussen quotes one study for the notion that premature risk of death increases with simple pneumoconiosis:

> "[I]t [premature risk of death] occurs also when such exposures have
> not resulted in massive fibrosis, or perhaps even in the absence of the
> smaller radiographic shadows characteristic of coalworkers' simple
> pneumoconiosis, if the dust exposures are sufficient to cause or
> enhance lung damage recognized by certifying doctors as chronic
> bronchitis and emphysema."

[CX 1, p. 3] Even without Dr. Zaldivar's critique of this article [EX 6, p. 4], one can see that the quotation itself assumes, without proving, that the dust exposures are sufficient to cause the diagnosis certified by physicians at death. This flaw is fatal: one cannot assume the causal connection and then declare it proven. Dr. Zaldivar noted that this study involved dust exposures that were not known but merely estimated; nor did the study investigate the smoking habits of the miners insofar as smoking relates to causing obstructive pulmonary disease. If the study did not sort out coal dust exposure from the risk of smoking -- the "premiere" cause of obstructive pulmonary disease -- it cannot be relied on to establish the occupational link urged by Dr. Rasmussen.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the claim of Arvis Toler for benefits under the Black Lung Reform Act, 30 U.S.C. §901 et seq., filed February 4, 1993, be and is **DENIED**.

Christine McKenna
Administrative Law Judge

---

[4]The Board's remand order cites Marsiglio v. Director, OWCP, 8 BLR 1-190 (1985). Marsiglio addresses extent of disability, not the nature and cause of the illness itself, and stands for the proposition that a doctor's opinion based in part on history may support a finding of impairment despite lack of objective test results establishing total disability.

DECISION AND ORDER ON REMAND
Toler v. Eastern Associated Coal Corp.
Case No. 94-BLA 281, OWCP No. ████-5366

8

J.A. 69

**U.S. Department of Labor**    Benefits Review Board
800 K Street N.W.
Washington, D.C. 20001-8001

BRB No. 95-0434 BLA
OWCP No. ████-5366

ARVIS TOLER                          )
                                     )   
          Claimant-Petitioner        )
                                     )
     v.                              )      JAN 2 9 1996
                                     )   DATE ISSUED: _____
EASTERN ASSOCIATED COAL              )
CORPORATION                          )
                                     )
          Employer-Respondent        )
                                     )
DIRECTOR, OFFICE OF WORKERS'         )
COMPENSATION PROGRAMS, UNITED        )
STATES DEPARTMENT OF LABOR           )
                                     )
          Party-in-Interest          )   DECISION and ORDER

          Appeal of the Decision and Order of Christine M. Moore,
          Administrative Law Judge, United States Department of
          Labor.

          S.F. Raymond Smith (Rundle & Rundle), Pineville, West
          Virginia, for claimant.

          Laura Metcoff Klaus (Arter & Hadden), Washington, D.C.,
          for employer.

          Eileen McCarthy (Thomas S. Williamson, Jr., Solicitor of
          Labor; Donald S. Shire, Associate Solicitor; Rae Ellen
          Frank James, Deputy Associate Solicitor; Richard A. Seid
          and Michael J. Rutledge, Counsel for Administrative
          Litigation and Legal Advice), Washington, D.C., for the
          Director, Office of Workers' Compensation Programs, the
          United States Department of Labor.

          Before: HALL, Chief Administrative Appeals Judge, SMITH
          and DOLDER, Administrative Appeals Judges.


          PER CURIAM:

          Claimant[1] appeals the Decision and Order (94-BLA-0281) of
Administrative Law Judge Christine M. Moore denying benefits on a

---

[1] Claimant is Arvis Toler, the miner, whose claim for benefits
filed on February 4, 1993 was administratively denied on July 29,
1993. Director's Exhibits 1, 20. Thereafter, claimant requested
a formal hearing. Director's Exhibit 21.

claim filed pursuant to the provisions of Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §901 et seq. (the Act). The administrative law judge accepted the parties' stipulations that claimant established twenty-seven years of coal mine employment and had one dependent for the purpose of benefits augmentation, that the claim was timely filed, and that employer was the responsible operator. Decision and Order at 2. The administrative law judge found the evidence insufficient to establish the existence of pneumoconiosis pursuant to 20 C.F.R. §718.202(a)(1), (4) and, accordingly, denied benefits.

On appeal, claimant contends that the administrative law judge erred in weighing the evidence pursuant to Section 718.202(a)(1) and (4). Claimant's Brief at 5-9. Employer responds, urging affirmance. The Director, Office of Workers' Compensation Programs (the Director), has filed a Motion to Remand[2], asserting that the administrative law judge erred in weighing the evidence pursuant to Section 718.202(a)(4) and urging the Board to remand the case to the administrative law judge to reconsider the medical opinion evidence in light of intervening case law.[3] Director's Brief at 2-8.

The Board's scope of review is defined by statute. The administrative law judge's Decision and Order must be affirmed if it is supported by substantial evidence, is rational, and is in accordance with law. 33 U.S.C. § 921(b)(3), as incorporated into the Act by 30 U.S.C. § 932(a); O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc., 380 U.S. 359 (1965).

Claimant contends that remand is required because the administrative law judge converted positive x-ray interpretations into negative readings in weighing the x-ray evidence pursuant to Section 718.202(a)(1). Claimant's Brief at 5. The administrative law judge erroneously counted two properly classified positive readings as negative, see 20 C.F.R. §718.102(b); Tackett v. Director, OWCP, 7 BLR 1-703 (1985)(en banc); Employer's Exhibits 3-4, by crediting the reader's notations that the films were not diagnostic of pneumoconiosis, see Valazak v. Bethlehem Mines Corp., 6 BLR 1-282 (1983). This error is harmless, however, see Larioni v. Director, OWCP, 6 BLR 1-1276 (1984), inasmuch as she properly

---

[2] We reject employer's contention that the Director's arguments are not properly before the Board. See Kingery v. Hunt Branch Coal Co., 19 BLR 1-6 (1994).

[3] We affirm as unchallenged on appeal the administrative law judge's findings regarding length of coal mine employment, dependency, miner, responsible operator status, and pursuant to 20 C.F.R. §§725.308, 718.202(a)(2), (3). See Coen v. Director, OWCP, 7 BLR 1-30 (1984); Skrack v. Island Creek Coal Co., 6 BLR 1-710 (1983).

J.A. 71

relied upon both the quantity and quality of the x-ray interpretations, *see Adkins v. Director, OWCP*, 958 F.2d 49, 16 BLR 2-61 (4th Cir. 1992); *Edmiston v. F & R Coal Co.*, 14 BLR 1-65 (1990), and permissibly accorded determinative weight to the "overwhelming number" of negative readings by Board-certified radiologists and B-readers in finding the preponderance of the x-ray evidence negative for pneumoconiosis,[4] *see Worhach v. Director, OWCP*, 17 BLR 1-105 (1993); *see also Mullins Coal Co. of Va. v. Director, OWCP*, 484 U.S. 135, 11 BLR 2-1 (1987), *reh'g denied*, 484 U.S. 1047 (1988); Decision and Order at 5. Therefore, we reject claimant's contention.

Claimant asserts that the administrative law judge erred in crediting the medical opinions of Drs. Zaldivar and Tuteur pursuant to Section 718.202(a)(4) because both physicians required positive x-rays to diagnose pneumoconiosis. Claimant's Brief at 6-7. Contrary to claimant's contention, neither physician indicated that he would not diagnose pneumoconiosis without a positive x-ray; rather, in discussing the medical data, these physicians merely noted that the x-ray interpretations were negative. Employer's Exhibits 1, 5.

Claimant further contends that the administrative law judge erred in crediting the opinions of Drs. Zaldivar and Tuteur because they were based on the erroneous premise that pneumoconiosis does not cause obstructive ventilatory impairments. Claimant's Brief at 7-8. The Director asserts that remand is required for the administrative law judge to consider the medical opinions in light of *Warth v. Southern Ohio Coal Co.*, 60 F.3d 173, BLR (4th Cir. 1995)(administrative law judge erred by relying on physician's opinion that claimant did not have pneumoconiosis where physician based opinion on erroneous assumption that obstructive disorders cannot be caused by coal mine employment). Director's Motion to Remand at 1. These contentions have merit.

Dr. Tuteur stated that arterial heart disease and chronic obstructive pulmonary disease are not conditions related to, aggravated by, or caused by the inhalation of coal mine dust, and based his conclusion that claimant did not have pneumoconiosis, in part, upon his observation that claimant's pulmonary function studies revealed a purely obstructive defect. Director's Exhibit 5. Because the administrative law judge relied on this rationale in crediting Dr. Tuteur's opinion over that of Dr. Rasmussen, Decision and Order at 9, and since we must apply the law in effect at the time of this decision, *see Lynn v. Island Creek Coal Co.*, 12 BLR 1-146 (1989), we vacate the administrative law judge's finding

---

[4] The administrative law judge overlooked two additional negative readings by Board-certified radiologists and B-readers, yielding a total of ten negative and three positive readings. Director's Exhibits 13-14.

J.A. 72

pursuant to Section 718.202(a)(4) and remand the case for her to reconsider the medical opinions in light of *Warth*.[5]

The Director further contends that the administrative law judge erred by according less weight to Dr. Rasmussen's opinion because he relied in part on a positive x-ray. Director's Brief at 2-3. In a letter to the Department of Labor explaining his diagnosis, Dr. Rasmussen stated that because he regarded the x-ray as a poor tool for excluding the existence of pneumoconiosis, his diagnosis of pneumoconiosis remained unchanged despite the subsequent negative readings of the positive x-ray interpretation upon which he had relied. Director's Exhibit 19.

The administrative law judge noted that this x-ray interpretation had been reread negative and stated that "Dr. Rasmussen himself believes that the x-ray is a poor diagnostic tool," concluding that therefore "one of the bases of his conclusion is faulty." Decision and Order at 8. We agree with the Director that the administrative law judge mischaracterized Dr. Rasmussen's opinion, *see Tackett v. Director, OWCP*, 7 BLR 1-703 (1985) (*en banc*), and erred in according less weight to Dr. Rasmussen's opinion because the positive x-ray he relied upon was reread negative, *see Taylor v. Director, OWCP*, 9 BLR 1-22 (1986).

The Director further asserts that the administrative law judge erred by rejecting claimant's twenty-seven years of coal mine employment as "non-diagnostic." Director's Brief at 4. Dr. Rasmussen indicated that he relied in part upon claimant's "27+ years of employment in the coal mine industry" in formulating his opinion that claimant suffered from pneumoconiosis. Director's Exhibit 10. The administrative law judge faulted Dr. Rasmussen's reliance on this factor, stating that "the fact of one's coal mine employment is non-diagnostic." Decision and Order at 8. Because the administrative law judge overlooked the legitimate role that a claimant's coal mine employment history plays in the formulation of a reasoned medical opinion, *see* 20 C.F.R. §§718.104, 718.201; *Marsiglio v. Director, OWCP*, 8 BLR 1-190 (1985), and otherwise erred in weighing Dr. Rasmussen's opinion, *see* discussion, *supra*, we instruct the administrative law judge to reweigh the medical opinion evidence on remand.

The Director also contends that the administrative law judge did not adequately explain why the four-year gap between the

---

[5] While Dr. Zaldivar did not distinguish between obstructive and restrictive impairments in making his diagnosis, he did conclude that claimant's pulmonary function studies revealed a severe obstructive defect, a factor the administrative law judge cited in weighing the medical opinions, finding that "Mr. Toler's studies show a progressive decrement in FEV1 without a restrictive defect." Decision and Order at 9; Employer's Exhibits 1, 6.

4

thirty-eight year smoking history taken by Dr. Rasmussen in the mistaken belief that claimant had quit smoking, and the forty-two year actual smoking history was significant enough to require discrediting of Dr. Rasmussen's opinion. Director's Brief at 8. We reject this contention because the administrative law judge did not actually discredit Dr. Rasmussen's opinion as based on an inaccurate smoking history, but rather credited the conclusions of Drs. Zaldivar and Tuteur that claimant was still smoking heavily, based on the carboxyhemoglobin levels they detected. Decision and Order at 10; Employer's Exhibits 1, 5. We also reject the Director's arguments that the administrative law judge failed to apply the legal definition of pneumoconiosis, Director's Brief at 3-4, and to give valid reasons for crediting the criticisms made by Drs. Zaldivar and Tuteur of the research studies that Dr. Rasmussen cited in concluding that claimant's emphysema was due in part to coal dust exposure, Director's Brief at 4-8, inasmuch as she stated the relevant regulation and thoroughly discussed the medical opinions. *See* Decision and Order at 6-10.

Accordingly, the administrative law judge's Decision and Order denying benefits is affirmed in part and vacated in part, and the case is remanded to the administrative law judge for further consideration consistent with this opinion.

SO ORDERED.


BETTY JEAN HALL, Chief
Administrative Appeals Judge


ROY P. SMITH
Administrative Appeals Judge


NANCY S. DOLDER
Administrative Appeals Judge

**U.S. Department of Labor**

Office of Administrative Law Judges
800 K Street, N.W.
Washington, D.C. 20001-8002



IN THE MATTER OF )
)
ARVIS TOLER )
    Claimant, )
)
v. )
)
)
EASTERN ASSOCIATED COAL CORP., )
    Employer )
)
and )
)
DIRECTOR, OFFICER OF WORKERS' )
    COMPENSATION PROGRAMS, )
    Party in Interest. )

Date issued:   SEP 30 1994

OALJ NO. 94-BLA-0281

OWCP No. █████5366

Appearances:

    S.F. Raymond Smith for Claimant
    Paul Frampton for Eastern Associated Coal Corporation
    Javier Romanach for Director, OWCP [not appearing at hearing]

Before:

    Christine M. Moore, Administrative Law Judge

# DECISION AND ORDER DENYING BENEFITS

    This proceeding arises from a claim for benefits under the Black Lung Benefits Act of 1969, 30 U.S.C. 901, et seq., as amended ("the Act"). Benefits are awardable under the Act to persons who are totally disabled due to pneumoconiosis and to certain survivors of persons whose death was caused by pneumoconiosis. Pneumoconiosis, commonly known as "black lung," is a chronic dust disease of the lungs and its sequelae, including respiratory and pulmonary impairments, arising from coal mine employment.

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP █████5366

1

J.A. 75

# PROCEDURAL HISTORY

Arvis Riley Toler filed a claim for benefits under the Act on February 4, 1993 (DX. 1).[1] The claimant identified Eastern Associated Coal ["Eastern"] as his employer, alleging employment in underground mining from 1966 through the time of his application (DX 2). The claim was denied July 29, 1993 (DX. 20) and the claimant took a timely appeal (DX 21). The case was referred to the Office of Administrative Law Judges November 8, 1993 (DX 28).

This matter went to hearing before me on June 28, 1994, at Beckley, West Virginia. All parties were offered a full opportunity to present evidence and argument. The Director did not appear. The following exhibits were admitted at hearing: ALJ 1-3; DX 1-28; CX 1; and EX 1-6. The record remained open for submission of post-hearing arguments. Admitted after hearing were CX-2, claimant's closing statement; and EX 7, Eastern's closing statement.

The employer stipulated at hearing that the claim was timely filed; that the claimant is a miner within the meaning of the Act, with employment after 1969, and that he has one dependent, his wife; that he worked for Eastern for the 27 years alleged. Eastern also stipulated that it is the responsible operator (TR 7). Eastern contends that Mr. Toler is totally disabled, but this is due to heart disease, and contests the medical issues, that is, the existence of pneumoconiosis, causal relationship to coal mine employment, and total disability allegedly due to pneumoconiosis.

## ISSUES

After the foregoing stipulations and withdrawal of contentions by Eastern, the following issues remain:

1. Whether the claimant has pneumoconiosis?
2. If so, whether his pneumoconiosis resulted from coal mine employment?
3. Whether the claimant is totally disabled?
4. If so, whether his total disability is due to pneumoconiosis?

## DISCUSSION: FINDINGS OF FACT AND CONCLUSIONS OF LAW

Mr. Toler was born December 25, 1937, is currently 56 years of age and has an eighth grade education (DX 1). He has been married to Clara Sue Harness since 1964 (DX 7). He testified that he last worked March 23, 1993 at Kopperston for Eastern Association Coal, where

---

[1]The following designations appear herein: "DX" refers to Director's exhibits; "EX" to the exhibits for respondent Eastern; "CX" to claimant's exhibits; and "ALJ" to administrative law judge exhibits. References to the transcript are designated "TR."

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP ████-5366

2

J.A. 76

he was an electrician at the preparation plant or "tipple" (TR 9). His duties required him to maintain electrical apparatus, lift and carry items as heavy as a motor, and walk up and down stairways (TR 10-11). He began to notice shortness of breath ten years ago, and it got progressively worse, to the point where, he says, he could no longer do his work or climb the stairs (TR 11). He currently does very little and uses a portable oxygen tank to help his breathing (TR 12). He conceded that he smoked 30 years, alleging that he quit in 1986, although the hospital record in 1990 show he was smoking at that time; he said at one point in his testimony that he smoked one-half pack per day but later said it was a pack per day (TR 12 and 15). He had a heart attack in 1990, was hospitalized and missed four months of work (TR 13) An angioplasty was performed to open the occluded arteries, and a later angiogram showed the arteries as clear (TR 14-15, 18; EX 6). He has received a 40% award from the state of West Virginia for occupational pneumoconiosis (TR 13; DX 3).

Disposition of Mr. Toler's claim is governed by the implementing regulations at Part 718, Title 20 C.F.R. The claimant bears the burden of proving by a preponderance of the evidence each and every one of the following four elements:

1. That he suffers from pneumoconiosis;
2. That his pneumoconiosis arose out of coal mine employment;
3. That he is totally disabled; and
4. That his total disability is caused by pneumoconiosis.

Failure to establish any one of these elements precludes entitlement. Perry vs. Director, OWCP, 9 BLR 1-1 (1986).

Pneumoconiosis is defined in 20 C.F.R. 718.201 as:

> [A] chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, progressive massive fibrosis, silicosis or silicotuberculosis, arising out of coal mine employment. For purposes of this definition, a disease "arising out of coal mine employment" includes any chronic pulmonary disease resulting in respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment.

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP ▆▆▆5366

3

J.A. 77

## Medical Evidence

Turning now to the question of whether Mr. Toler suffers from pneumoconiosis, the Act provides that the existence of the disease may be established by four alternative methods: (1) chest x-ray; (2) autopsy or biopsy studies; (3) presumption; or (4) the well-reasoned opinion of a physician. 20 C.F.R. 718.202(a). Because there are no pathology studies in this case and because none of the presumptions set forth in Section 718.202(a)(3) are available to the claimant, this discussion will be limited to the x-ray readings and medical reports.

### 1. Chest x-rays[2]

Two films have been read and re-read on eleven separate occasions by eight different physicians:

| X-ray date | Physician | Qualifications[3] | Reading | Exhibit |
|---|---|---|---|---|
| 3/8/93 | Speiden | Bd. certified. B-reader | Pneumoconiosis 1/1[4] p/q, all zones, and marked emphysema | DX 15-16 |

---

[2]The report of Dr. Tuteur of June 3, 1994 discusses x-rays taken in 1984 and 1989 [EX 5]. However, these are not available to me in the record and there is no way to determine the qualifications of those reading them nor whether they were classified under the ILO classification system as required pursuant to 20 CFR 718.102(b). I therefore do not include them in the following discussion. Section 718.102(b) requires that a chest x-ray, "... to establish the existence of pneumoconiosis *shall* be classified as Category 1,2, 3, A, B, or C, according to the International Classification of Radiographs ..." [emphasis added].

[3]A "B-reader" is a physician who has demonstrated proficiency in assessing and classifying x-ray evidence of pneumoconiosis by successful completion of an examination given by or on behalf of the Appalachian Laboratory for Occupational Safety and health; see 42 C.F.R. 37.51. A physician who is a board-certified radiologist has received certification in radiology or diagnostic roentgenology by the American Board of Radiology, Inc., or the American Osteopathic Association. 20 C.F.R. 718.202(a)(ii).

[4] A reading of 1/0 signifies that the radiologist has determined that the x-ray is Category 1 [see 20 C.F.R. 718.102(b)] but that he or she seriously considered Category 0. Category 0 signifies small opacities absent or less profuse than in Category 1; whereas Category 1 means that small opacities are definitely present but few in number.

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP▮▮▮▮5366

4

J.A. 78

| | | | | |
|---|---|---|---|---|
| | Gogineni | Bd. certified, B-reader | No pneumoconiosis positive for emphysema | EX 2 |
| | Abramowitz | Bd. certified, B-reader | No pneumoconiosis positive for emphysema | EX 2 |
| | Binns | Bd. certified, B-reader | No pneumoconiosis positive for emphysema | EX 2 |
| | Wiot | Bd. certified, B-reader | No pneumoconiosis positive for emphysema | EX 3 |
| | Shipley | Bd. certified, B-reader | 1/0, s/t all zones, not diagnostic of pneumoconiosis | EX 3 |
| | Spitz | Bd. certified, B-reader | No pneumoconiosis COPD due to emphysema | EX 3 |
| 9/29/93 | Zaldivar | B-reader | No pneumoconiosis Bullous emphysema | EX 1 |
| | Wiot | Bd. certified, B-reader | No pneumoconiosis positive for pleural disease | EX 4 |
| | Shipley | Bd. certified, B-reader | 1/1 not diagnostic of pneumoconiosis | EX 4 |
| | Spitz | Bd. certified, B-reader | No pneumoconiosis COPD due to emphysema | EX 4 |

The probative weight of an x-ray reading depends to a great extent on the quality of the film, the report, and the qualifications of the physicians who interpret the film. See Worhach vs. Director, 17 BLR 1-105 (1993). In addition, because pneumoconiosis is a progressive disease, the timing of the x-ray is also probative, in that a later film can shed light on both the existence of the disease and the reliability of an earlier reading, as well as providing a longitudinal view of the claimant's condition. It is within the discretion of the factfinder to defer to the numerical superiority of negative readings, Sheckler vs. Clinchfield Coal. Co., 7 BLR 1-128 (1984), although she is not required to do so. Tokarcik vs. Consolidation Coal Co., 6 BLR 1-666 (1984). However, there must be some articulable reason for accepting a finding based on the minority of x-ray readings. Zeigeler Coal vs. OWCP, 23 F.3d 1235 (7th Cir. 1994). It is also appropriate to take into account the source of the reading, that is, whether the reader is retained by either claimant, employer, or Director.

On the face of it, the overwhelming number of readings support a finding that no pneumoconiosis is established, at least by x-ray evidence. Whether one looks only at the numbers, or factors in qualitative evidence, the x-ray evidence is insufficient to establish the presence of pneumoconiosis in this case.

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP ▓▓▓-5366

5

J.A. 79

Only Dr. Speiden, a qualified B-reader, finds pneumoconiosis and at only a minimum level [DX 15-16]. She finds both parenchymal and pleural abnormalities consistent with pneumoconiosis. I do note that Dr. Shipley interprets both x-rays as having some profusion but he declines to diagnose pneumoconiosis. He finds that, while there are parenchymal abnormalities consistent with pneumoconiosis, there are no pleural abnormalities. The minimal irregular opacities, he concludes, are consistent with interstitial lung disease [EX 3 and 4]. This conclusion is corroborated by the later opinion of Dr. Tuteur, who terms the interstitial process consistent with the claimant's heart disease [EX 5].With respect to the film of September 29, 1993, both Drs. Wiot and Shipley caution that the quality is compromised and somewhat dark [EX 4].

The remaining x-ray evidence is entirely negative for the presence of pneumoconiosis. I note that the most qualified radiologists have concluded that there is no disease whatsoever. Drs. Wiot, Shipley and Spitz in particular demonstrate impressive credentials, that they are practicing physicians who teach at a known medical university, and have experience not only with industrial standards but in formulating pneumoconiosis standards specifically. Dr. Zaldivar is not only a B-reader but also specializes in the treatment of pulmonary disease (DX 53). I therefore accord the readings of the foregoing physicians greater weight than I do that of Dr. Speiden.

I therefore conclude that the claimant has not proven the existence of pneumoconiosis is not established by x-ray evidence. What does seem established beyond cavil through the x-rays is the existence of emphysema.

## 2. Medical opinions

Mr. Toler may establish the existence of pneumoconiosis through well-reasoned medical opinions despite the absence of x-ray evidence. 20 C.F.R. 718.202(a)(4). Here three physicians have rendered opinions, and commented upon one anothers' opinions: Drs. Rasmussen [DX 10 and CX 1], Zaldivar [EX 1 and 6], and Tuteur [EX 5]. I note that Drs. Rasmussen and Zaldivar examined the claimant, while Dr. Tuteur acted as a consultant. All three physicians agree that Mr. Toler is totally disabled. The question is by what, and where did it come from.

Examination of the medical opinions reveals that the crux of the matter is whether Mr. Toler suffers from emphysema as a result of his coal mine employment, his smoking, or both. It is well known that the legal definition of pneumoconiosis is broader than the medical diagnosis of pneumoconiosis. The regulation defining pneumoconiosis encompasses *any* respiratory or pulmonary condition that is significantly related to or substantially aggravated by coal dust exposure. The question here is whether this man's chronic pulmonary condition is significantly related to or substantially aggravated by coal dust exposure. Another intriguing question is whether Mr. Toler continues to abuse tobacco or whether, as he insists, he has quit smoking.

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP ▮▮▮-5366

6

In order to sift through the opinions, the pulmonary function and blood gas test results must be set out:

*Pulmonary function tests*

| 2/14/91[5] | pre-Rx% | | | age nl | Ex.DX 8 |
|---|---|---|---|---|---|
| | | | | 68 | |
| FEV$_1$ | 2.01 | | | 59 | |
| FEV$_1$/FVC | 47 | | | 60 | |
| MVV | 78 | | | | |

| 3/8/93 | pre-Rx | post-RX | predicted normal | %age nl | Ex. DX 9 |
|---|---|---|---|---|---|
| | | | | 58 | |
| FEV$_1$ | 1.89 | 1.89 | 3.22 | 47-48 | |
| FEV$_1$/FVC | 39 | 39 | 81 | 121 | |
| FVC | 4.81 | 4.94 | 3.96 | 68 | |
| MVV | 83 | 87 | 128 | | |

| 9/29/93 | result | | predicted normal | %age nl | Ex. EX 1 |
|---|---|---|---|---|---|
| | | | | 52 | |
| FEV$_1$ | 1.48 | | 2.87 | 47 | |
| FEV$_1$/FVC | 35% | | 74% | 109 | |
| FVC | 4.19 | | 3.86 | 55 | |
| MVV | 61 | | 111 | | |

*Blood gas exchange tests*

| 3/8/93 | resting | w/exercise | predicted normal | Ex. DX 11 |
|---|---|---|---|---|
| pCO$_2$ | 37 | 39 | 37-44 | |
| pO$_2$ | 68 | 52 | 73-101 | |

---

[5]Note that these results are unaccompanied by a spirometric tracing as required in 20 CFR Appendix B to Part 718. Under the regulatory scheme ventilatory and blood gas studies are used to determine the extent of functional loss, not the diagnosis. However, this discussion relates not to the issue of functional loss so much as diagnosis and causation, the purpose of the test results being to show a longitudinal picture.

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP ██████-5366                    7

J.A. 81

3/29/93 resting

pO$_2$   52.6

| 9/29/93 | result | predicted normal |
|---------|--------|------------------|
| pCO$_2$ | 39 | 35-45 |
| pO$_2$ | 72 | 80-90 |

Medical opinions cannot simply be accepted at face value, but must be analyzed to determine whether they are well reasoned and supported by the medical data. Rowe vs. OWCP, 711 F.2d 251 (6th Cir. 1983). Turning first to the claimant's evidence, I address the opinions of Dr. Rasmussen set forth in DX 10 and 19 and CX 1. Based on his examination of March 8, 1993, Dr. Rasmussen concluded that the claimant had coal workers' pneumoconiosis. He based this conclusion primarily on Dr. Speiden's reading of the March 8, 1993 x-ray,[6] laboratory test results showing a very severe, totally disabling, respiratory insufficiency, and the fact that Mr. Toler had been a coal miner [DX 10] As explained above, Dr. Speiden's reading is was followed by numerous negative readings by highly qualified physicians. Dr. Rasmussen himself believes that the x-ray is a poor diagnostic tool [DX 19 and CX 1]. If this is so, it follows that one of the bases of his conclusion is faulty. The fact of one's coal mine employment is non-diagnostic, and therefore the question then arises whether the ventilatory and blood gas test results are themselves diagnostic rather than purely a measure of functional loss.

When confronted with the negative x-rays and contrary medical opinion evidence [discussed below], Dr. Rasmussen responded the he found Mr. Toler totally disabled due to the effects of both coal dust exposure and smoking. He noted that x-rays can be completely negative even in the present of significant pneumoconiosis, citing several articles, in particular one showing a high percentage of deceased miners who had pneumoconiosis on autopsy but x-rays interpreted as negative by three B-readers. Dr. Rasmussen agreed that the claimant has emphysema, but asserted that it is well known that pulmonary emphysema may be the consequence of exposure to coal dust. He cited five British or European journal articles, and eight American journal articles for this proposition. CX 1.

Both Drs. Tuteur and Zaldivar have attacked Dr. Rasmussen's conclusion, primarily because it is based on faulty literature and because it draws conclusions from the test results that are not warranted. According to Dr. Tuteur, Mr. Toler clearly has two conditions going on: arteriosclerotic heart disease, and emphysema. While breathlessness is the "quintessential symptom" associated with clinically significant pneumoconiosis, he says, it is a highly nonspecific finding associated with almost any primary pulmonary or cardiac disorder, of which this claimant has both. Dr. Tuteur points out several findings that are inconsistent with the

---

[6]There is no evidence that Dr. Rasmussen himself has credentials as a B-reader.

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP ████-5366

diagnosis of pneumoconiosis: the pulmonary function studies show a progressive moderate to severe obstructive ventilatory defect, no persistent resting hypoxemia and desaturation with exercise. These are all consistent with chronic bronchitis and emphysema. In contrast, when coal workers' pneumoconiosis is "sufficiently advanced to produce pulmonary impairment" such as that seen here, one would expect a restrictive ventilatory defect [FVC] as well as progressive massive fibrosis and persistently abnormal adventitious sounds. These findings are absent in Mr. Toler. With respect to the x-rays, these show an interstitial pulmonary process most consistent with early congestive heart failure due to arteriosclerotic heart disease.

Dr. Tuteur also states that Dr. Rasmussen's conclusion is not supported by the literature cited. Dr. Rasmussen asserts, he says, that because a few miners with tobacco-induced emphysema have pathologically-significantly coal workers' pneumoconiosis, their chronic obstructive pulmonary disease is due not to smoking but to pneumoconiosis. However, the data in the articles cited actually show, "when appropriately analyzed using normal controls for pulmonary function ...," that "... the progressive decline of $FEV_1$ among non-smoking miners [is] statistically identical to that found among non-smoking non-miners ... in stark contrast to the more rapid decline of $FEV_1$ among smoking miners. The obvious conclusion is that it is the tobacco smoke, not the coal mine dust that produces the obstructive defect." EX 5

Dr. Zaldivar's criticism is identical. While he has numerous criticisms of Dr. Rasmussen's conclusions, the most salient are these. First, in the 1985 British study by Miller et al, the authors concluded that miners have a higher mortality rate due to bronchitis and emphysema because they are coal miners. However, the authors failed to factor into their conclusions the effect of smoking on bronchitis and emphysema. Second, while Dr. Rasmussen complains that the x-ray is a poor diagnostic tool, the author he quotes for this proposition also criticizes pathological studies are poor diagnostic tool. If that is so, physicians will be left with no radiographic or pathologic tools to factor in to their diagnoses. Third, Dr. Zaldivar points out that on two occasions in 1993, carboxyhemoglobin test results showed levels consistent with an individual who continues to smoke. The claimant's carboxyhemoglobin level of 8.0 in September 1993 is equivalent to currently smoking 1.5 packs of cigarettes per day. I note that Dr. Tuteur remarks on the elevated carboxyhemoglobin level in 1993, consistent with levels in heavy tobacco users. Finally, according to Dr. Zaldivar, the decrement that one sees in the $FEV_1$ [from 2.33 in 1989 to 1.49 in 1993] is most easily explained by the claimant's continuing smoking habit, a conclusion identical to that of Dr. Tuteur.

I find that the opinions of Drs. Tuteur and Zaldivar are entitled to greater weight than those of Dr. Rasmussen. These opinions address specifically and in detail the significance of the laboratory results, the absence of findings typical of pneumoconiosis, and the import of the literature concerning coal miners who smoke. They demonstrate that Dr. Rasmussen's conclusion is based on an incomplete discussion of the laboratory result and the literature. Here, Mr. Toler's studies show a progressive decrement in $FEV_1$ without a restrictive defect in FVC. Both Drs. Tuteur and Zaldivar attribute these findings to smoking, and I agree. While Dr. Rasmussen

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP ▮▮▮▮5366

9

J.A. 83

concedes that smoking is a significant risk factor for Mr. Toler, he concluded, initially and without explanation, that pneumoconiosis was a major contributing factor to his lung disease [DX 10]. His later follow-up opinion attempted to make the causal connection with studies that were faulty and omitted the importance of smoking in their conclusions. The evidence here suggests that coal dust was not a sufficient cause of the claimant's disability. A miner is not entitled to benefits if, due to his heavy smoking he would have become disabled even if he had never engaged in mining. Robinson vs. Picklands Mather and Co., 914 F.2d 35, 38 (4th Cir. 1990); Shelton v. Director, OWCP, 899 F.2d 690, 693 (7th Cir. 1990). I find that Mr. Toler suffers the consequences of emphysema and chronic bronchitis due to his past and current heavy smoking rather than a respiratory illness "significantly related to or substantially aggravated by" coal dust exposure.

Based on the foregoing, I conclude that the claimant has failed to carry his burden of proving the existence of pneumoconiosis.

## DECISION AND ORDER

The claim of Arvis Toler is hereby DENIED.

CHRISTINE M. MOORE
Administrative Law Judge

NOTICE OF APPEAL RIGHTS: Pursuant to 20 C.F.R. 725.481, any party dissatisfied with this Decision and Order may appeal it to the Benefits Review Board within thirty (30) days from the date of this Decision and Order, by filing a notice of appeal with the Benefits Review Board, 800 K Street N.W., Suite 500, Washington, D.C. 20001. A copy of the notice of appeal must also be served on Donald S. Shire, Esquire, Associate Solicitor for Black Lung Benefits, Francis Perkins Building, Room N-2605, 200 Constitution Avenue N.W., Washington, D.C. 20210

DECISION AND ORDER DENYING BENEFITS
Arvis Toler vs. Eastern Associated Coal Corp.
94-BLA-0281, OWCP ▮▮▮▮5366

10

Medical History and Examination for
Coal Mine Workers' Pneumoconiosis



**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs
Division of Coal Mine Workers' Compensation



| A. Patient Information | (Please type or neatly print all responses.) | OMB No.: 1215-0090 |
|---|---|---|
| 1. Name and Address | 2. DOL Claim No. | Expires: 01-31-90 |

| 1. Name and Address | 2. DOL Claim No. | 4. Date of Exam |
|---|---|---|
| Arvis Toler<br>P. O. Box 306<br>Oceana, WV 24870 | ████5366 | 3/8/93 |
| | 3. Telephone No.<br>(304 ) 682-4158 | 5. Date of Birth<br>████ |

| 6. Personal Physician (name, address, phone no.) | 7. Examining Physician (name, address, phone no.) |
|---|---|
| Dr. Flaim<br>Oceana, WV | D. L. Rasmussen, M.D.<br>302 Stanaford Road<br>Beckley, WV 25801 |

RECEIVED
FEB 26 2008
ESA/OWCP/DCMWC
MT. STERLING, KY

**B. Employment History** (Please type or neatly print all responses.)

☑ "Employment History", Form CM-911a, or equivalent (dated __2-4-93__ ) is attached. Please review the form and, with the miner's help, complete only blocks 1.a., below, describing his/her most recent coal mine job (of at least one year's duration). Then, move on to "C. Patient History".

☐ CM-911a is not attached - complete both sections, 1. and 2., below.

1. **Coal Mine Employment - CME.** List most recent employment first. In line (a.) describe the last job of at least one year's duration. (Include in all lines any coal mine construction or transportation work, or work in a mine preparation facility.)

| Name of Company | Job Title and Description of Job's Physical Requirements | From (mm/yy) | To (mm/yy) |
|---|---|---|---|
| a. Last CME held at least one year. | Electrician at cleaning plant - carries tools, welding equipment, heavy lifting, shovels to clean up. Climbs 8 flights of stairs frequently. Considerable heavy manual labor. | | |
| b. Other CME: | | | |

RECEIVED
JUN 09 1993
USDOL
CHARLESTON, WV

c. Additional number of years in CME **not** described above: _____ years.

2. **Other Employment - Not CME.** (If the employment exposed the patient to an occupational toxic inhalant hazard, describe the inhalant under "Job Title and Description".)

| Name of Company | Job Title and Description | From (mm/yy) | To (mm/yy) |
|---|---|---|---|
| USMC 1959-1963. | *See attached.*<br>*copy CM-911a* | | |

**C. Patient History** (Family - Medical - Social) (Please type or neatly print all responses.)

1. Family History.

Have the patient's parents, children, or other "blood" relatives ever had any of the following:

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| High blood pressure | X | | Asthma | | X |
| Heart Disease | | X | Allergies | | X |
| Tuberculosis | | X | Emphysema | X | |
| Diabetes | | X | Stroke | X | |
| Cancer | X | | | | |

DIRECTOR EXHIBIT
NO. __13__ CONSISTIN
OF __17__ PAGES

If "Yes," identify family member
Hypertension - Father's side, and father.
Cancer - Mother
Emphysema - Father (Black Lung)
Stroke - Father and on father's side.

Form CM-988
Rev. July 1987

J.A. 85

6. Cardiopulmonary Diagnosis (es): (And provide the basis (es) for your stated diagnosis (es).)    (Please type or neatly print all responses.)

1.  CWP - 27+ years employment in the coal mining industry and x-ray evidence of pneumoconiosis.

2.  COPD - History of chronic productive cough, severe obstructive ventilatory impairment.

7. Etiology of Cardiopulmonary Diagnosis (es): (List Primary and Secondary Causes - if applicable - and Provide Rationale.)

1.  CWP - Coal mine dust exposure.

2.  COPD - Coal mine dust exposure and cigarette smoking.

RECEIVED
FEB 26 2008
ESA/OWCP/DCMWC
MT. STERLING, KY

8. Impairment – If the patient has chronic respiratory or pulmonary disease, give your medical assessment - With Rationale - of:

a. The degree of severity of the impairment, particularly in terms of the extent to which the impairment prevents the patient from performing his/her current or last coal mine job of one year's duration: (Refer to section B.1.a. of this form.)

The patient has very severe pulmonary insufficiency. He is totally disabled for any significant gainful employment and is unable to perform his current coal mining job.

b. The extent to which each of the diagnoses listed in D.6. above contributes to the impairment:

The two risk factors are his cigarette smoking and his coal mine dust exposure. The latter is at least a major contributing factor to his totally disabling respiratory insufficiency.

9. Non-Cardiopulmonary Diagnosis – If the patient has any disabling non-respiratory condition(s) indicate what the condition is and describe its degree of impairment, especially as it may affect the patient's ability to perform his coal mine work:

E. Physician Referral

Should this patient be referred to another physician for further evaluation?  ☐ Y  ☒ N    Has referral been made?  ☐ Y  ☒ N
For what reason?

F. Physician Signature

I certify that the information furnished is correct and am aware that my signature attests to its accuracy. I am also aware that any person who willfully makes any false or misleading statement or representation in support of an application for benefits shall be guilty under Title 30 USC 941 of a misdemeanor and subject to a fine of up to $1,000., or to imprisonment for up to one year, or both.

Signature:                                    Date:    3/8/93

(Physician's name should be typewritten on front page of this form.)

J.A. 86

ARVIS TOLER
7-00-94



RECEIVED

R E C E I V E D
FEB 26 2008
ESA/OWCP/DCMWC
MT. STERLING, KY

JUN 0 9 1995

USDOL
CHARLESTON, WV

Mr. Toler is 55 years of age.

This patient first began to experience shortness of breath with exertion some 12-13 years ago. He now is limited to 1-2 flights of stairs. He notes a mostly morning productive cough. He wheezes mostly while lying down at night. He denies orthopnea, paroxysmal nocturnal dyspnea, or ankle swelling. He gives no history of hemoptysis. He describes substernal and posterior chest discomfort beneath the shoulders occurring with exertion. He states that he had pleurisy in the 1960's. He sustained a myocardial infarction 1990 and underwent a subsequent angioplasty.

REVIEW OF SYSTEMS:

GASTROINTESTINAL SYSTEM: The patient notes occasional heart burn and indigestion. He does have a history of previous duodenal ulcer. He denies gastrointestinal bleeding, icterus, hepatitis, or bowel habit changes.

GENITOURINARY SYSTEM: The patient denies significant symptoms.

CENTRAL NERVOUS SYSTEM: The patient denies significant symptoms.

MUSCULOSKELETAL SYSTEM: The patient denies significant symptoms.

GENERAL: The patient states that his weight is stable. He has had no fever, adenopathy, or skin rash.

PAST MEDICAL HISTORY: A) PREVIOUS ILLNESSES: Myocardial infarction followed by angioplasty in 1990.

B) SURGERY: The patient underwent an appendectomy in the past.

C) INJURIES: The patient sustained a finger injury while he was in the United States Marine Corp. in the last 1950's.

HABITS: The patient reports that he began smoking in 1951. He smoked an average of 1 pack of cigarettes a day until he quit in 1989. He does not drink. He has never used illicit drugs.

MEDICATIONS: The patient is on therapy with Cardizem, aspirin, Mevacor, Nitrostat, Ventolin Inhaler.

OCCUPATIONAL HISTORY: Mr. Toler worked as a carpenter's helper between 1956 and 1959. He was in the United States Marine Corp. as a mechanic between 1959 and 1963. He worked for a utility company as a mechanic between 1963 and 1965. He hand loaded for about 3 months in 1957. He was employed principally as an underground electrician between 1966 to the present time. His current job is that of electrician at the cleaning plant. As such, he is required

J.A. 87

RECEIVED


FEB 26 2008
ESA/OWCP/DCMWC
MT. STERLING, KY

'JUN 09 1993

USDOL
CHARLESTON, WV

to carry tools and welding equipment. He does some heavy lifting, climbs stairs frequently. Thus, he does some heavy manual labor.

PHYSICAL EXAMINATION: The patient is 64 1/4" tall and weighs 130 pounds. His blood pressure is 94/60. Heart rate 72. Respirations 20. There were no abnormalities of the patient's eyes, ears, nose, or pharynx. Neck veins were flat. Carotid arteries were palpable. I could hear no bruits. There was no adenopathy or thyroid enlargement. Chest expansion and diaphragmatic excursions were normal. Diaphragms were low. Breath sounds were markedly reduced. There were no rales, rhonchi, or wheezes. Heart tones were markedly reduced. Rhythm was regular. I could hear no murmurs, gallops, or clicks. The abdomen was soft and non-tender. The liver descended, but was not enlarged. Genitalia, rectal and prostate were normal. Peripheral pulses were intact. There was no edema. There was no clubbing. Deep tendon reflexes were physiologic.

Chest x-ray interpreted by Lois Speiden, M.D., a Board Certified Radiologist and B-Reader indicated the presence of pneumoconiosis p/q with a profusion of 1/1 throughout all six lung zones. She noted some blunting of both costophrenic angles. She felt it may be partly due to the patient's generalized emphysema.

The patient's electrocardiogram revealed sinus bradycardia with minimal non-specific ST-T wave changes.

LABORATORY STUDIES: Ventilatory function studies revealed severe, irreversible obstructive ventilatory impairment. Maximum breathing capacity was minimally reduced. The single breath carbon monoxide diffusing capacity and the DL/VA were markedly reduced. (However the inspiratory volumes were somewhat less than adequate i.e. 78 and 85% of FVC.)

Resting arterial oxygen tension was minimally reduced.

This patient underwent initially an incremental treadmill exercise study beginning at 1.5 mph at a 0% grade. This level was maintained for 2 minutes, following which, while the patient continued walking, the speed or grade of the treadmill was increased at 1 minute intervals. The patient exercised for 8 minutes and reached a maximum of 2 mph at a 10% grade. He was then allowed to rest for approximately 45 minutes, and then he returned to the treadmill where he completed a steady state exercise stint of 5 minutes duration at 2 mph at a 7.5% grade. He achieved an oxygen consumption of 16.8 cc's during his incremental and 16.1 cc's per kilogram during his steady state exercise level. He described mild substernal and posterior chest discomfort. His EKG and blood pressure responses were normal. His anaerobic threshold



was not identified. His heart rate was moderately excessive. His volume ventilation was very markedly increased. There was marked increase in VD/VT ratio. The latter is due, in part, to increase in respiratory frequency, however, he also exhibited distinct increase in physiologic dead space per se, amounting to some 691 cc's per breath during his steady state stint. Oxygen transfer was markedly impaired throughout his exercise study, especially during his highest incremental and during his steady state exercise level, and he was markedly hypoxic.

These studies indicate very severe, totally disabling respiratory insufficiency as reflected by the severe ventilatory impairment, the reduced diffusing capacity, the marked impairment in oxygen transfer and hypoxia during light exercise. This degree of impairment would render this patient totally disabled for any significant gainful employment.

This patient has a significant history of exposure to coal mine dust. He has x-ray changes consistent with pneumoconiosis. It is medically reasonable to conclude that he does have coalworkers' pneumoconiosis which arose from his coal mine employment.

The two risk factors for this patient's totally disabling respiratory insufficiency are, of course, his cigarette smoking and his coal mine dust exposure with its resultant pneumoconiosis. The latter must be considered at least a major contributing factor to his totally disabling lung disease.

DLR/adw
T: 5/25/93

D. L. RASMUSSEN, M.D.
DIVISION OF PULMONARY MEDICINE

RECEIVED
JUN 0 9 1993
USDOL
CHARLESTON, WV

Medical History and Examination for
Coal Mine Workers' Pneumoconiosis



**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs
Division of Coal Mine Workers' Compensation



| A. Patient Information | (Please type or neatly print all responses.) | OMB No.: 1215-0090 Expires: 01-31-90 |
|---|---|---|
| 1. Name and Address | 2. DOL Claim No. | |
| Arvis Toler P. O. Box 306 Oceana, WV 24870 | ▉-5366 | 4. Date of Exam 3/8/93 |
| | 3. Telephone No. (304) 682-4158 | 5. Date of Birth ▉ |

| 6. Personal Physician (name, address, phone no.) | 7. Examining Physician (name, address, phone no.) |
|---|---|
| Dr. Flaim Oceana, WV | D. L. Rasmussen, M.D. 302 Stanaford Road Beckley, WV 25801 |

**B. Employment History** (Please type or neatly print all responses.)

☐ "Employment History", Form CM-911a, or equivalent (dated _2/4/93_) is attached. Please review the form and, with the miner's help, complete only blocks 1.a., below, describing his/her most recent coal mine job (of at least one year's duration). Then, move on to "C. Patient History."

☐ CM-911a is not attached - complete both sections, 1. and 2., below.

1. **Coal Mine Employment - CME.** List most recent employment first. In line (a.) describe the last job of at least one year's duration. (Include in all lines any coal mine construction or transportation work, or work in a mine preparation facility.)

| Name of Company | Job Title and Description of Job's Physical Requirements | From (mm/yy) | To (mm/yy) |
|---|---|---|---|
| a. Last CME held at least one year. | Electrician at cleaning plant - carries tools welding equipment, heavy lifting, shovels to clean up. Climbs 8 flights of stairs frequently. Considerable heavy manual labor. | | |
| b. Other CME: | | | |

RECEIVED

JUN 09 1993

USDOL
CHARLESTON, WV

c. Additional number of years in CME **not** described above: _____ years.

2. **Other Employment - Not CME.** (If the employment exposed the patient to an occupational toxic inhalant hazard, describe the inhalant under "Job Title and Description".)

| Name of Company | Job Title and Description | From (mm/yy) | To (mm/yy) |
|---|---|---|---|
| USMC 1959-1963. | See attached copy CM-911a | | |

**C. Patient History** (Family - Medical - Social) (Please type or neatly print all responses.)

1. Family History.

Have the patient's parents, children, or other "blood" relatives ever had any of the following:

| | Yes | No | | Yes | No | If "Yes," identify family member |
|---|---|---|---|---|---|---|
| High blood pressure | X | | Asthma | | X | Hypertension - Father's side, and father. |
| Heart Disease | | X | Allergies | | X | Cancer - Mother |
| Tuberculosis | | X | Emphysema | X | | Emphysema - Father (Black Lung) |
| Diabetes | | X | Stroke | X | | Stroke - Father and on father's side. |
| Cancer | X | | | | | |

Page 1

DIRECTOR'S EXB. NO. _15_
CONSISTING of _8_ PAGES

Form CM-988
Rev. July 1987

J.A. 90

## C. Patient History (continued)

### 2. Individual Health/Medical History.

#### a. Does the patient have a history of:

| Yes | No | | When Manifested (Month, Year) | Yes | No | | When Manifested (Month, Year) |
|-----|----|--|-------------------------------|-----|----|--|-------------------------------|
| X | | Frequent Colds | | | X | Arthritis | |
| | X | Pneumonia | | X | | Heart Disease/Problems | MI 90, Angioplasty 1990. |
| X | | Pleurisy | 1960's | | X | Allergies | |
| | X | Attacks of wheezing | | | X | Cancer (of ) | |
| | X | Tuberculosis | | | X | Diabetes Mellitus | |
| | X | Chronic bronchitis | | | X | High Blood Pressure | |
| | X | Bronchial Asthma | | | X | Connective Tissue Disease | |

#### b. Other Significant Conditions or Serious Illnesses (when diagnosed?)

Finger injury .
Cable smoke exposure in 1970's.

#### c. Hospitalizations (reasons and dates):

MI in 1990 with angioplasty.

#### d. Surgery:

Appendectomy. Coronary angioplasty in 1990.

### 3. Social History.

#### a. Smoking History

☐ Never Smoked    ☒ Has Stopped Smoking    ☐ Currently Smoking

Started: 1951 ; Stopped: 1989        Started: _____
Smoked what? Cigarettes              Smokes what? _____
How much (e.g., packs/day): 1 pack   How much: _____

#### b. Other Pertinent Social History (e.g. drug or alcohol use; strenuous hobbies):

No alcohol, no illicit drugs.

## D. Present Illness/Physical Examination

### 1. Chief Complaints/Symptoms - as described by patient. Please comment on all "Yes" answers (e.g. describe frequency, duration, and/or severity of symptoms).

| Yes | No | | Comments |
|-----|----|--|----------|
| X | | Sputum (daily?) | Mostly A.M. |
| X | | Wheezing (daily?) | Worse lying down at night. |
| X | | Dyspnea (quantitate) | 12-13 years. 2 flights of stairs. |
| X | | Cough | Mostly A.M. |
| | X | Hemoptysis | |
| X | | Chest pain  (Inciting Factor): | Substernal and posterior chest, beneath shoulder blade especially with exertion. |
| | X | Orthopnea | |
| | X | Ankle edema | |
| | X | Paroxysmal Nocturnal Dyspnea | |

(Indicate in D.4., next page, any of the above symptoms manifested during the exam.)

### 2. Other complaints. (Include here the patient's description of any limitations in physical activities like walking, climbing, and lifting.)

Very dyspneic with chest tightness with exposure to welding fumes, smoke from burning plastics.

J.A. 91

3. Current Treatment (including medications):

Ecotrin, Ventolin inhaler, Mevacor, Nitrostat, Cardizem.

4. **Physical Findings:** Based on Your Physical Examination.
   (Show all findings, especially those pertinent to the respiratory system and the cardiovascular system.)

a. Fill in the appropriate data or response:

| General | | Thorax & Lungs | | Nose | | Abdomen | |
|---|---|---|---|---|---|---|---|
| | | Inspection Expansion & diaph-ragmatic excursions normal. | | Membranes | | Peristalsis | |
| Height | | | | Obstruction | | Tenderness | |
| Weight | | Palpation | | Discharge | Okay | Ascites | |
| | | | | Septum | | Liver Descends, not enl'r | |
| Temperature | | Percussion Diaphragms low. | | Sinuses | | Spleen | |
| Pulse | | | | | | Kidneys | |
| Respiration | | Auscultation Breath sounds are markedly decreased. No rales, rhonchi, or wheezes | | Throat | | Urinary bladder | |
| B.P. rt. arm | | | | Erythema | | Masses | |
| B.P. lf. arm | | | | Exudate | Okay | Hernia | |
| Development | | Heart | | Tonsils | | | |
| Nutrition | | Peripheral Pulse | | Pharynx | | | |
| Hydration | | PMI | | | | | |
| Orientation | | Pulsation | | Neck | | | |
| Mentation | | Epigastric Cardiac Pulsation | | Masses | | | |
| Personality | | | | Thyroid | Okay | | |
| Mood | | Thrills | | Trachea | | | |
| | | Rhythm | | Arteries | | | |
| Extremities | | Sounds Reduced. | | Veins | | | |
| Color | Okay | Gallop | | | | | |
| Clubbing | 0 | Murmurs | | Musculoskeletal | | | |
| Edema | 0 | | | Spine | | | |
| Varicosities | 0 | Friction rub | | Joints | Okay | | |
| Arterial Pulses | Okay | | | Muscles | | | |

b. Other relevant findings - narrative summary:

RECEIVED

JUN 09 1993

USDOL
CHARLESTON, WV

5. **Summary of Diagnostic Testing** - In the space below, check the applicable block(s) next to any test results (including those conducted in conjunction with this physical exam) which you reviewed and relied upon, at least in part, to base your medical assessments and conclusions - especially those on the next page. Be sure to show the date(s) of each test, and summarize the results.

| | | Dates | Summary of Results |
|---|---|---|---|
| [x] | Chest X-ray | 3/8/93 | Pneumoconiosis p/q 1/1 all zones. |
| [x] | Vent Study (PFS) | 3/8/93 | Severe, irreversible obstructive ventilatory impairment. |
| [x] | Arterial Blood Gas | 3/8/93 | Marked impairment in oxygen transfer during light exercise |
| [x] | Other: | 3/8/93 | SBDLCO and DL/VA is markedly decreased. |
| [ ] | Other: | | |

J.A. 92

**D. Present Illness/Physical Exam (Continued)**       (Please type or neatly print all responses.)

6. **Cardiopulmonary Diagnosis (es):** (And provide the **basis (es)** for your stated diagnosis (es).)

1. CWP - 27+ years employment in the coal mining industry and x-ray evidence of pneumoconiosis.

2. COPD - History of chronic productive cough, severe obstructive ventilatory impairment.

7. **Etiology of Cardiopulmonary Diagnosis (es):** (List Primary and Secondary Causes - if applicable - and Provide Rationale.)

1. CWP - Coal mine dust exposure.

2. COPD - Coal mine dust exposure and cigarette smoking.

8. **Impairment** - If the patient has chronic respiratory or pulmonary disease, give your medical assessment - With Rationale - of:

a. The degree of severity of the impairment, particularly in terms of the extent to which the impairment prevents the patient from performing his/her current or last coal mine job of one year's duration: (Refer to section B.1.a. of this form.)

The patient has very severe pulmonary insufficiency. He is totally disabled for any significant gainful employment and is unable to perform his current coal mining job.

b. The extent to which each of the diagnoses listed in D.6. above contributes to the impairment:

The two risk factors are his cigarette smoking and his coal mine dust exposure. The latter is at least a major contributing factor to his totally disabling respiratory insufficiency.

9. **Non-Cardiopulmonary Diagnosis** - If the patient has any disabling **non-respiratory condition(s)** indicate what the condition is and describe its degree of impairment, especially as it may affect the patient's ability to perform his coal mine work:

**E. Physician Referral**

Should this patient be referred to another physician for further evaluation? ☐ Y ☒ N    Has referral been made? ☐ Y ☒ N
For what reason?

**F. Physician Signature**

I certify that the information furnished is correct and am aware that my signature attests to its accuracy. I am also aware that any person who willfully makes any false or misleading statement or representation in support of an application for benefits shall be guilty under Title 30 USC 941 of a misdemeanor and subject to a fine of up to $1,000., or to imprisonment for up to one year, or both.

Signature:                            Date:    3/8/93

(Physician's name should be typewritten on front page of this form.)

     ☆U.S.GPO::1989-262-262/08109

J.A. 93

RECEIVED

JUN 0 9 1995

USDOL
CHARLESTON, WV

Mr. Toler is 55 years of age.

This patient first began to experience shortness of breath with exertion some 12-13 years ago. He now is limited to 1-2 flights of stairs. He notes a mostly morning productive cough. He wheezes mostly while lying down at night. He denies orthopnea, paroxysmal nocturnal dyspnea, or ankle swelling. He gives no history of hemoptysis. He describes substernal and posterior chest discomfort beneath the shoulders occurring with exertion. He states that he had pleurisy in the 1960's. He sustained a myocardial infarction 1990 and underwent a subsequent angioplasty.

REVIEW OF SYSTEMS:

GASTROINTESTINAL SYSTEM: The patient notes occasional heart burn and indigestion. He does have a history of previous duodenal ulcer. He denies gastrointestinal bleeding, icterus, hepatitis, or bowel habit changes.

GENITOURINARY SYSTEM: The patient denies significant symptoms.

CENTRAL NERVOUS SYSTEM: The patient denies significant symptoms.

MUSCULOSKELETAL SYSTEM: The patient denies significant symptoms.

GENERAL: The patient states that his weight is stable. He has had no fever, adenopathy, or skin rash.

PAST MEDICAL HISTORY: A) PREVIOUS ILLNESSES: Myocardial infarction followed by angioplasty in 1990.

B) SURGERY: The patient underwent an appendectomy in the past.

C) INJURIES: The patient sustained a finger injury while he was in the United States Marine Corp. in the last 1950's.

HABITS: The patient reports that he began smoking in 1951. He smoked an average of 1 pack of cigarettes a day until he quit in 1989. He does not drink. He has never used illicit drugs.

MEDICATIONS: The patient is on therapy with Cardizem, aspirin, Mevacor, Nitrostat, Ventolin Inhaler.

OCCUPATIONAL HISTORY: Mr. Toler worked as a carpenter's helper between 1956 and 1959. He was in the United States Marine Corp. as a mechanic between 1959 and 1963. He worked for a utility company as a mechanic between 1963 and 1965. He hand loaded for about 3 months in 1957. He was employed principally as an underground electrician between 1966 to the present time. His current job is that of electrician at the cleaning plant. As such, he is required

J.A. 94

**RECEIVED**

JUN 09 1993

USDOL
CHARLESTON, WV

to carry tools and welding equipment. He does some heavy lifting, climbs stairs frequently. Thus, he does some heavy manual labor.

PHYSICAL EXAMINATION: The patient is 64 1/4" tall and weighs 130 pounds. His blood pressure is 94/60. Heart rate 72. Respirations 20. There were no abnormalities of the patient's eyes, ears, nose, or pharynx. Neck veins were flat. Carotid arteries were palpable. I could hear no bruits. There was no adenopathy or thyroid enlargement. Chest expansion and diaphragmatic excursions were normal. Diaphragms were low. Breath sounds were markedly reduced. There were no rales, rhonchi, or wheezes. Heart tones were markedly reduced. Rhythm was regular. I could hear no murmurs, gallops, or clicks. The abdomen was soft and non-tender. The liver descended, but was not enlarged. Genitalia, rectal and prostate were normal. Peripheral pulses were intact. There was no edema. There was no clubbing. Deep tendon reflexes were physiologic.

Chest x-ray interpreted by Lois Speiden, M.D., a Board Certified Radiologist and B-Reader indicated the presence of pneumoconiosis p/q with a profusion of 1/1 throughout all six lung zones. She noted some blunting of both costophrenic angles. She felt it may be partly due to the patient's generalized emphysema.

The patient's electrocardiogram revealed sinus bradycardia with minimal non-specific ST-T wave changes.

LABORATORY STUDIES: Ventilatory function studies revealed severe, irreversible obstructive ventilatory impairment. Maximum breathing capacity was minimally reduced. The single breath carbon monoxide diffusing capacity and the DL/VA were markedly reduced. (However the inspiratory volumes were somewhat less than adequate i.e. 78 and 85% of FVC.)

Resting arterial oxygen tension was minimally reduced.

This patient underwent initially an incremental treadmill exercise study beginning at 1.5 mph at a 0% grade. This level was maintained for 2 minutes, following which, while the patient continued walking, the speed or grade of the treadmill was increased at 1 minute intervals. The patient exercised for 8 minutes and reached a maximum of 2 mph at a 10% grade. He was then allowed to rest for approximately 45 minutes, and then he returned to the treadmill where he completed a steady state exercise stint of 5 minutes duration at 2 mph at a 7.5% grade. He achieved an oxygen consumption of 16.8 cc's during his incremental and 16.1 cc's per kilogram during his steady state exercise level. He described mild substernal and posterior chest discomfort. His EKG and blood pressure responses were normal. His anaerobic threshold

was not identified. His heart rate was moderately excessive. His volume ventilation was very markedly increased. There was marked increase in VD/VT ratio. The latter is due, in part, to increase in respiratory frequency, however, he also exhibited distinct increase in physiologic dead space per se, amounting to some 691 cc's per breath during his steady state stint. Oxygen transfer was markedly impaired throughout his exercise study, especially during his highest incremental and during his steady state exercise level, and he was markedly hypoxic.

These studies indicate very severe, totally disabling respiratory insufficiency as reflected by the severe ventilatory impairment, the reduced diffusing capacity, the marked impairment in oxygen transfer and hypoxia during light exercise. This degree of impairment would render this patient totally disabled for any significant gainful employment.

This patient has a significant history of exposure to coal mine dust. He has x-ray changes consistent with pneumoconiosis. It is medically reasonable to conclude that he does have coalworkers' pneumoconiosis which arose from his coal mine employment.

The two risk factors for this patient's totally disabling respiratory insufficiency are, of course, his cigarette smoking and his coal mine dust exposure with its resultant pneumoconiosis. The latter must be considered at least a major contributing factor to his totally disabling lung disease.

DLR/adw
T: 5/25/93

D. L. RASMUSSEN, M.D.
DIVISION OF PULMONARY MEDICINE

RECEIVED

JUN 09 1993

USDOL
CHARLESTON, WV

## Southern West Virginia Clinic

302 Stanaford Road · Beckley, West Virginia 25801
304/252-7331

Toll Free 1-800-950-9394

Fax No. 1-304-252-4484

August 6, 1993

RECEIVED

AUG 1 6 1993

USDOL
CHARLESTON, WV

Ms. Kelly M. Kirk
Claims Examiner
U. S. Department of Labor
#2 Hale Street, Suite 304
Charleston, WV  25301

RE:  Arvis Toler
     SSN:  ███-5366
     SWVC #:  7-00-94

Dear Ms. Kirk:

I have reviewed the readings of the x-ray of March 8, 1993 by W. S. Cole, M.D., and Paul Francke, Jr., M.D.  They disagreed with the interpretation of Lois Speiden, M.D., who originally interpreted the film.  She felt that the film showed pneumoconiosis with a profusion of 1/1, while Drs. Cole and Francke felt there was no evidence of coalworkers' pneumoconiosis.  Drs. Cole, Francke, and Speiden are all Board Certified Radiologists and B-Readers.  This is a rather striking difference of opinion, however, differences of opinion among qualified b-readers is, of course, quite common place.  This is one reason the x-ray itself is a poor tool for excluding the presence of pneumoconiosis.  Additionally, it has been known for many years that the chest film itself may fail to reveal evidence of pneumoconiosis when, in fact, significant pneumoconiosis may exist.  It has also been well known that the occurrence of emphysema frequently diminishes the appearance of pneumoconiotic shadows.

One recent study sheds some additional light on this topic.  Please see:  V. Vallyathan, et al, "Radiographic Correlation of Coalworkers' Pneumoconiosis, Pathologic Lesions and Dust Burden of the Lungs", _American Review of Respiratory Diseases_, 1992, Vol. 145, #4, Part 2, pp. A-320.  In this study, the authors had available pre-mortem x-rays as well as autopsy material including full Gaugh sections  and microscopic sections of the lungs of 100 coal miners from Southern West Virginia.  They found that among those, 20% of those with severe and 30% of those with moderate grades of macular pneumoconiosis and 29% of those with micronodular pneumoconiosis had x-rays which were interpreted as negative by 3 b-readers.



DIRECTOR'S EXB. NO. 17
CONSISTING of 2 PAGES

J.A. 97

RE: Arvis Toler

Based on this patient's significant occupational dust exposure and Dr. Speiden's x-ray findings, and considering the imperfection of the x-ray, it is my opinion that this patient does have coalworkers' pneumoconiosis which arose from his coal mine employment.

I further believe that there is clear evidence indicating the patient's coal mine dust exposure has played a very significant role in causing his disabling lung disease since it is now well established that chronic obstructive lung disease including pulmonary emphysema may clearly be the consequence of coal mine dust exposure.

In my opinion, this patient does have a totally disabling respiratory insufficiency which was in significant part caused by his coal mine dust exposure.

I hope this information will be of assistance.

Sincerely,

D. L. Rasmussen, M.D.
Division of Pulmonary Medicine

DLR/adw
T:  8/6/93

January 24, 1994

Mr. S. F. Raymond Smith
Attorney at Law
P. O. Box 469
Pineville, WV 24874

> RE: Arvis Toler
> SSN: ███████-5366
> SWVC#: 7-00-94

Dear Mr. Smith:

I have reviewed the following concerning the above patient:

1. Report of D. L. Rasmussen, M.D., dated March 8, 1993.

2. The report of Dr. George Zaldivar dated October 20, 1993.

3. Letter from Dr. Anthony Flaim dated April 5, 1993.

Mr. Toler was evaluated by the undersigned on March 8, 1993 and on September 29, 1993. Dr. Zaldivar subsequently wrote a summary letter of October 20, 1993.

In both our study and Dr. Zaldivar's study, this patient was found to have severe to very severe pulmonary insufficiency sufficient to render him totally disabled for resuming his former coal mine employment. Dr. Zaldivar feels that the patient's loss of function is due solely to his cigarette smoking, while I believe the patient's impaired function is due both to his cigarette smoking and to his coal mine dust exposure.

In part, Dr. Zaldivar's opinion is based on the fact that his x-ray examination failed to reveal evidence of pneumoconiosis. The patient previously was found to have definite evidence of pneumoconiosis by Dr. Speiden on March 8, 1993. Disagreements among B-Readers concerning the presence or absence of pneumoconiosis is, of course, a common place occurrence and is one reason the x-ray itself is a poor tool for determining the presence or absence of pneumoconiosis. It is also noteworthy that the x-ray

J.A. 99

RE: Arvis Toler

may, in fact, be negative in the presence of significant pneumoconiosis. Please see V. Vallyathan, et al, "Radiographic Correlation of Coalworkers' Pneumoconiosis, Pathologic Lesions and Dust Burden of the Lungs", American Review of Respiratory Diseases, 1992, Vol. 145, #4, Part 2, pp. A-320. In this study, the authors had available pre-mortem x-rays as well as autopsy material including full Gaugh sections and microscopic sections of the lungs of 100 coal miners from Southern West Virginia. They found that among those, 20% of those with severe and 30% of those with moderate grades of macular pneumoconiosis and 29% of those with micronodular pneumoconiosis had x-rays which were interpreted as negative by 3 B-Readers.

Dr. Zaldivar asserts, and I agree, that the patient undoubtedly suffers from pulmonary emphysema. It is well known, of course, that cigarette smoking is a potent cause of emphysema. It is also, however, well known that pulmonary emphysema may be the consequence of coal mine dust exposure. Multiple reports from the world's literature, beginning in about 1970, confirm this fact. Among these are the following: Ryder, R. etal, "Emphysema in Coalworkers' Pneumoconiosis", British Medical Journal, 29 Aug. 1970, iii, pp. 481-487. J. P. Lyons, et al, "Pulmonary Disability in Coalworkers Pneumoconiosis", British Medical Journal, 18 Mar. 1972, i, pp. 713-716. J. P. Lyons, et al, "Emphysema in Smoking and Non-Smoking Coalworkers with Pneumoconiosis", Bulletin of the European Physiopathology of Respiration, 1981, Vol. 17, pp. 75-85. V. Ann Ruckley, etal, "Emphysema and Dust Exposure in a Group of Coalworkers", American Review of Respiratory Diseases, 1984, Vol. 129, pp. 528-532. V. Ann Ruckley, et al, "Causes of Disability in Coal Miners: A Clinico-Pathologic Study of Emphysema, Airways Obstruction and Massive Fibrosis" Institute of Occupational Medicine, Report # TM/89/05, May 1989. F. H. Y. Green, et al, "Emphysema in Coalworkers' Pneumoconiosis: Contribution by Coal and Cigarette Smoking", American Review of Respiratory Diseases, 1992, Vol. 145, #4, Part 2, pp. A-321. In addition, the basic mechanisms leading to production of emphysema have been elucidated. Please see: William N. Rom, "Basic Mechanisms Leading to Focal Emphysema in Coalworkers' Pneumoconiosis", Environmental Research, 1990, Vol. 53, pp. 16-28. In that article Dr. Rom points to the fact that focal emphysema is, in fact, a form of centrilobular emphysema distinguished only by the presence of a coal macule.

Evidence for a causal relationship between chronic obstructive lung disease, which of course includes emphysema, has been gained from a number of sources. These include longitudinal studies of ventilatory function in coalworkers. Please see: Love, R. G., and

Miller, B. G., "The Longitudinal Study of Lung Function in Coal
Miners", <u>Thorax</u>, 1982, Vol. 37, pp. 193-197. M. D. Attfield, M.D.,
"Longitudinal Decline in FEV1 in United States Coal Miners",

<u>Thorax</u>, 1985, Vol. 40, pp. 132-137. William M. Marine, etal,
"Clinically Important Respiratory Effects of Dust Exposure and
Smoking in British Coal Miners", <u>American Review of Respiratory
Diseases</u>, 1988, Vol. 137, pp. 106-112. Additionally, cross
sectional studies have shown that coal mine dust exposure may
produce significant loss of ventilatory capacity. Please see:
Michael D. Attfield and Thomas K. Hodous, "Pulmonary function of U.
S. Coal Miners Related to Dust Exposure Estimates", <u>American Review
of Respiratory Diseases</u>, 1992, Vol. 145, pp. 605-609. J. F.
Hurley, and C. A. Soutar, "Can Exposure to Coal Mine Dust Cause
Severe Impairment of Lung Function?", <u>British Journal of Industrial
Medicine</u>, 1986, Vol. 43, pp. 150-157. It is also noteworthy that
even fatal lung disease can be the consequence of coal mine dust
exposure even absent progressive massive fibrosis. Please see: B.
G. Miller and M. Jacobsen, "Dust Exposure, Pneumoconiosis and
Mortality of Coal Miners", <u>British Journal of Industrial Medicine</u>,
1985, Vol. 42, pp. 723-733. In that article, the authors make the
following statement in part: "We believe that in the light of all
information available now, the answer to the question "Does the
inhalation of coal mine dust increase risk of premature death?"
must be answered "Yes". The additional risk certainly occurs if
miners have been exposed to levels of dust sufficiently severe to
cause massive fibrosis of the lung identified radiographically as
Category A or higher on the ILO scale. It occurs also when such
exposures have not resulted in massive fibrosis, or perhaps even in
the absence of the smaller radiographic shadows characteristic of
coalworkers' simple pneumoconiosis, if the dust exposures are
sufficient to cause or enhance lung damage recognized by certifying
doctors as chronic bronchitis and emphysema." Recently the
evidence for chronic obstructive lung disease is a consequence of
coal mine dust exposure has been reviewed by a number of
international experts. Please see: Andrew D. Oxman, et al,
"Occupational Dust Exposure and Chronic Obstructive Pulmonary
Disease, A Systematic Over-View of the Evidence", <u>American Review
of Respiratory Diseases</u>, 1993, Vol. 148, pp. 38-48.

Based on all of the above, it can be stated with a reasonable
degree of medical certainty that Mr. Toler's severe disabling
respiratory insufficiency is at least in significant part the
consequence of his long history of coal mine dust exposure. My
opinion is that this patient does suffer from coalworkers'
pneumoconiosis which arose from his coal mine employment and which

RE:  Arvis Toler

is at least a major contributing cause of his totally disabling
respiratory insufficiency.

I hope this information will be of assistance.

Sincerely

D. L. Rasmussen, M.D.
Division of Pulmonary Medicine

DLR/adw
T:  1/24/94





**EAST TENNESSEE
PULMONARY
ASSOCIATES, PC**

CHARLES W. BRUTON, JR., MD, FCCP
R. HAL HUGHES, MD, FCCP
MICHAEL J. DIMEO, MD, FCCP
MARY T. HINMAN, MSN, APRN, BC

**Suite 201**
**Baptist Physicians Plaza**
10810 Parkside Drive
Knoxville, TN 37934
Phone (865) 218-7499
Fax   (865) 218-7490

**Suite C-200**
**Jackson Plaza**
800 Oak Ridge Turnpike
Oak Ridge, TN 37830
Phone (865) 483-3594
Fax   (865) 483-4910

June 19, 2009

Ms. Sadie C. Tipton, Benefits Counselor
Community Health of Tennessee
Fax #423-566-5106

RE: Arvis Toler
ETPA #20777
Claim # ████536
DOB: ██████

Dear Ms. Tipton:

This is in response to your letter requesting support for Mr. Toler's claim of coal worker's pneumoconiosis.

Mr. Toler has severe obstructive lung disease with pulmonary nodule and intermittent infiltrates.   It is quite probable given the severity of Mr. Toler's disease that coal dust played an integral role in it's development.

Sincerely,

Michael J. DiMeo, M.D., F.C.C.P., MBA

MJD/pm

J.A. 103

January 11, 2010

Paul E. Frampton
Bowles, Rice, McDavid, Graff & Love, L.L.P.
600 Quarrier Street
Charleston, WV 25301

**Corporate Health**

Occupational & Environmental
Health Services

3909 Orange Place
Suite 2300
Orange Village, OH 44122
216 896 1855 Phone
216 896 1851 Fax

RE:      **ARVIS TOLER**
          **CASE # XXX-XX-5366**

Dear Mr. Frampton:

The following correspondence is in reference to Arvis Toler who was evaluated by myself on December 11, 2009. As you are aware, Mr. Toler is a 71 year old year old gentleman formerly employed in the coal mine industry. Consequent to this employment, the issues to be addressed are whether or not Mr. Toler has medical or legal coal workers' pneumoconiosis (CWP). Also, it should be stated if he has any respiratory impairment and/or disability, and if so, has it arisen from his coal mining employment and the inhalation of coal mine dust. In preparing this report, in addition to personally examining Mr. Toler, I have reviewed the following with respect to him:

1.)     Application and employment history;
2.)     Description of coal mine work;
3.)     Evaluation of Dr. Rasmussen from March 8, 1993;
4.)     B reading of a chest X-ray dated March 8, 1993 by Dr. Speiden;
5.)     Report of Dr. Wolfe from April 2, 2008;
6.)     B reading of a chest X-ray from April 2, 2008 by Dr. Ahmed;
7.)     B reading of a chest X-ray dated July 14, 2008 by Dr. Miller;
8.)     B reading of a chest X-ray dated April 2, 2008 by Dr. Wheeler.
9.)     CT scan interpretations of studies dated August 15, 2007 and November 3, 2008 by Dr. Wheeler;
10.)    CT scan interpretations of studies dated December 1, 2006, January 4, 2008, and September 2, 2008 by Dr. Scott; and
11.)    Current pulmonary function tests, chest X-ray as interpreted by William Scott, EKG, arterial blood gas study, carboxyhemoglobin level, nicotine level, and cotinine level.

First, the Claim Application was reviewed, and it indicated that Mr. Toler had 28 years of coal mine employment, up until 1993. It was reported that he was forced to retire because he couldn't breathe. Also, it was noted that he had been exposed to various dusts, and his condition had worsened over the previous eight years. It also was noted that he had been hospitalized for his breathing problems and was under the care of a pulmonary specialist. Additionally, it was described that he had been employed in the coal mines from 1966 to 1993. The different job capacities included being a shuttle car operator, electrician and prep plant electrician. Other work outside of the mines over the years included being a mechanic for the utility company from 1963 to 1965, a mechanic in the marines from 1959 to 1963 and a carpenter's helper from 1956 to 1959. Furthermore, it was noted that as an electrician, he would have to repair and maintain all electrical apparatus in the coal preparation plant and

other areas. He would walk and crawl regularly, and would have to lift tools wherever he went. It was reported that he was not supposed to lift over 30 pounds, although he occasionally did, and he had been evaluated by Dr. Rasmussen in 1993. Furthermore, it was noted that he was being treated by Dr. Dimeo for CWP.

Next, Dr. Rasmussen performed an evaluation on March 8, 1993, with the report being written on May 25, 1993. Mr. Toler was said to have had shortness of breath for 12-13 years with a morning cough. He wheezed mostly when he would lie down at night, and there was a history of pleurisy. A myocardial infarction had occurred around 1990, treated with angioplasty. It was reported that he began smoking in 1951, averaging a pack of cigarettes per day until he quit in 1989. Also, he was said to have done carpentry work from 1956-1959, was a marine mechanic from 1959-1963 and worked in a utility company as a mechanic from 1963-1965. He hand loaded coal for three months in 1957, and was employed predominantly underground as an electrician from 1966 until the time of Dr. Rasmussen's evaluation. At the time of the evaluation, he was an electrician at a cleaning plant, and as such, he would have to carry tools and welding equipment. He did some heavy lifting and was considered to perform heavy manual labor. On examination, his breath sounds were markedly reduced, and he had no rales, rhonchi or wheezes. Dr. Speiden felt that the X-ray revealed p/q opacities in all lung zones, with a profusion of 1/1, with blunting of the costophrenic angle and some emphysema. Pulmonary function tests revealed a FVC of 4.28 liters (114% predicted) with an $FEV_1$ of 2.01 liters (68% predicted) and an $FEV_1\%$ of 47%. The MVV was 78 liters/min (60% predicted). A resting arterial blood gas with a barometric pressure of 691 mmHg revealed a pH of 7.42, a $PCO_2$ of 37 mmHg and a $PO_2$ of 68 mmHg. With exercise, the heart rate increased from 56 to 124 beats/minute, and the blood gas revealed a pH of 7.33, a $PCO_2$ of 39 mmHg and a $PO_2$ of 52 mmHg. It was reported that he exercised to maximum oxygen consumption of 16.8cc/kg/minute and chest pain developed during the test. His VD/VT went up, and he was considered to have severe disabling respiratory impairment overall. In addition, he had a reduced diffusing capacity, which represented a marked oxygenation abnormality. Overall, Mr. Toler was felt to be totally disabled, and the two factors responsible for his disability were considered to be coal mine dust exposure and cigarette smoking.

Next, the Occupational Pneumoconiosis Board findings from West Virginia were reviewed. On March 18, 1991, it was stated that Mr. Toler was awarded benefits from the Occupational Pneumoconiosis Board. He was considered to have 15% additional impairment, having a total of 40%. Mr. Toler was noted to have ten years of shortness of breath with coughing and sputum production. Also, he was said to have pleurisy, and significant impairment had been found on pulmonary function tests from February 14, 1991.

It was noted that the chest X-ray from March 8, 1993 was read by Dr. Speiden. She felt the film revealed p/q opacities in all lung zones, with a profusion of 1/1; bilateral costophrenic angle blunting was observed along with emphysema and bullae formation. A generalized emphysema pattern was observed.

Next, it was noted that Dr. Burrell performed an evaluation on April 2, 2008. Coal mine employment covering a span of 28 years was noted, 16-17 years underground. He spent about 11 years on the surface, last working as a surface prep plant electrician up until 1993. He was

J.A. 105

said to have stopped smoking, and he had pneumonia on three different occasions, with pleurisy on one occasion with attacks of wheezing. Sputum production, wheezing, dyspnea and coughing were reported, and his medications included Pravachol, Zetia, Singulair, Spiriva, Symbicort 160/4.5 two puffs b.i.d., Actonel weekly, nebulizer treatment with albuterol and Atrovent and oxygen at 2 liters/minute. He also was on Combivent at two puffs every four to six hours with Mucinex. Inspection of his chest revealed an increased A-P diameter with dorsal kyphosis, and he had hyperresonance with a prolonged expiratory face. A resting arterial blood gas revealed pH of 7.45, a $PCO_2$ of 36.2 mmHg and a $PO_2$ of 70.1 mmHg. With exercise, his heart rate increased from 80 to 107 beats/minute, and the blood gas revealed a pH of 7.449, a $PCO_2$ of 36.1 mmHg and a $PO_2$ of 49 mmHg. The barometric pressure was 740 mmHg. Pulmonary function tests revealed a FVC of 3.17 liters (103% predicted) with an $FEV_1$ of 0.60 liters (24% predicted) and an $FEV_1$% of 19%. The chest X-ray was read by Dr. Ahmed as revealing s/t opacities in the mid and lower lung zones, with a profusion of 1/0 with the presence of emphysema. The film was felt to be quality 1, and Dr. Burrell felt the film was quality 1. Overall, Dr. Burrell felt that Mr. Toler had simple CWP with severe obstructive lung disease along with atherosclerotic heart disease. In addition, he had impairment which would prevent him from performing his previous coal mine employment, with COPD being a major disability factor. The etiology of his lung problems were felt to be 28 years of coal mine employment along with 30 years of cigarette use. In addition, it was reported that he had coronary artery disease, having had stent insertion and angioplasty.

Next, the chest X-ray from July 14, 2008 was reviewed by Dr. Miller. He felt that there were t/s opacities in the left lung zones, with a profusion of 1/0. Emphysema was present along with bullae formation, predominantly in the right lung. Also, Dr. Wheeler reviewed the X-ray from April 2, 2008, and it was considered 0/0. There was hyperinflation with a question of emphysema, with some areas of atelectasis.

Next, CT scans dated August 15, 2007 and November 3, 2008 were interpreted by Dr. Wheeler. Both were felt to demonstrate moderate to marked emphysema, with some distorted lung markings in all lung zones. Also, there were scattered linear scars or thickened bleb walls, some atelectasis and slight elevation of the left hemidiaphram. No micronodularity related to past coal mine dust exposure was observed. Subsequently, Dr. Scott reviewed CT scans dated December 1, 2006, January 4, 2008 and September 2, 2008. He observed moderate-marked emphysema without micronodularity. Also, some atelecatsis was observed with focal scars and/or infiltrates.

At the time of **MY EVALUATION** Mr. Toler reported that he had been on oxygen constantly, 24/7, over the last several years. He had breathing difficulties over the last five years, and the symptoms were getting progressively worse, being short of breath with activities of daily living. He had cough and non-purulent sputum production on a regular basis. If the sputum started to become purulent, he often would end up in the hospital. He wheezed and slept on one pillow, and generally slept through the night without paroxysmal nocturnal dyspnea. He had some swelling of his ankles, particularly when he was on prednisone, with hemoptysis in the past. Also, he had a history of chest pain, with stent insertion in 2004. Prior to that, he had angioplasty in 1998. He denied any palpitations of his heart.

J.A. 106

His **PAST MEDICAL HISTORY** was notable for a sulfa allergy, and he was on a variety of medications including oxygen at 2 liters/minute 24/7. He used both the VEST (a mechanical device to loose secretions), as well as a flutter valve for the same purpose. He also used an Incentive spirometer regularly and albuterol nebulization maybe once a day. He was on Symbicort b.i.d., Spiriva q.d. and Combivent as needed, perhaps twice a day. Furthermore, he was on a baby aspirin a day, along with doxycycline 100mg/day for prevention of recurrent bronchitis. Also, he was on pravastatin 40mg/day, Mucinex as needed, calcium with vitamin D and separate vitamin D supplementation. Lastly, he was on fluticasone nasal spray as well as Zyrtec. He had been hospitalized perhaps six times or so over the last three to four years for his respiratory problems, probably around twice per year of late. Also, he frequently had pneumonia, without a history of whooping cough or TB. He has some sinus congestion of late, with a history of dermatitis, the etiology of which was unclear.

His **FAMILY HISTORY** was notable in that both parents died in their 50's, his mother of cancer and his father suddenly of a stroke. One sister developed lung cancer, and there was nobody else in the family with any respiratory disorders.

His **SOCIAL HISTORY** was notable in that he was married and served in the marines from 1959 to 1963, and prior to that was in the army from 1956 to 1959. He smoked cigarettes starting when he went into the marines from 1959 or so, a pack of cigarettes per day or less up until 1996. Furthermore, he stated that when working in the mines, he couldn't smoke most of the day. Currently, he was essentially sedentary at home.

His **WORK HISTORY** was notable for a little over 27 years of coal mine employment, up until 1993, being forced to retire because of his respiratory problems. His work was all underground up until 1985; at that point he became an electrician at the preparation plant. With this position, he would perform repairs throughout the facility, and as such, had to regularly lift 50-60 pounds. There was a lot of climbing, regularly going up flights of steps. He also would be around the belt line, and a lot of coal dust exposure occurred. Additionally, he stated that the oil cans themselves weighed 35 pounds. Prior to working at the preparation plant, he was underground, and he last worked underground as an electrician mechanic. Prior to that, he ran a miner, was a shuttle car operator for apparently five years, operated a loading machine, was a roof bolter helper, did bed work, etc. Masks were worn only in the late 1980's or into the 1990's.

His **REVIEW OF SYSTEMS** was notable was pretty much negative except as noted.

On **PHYSICAL EXAMINATION** he was wearing his oxygen and appeared short of breath with minimal activities. Just getting Mr. Toler up on the exam table caused him to be symptomatic. His blood pressure was 130/80, and his respiratory rate was 20-24 breaths/minute, and his heart rate was 68 beats/minute and regular. His head, ears, eyes, nose and throat revealed no use of accessory muscles. He had equal expansion of his chest, but he was markedly hyperresonant. Deep breath sounds were barely audible, and he had no rhonchi, wheezes or rales. In addition, he had no murmurs, gallops or rubs, and his abdomen was benign, without masses or areas of tenderness. He had no edema, cyanosis or clubbing.

4

J.A. 107

Next, his **chest X-ray** was reviewed by Dr. Scott, and it revealed hyperinflation compatible with emphysema, without micronodularity (0/0). Some atelectasis or related changes were observed in the right middle lobe and left lower lobe. Next, **pulmonary function tests** revealed a FVC of 2.40 liters (79% predicted) with an $FEV_1$ of 0.58 liters (24% predicted) and an $FEV_1$% of 24%. The MVV was 22 liters/minute (20% predicted). After bronchodilators the FVC was 2.69 liters (89% predicted; a 12% increase) with an $FEV_1$ of 0.60 liters (25% predicted; a 3% increase) and an $FEV_1$% of 22%. The MVV was 23 liters/minute (21% predicted). The total lung capacity was 135% predicted with an RV/TLC of 194% predicted. The RV was 259% predicted. The diffusing capacity was 53% predicted; corrected for lung volumes 39% predicted. A **resting arterial blood gas** revealed a pH of 7.45, a $PCO_2$ of 35.8 mmHg and a $PO_2$ of 65.6 mmHg. The **carboxyhemoglobin** level was 1.2%. In addition his **nicotine level** was 9.2 ng/ml (active tobacco user, >2.0 ng/ml) and cotinine level 566 ng/ml (active tobacco user, >20 ng/ml). An **exercise arterial blood gas** was not performed because he was markedly short of breath at rest, and it was not felt clinically appropriate for him to exercise.

In **SUMMARY** , Mr. Toler is a 71 year old who has had shortness of breath over the last five years which has worsened markedly over the last several years. He's had frequent hospitalizations for his breathing and is short of breath with activities of daily living. He has cough and sputum production, and also has coronary artery disease. He smoked regularly up until 1996 over a period of nearly 40 years, and he described 27+ years in the coal mines. His breath sounds were markedly decreased on examination, and his chest X-ray revealed a diffuse emphysematous process, without micronodularity. His pulmonary function test revealed severe airflow obstruction with an improvement in association with bronchodilator administration. His diffusing capacity was severely reduced, and he had marked air trapping. Finally, it was noted that both his cotinine and nicotine levels were increased.

**DISCUSSION**:                Based on review of the above information, it can be appreciated that Mr. Toler's chest X-ray overall revealed a diffuse emphysematous process without micronodularity (0/0). The finding of linear changes by others does not relate to past coal mine dust exposure. Rather, it represents a manifestation of Mr. Toler's past smoking history (Weiss). In addition, his total lung capacity was increased which indicates he does not have restriction. Furthermore, while his diffusing capacity was reduced, this in the setting of severe airflow obstruction undoubtedly relates to the presence of chronic obstructive pulmonary disease (COPD). Finally, his diminished breath sounds and hyperresonance relate to the presence of COPD. When all of the above information is looked at in total, Mr. Toler clearly does not have the condition of clinical CWP.

From an impairment perspective, Mr. Toler has severe airflow obstruction and clearly can not perform his previous coal mine job or any other similarly arduous types of labor. The next question to ask pertains to what is the etiology for his disabling obstruction.

First as outlined in the comments to the Federal Black Lung regulations it states that "coal miners have an increased risk of developing COPD". It also states that "COPD may be detected from decrements in certain measurements of lung function, especially the $FEV_1$ and the ratio of $FEV_1$/FVC". I do not disagree with either proposition stated in the comments. Coal miners may develop COPD related to coal dust. Moreover, COPD is typically measured

5

J.A. 108

by decrements in lung function as seen by decreases in $FEV_1$ and in the $FEV_1$ / FVC (or $FEV_1\%$). The comments, however, do not say that coal dust causes decreases in $FEV_1\%$. On the contrary, the medical literature referenced in the comments (Morgan, Soutar and Hurley, and Attfield and Houdos) establishes that coal dust causes a proportionate reduction in the FEV and $FEV_1$, such that the $FEV_1$/FVC ratio is generally preserved. Attfield and Houdos outlined that the $FEV_1$ / FVC ratio documented at most a 3% decline, thus a generally preserved $FEV_1\%$. Morgan and Soutar and Hurley outlined that in relationship to increasing amounts of coal dust exposure, the miners they investigated actually had no decrease in the $FEV_1$ / FVC ratios; the observed values were normal. Additionally, the presence of preserved ratios in miners with legal CWP is supported by the works of Dimich-Ward and Bates. These authors published articles in 1985 and 1994, outlining that the obstruction observed in relationship to past coal dust exposure was characterized by a symmetrical reduction of the $FEV_1$ and FVC. Consequently, the $FEV_1$ / FVC ratios were normal.

Second, there is no basis for finding that COPD is only defined by decrements in $FEV_1$ and $FEV_1\%$. The Global Initiative for Chronic Obstructive Pulmonary Disease (GOLD) defines COPD broadly as a reduction in $FEV_1$ / FVC ratio, but this definition does not purport to comprehensively define the problem. The definition applies to the population generally, but this is heavily influenced by the fact that cigarette smoking makes up the large portion of COPD, which typically is characterized by a decreased $FEV_1\%$. In fact, recent literature (including literature published after D.O.L.'s revisions to the black lung regulations) establishes the limitation of defining COPD as simply a reduction in $FEV_1$ or $FEV_1\%$ values. These authors have documented that in certain segments of the population, COPD is defined by a proportionate reduction in $FEV_1\%$.[1]

Thus, based on the above discussion while I agree with the D.O.L. that COPD may be detected by a decrease in the $FEV_1$ and $FEV_1$ / FVC ratio, this does not generally apply to patients with legal CWP. Among the latter, based on epidemiologic studies accepted by the D.O.L., the obstruction is characterized by a preservation of the $FEV_1$ / FVC ratio. As an aside it should be appreciated that epidemiologic studies performed on smokers have demonstrated their obstruction is characterized by a reduction of the $FEV_1$ / FVC ratio (Huhti; Ashley; Balchum; Coates).

The above discussion outlines that a preservation of the $FEV_1$ / FVC ratio is the "norm" in patients with coal mine induced obstructive lung disease. The opposite is true with respect to

---

[1]     With respect to the GOLD criteria failing to diagnose a significant number of patients with COPD, a discussion regarding this is outlined by Fabbri in an article that accompanied the recent GOLD update (Rabe). Fabbri outlined how the established GOLD criterion for defining COPD, namely a reduced $FEV_1$ / FVC ratio, fails to diagnose COPD in a significant number of patients with the disorder. Specifically, Fabbri discussed how a subset of patients with COPD, about 15% of all individuals with this disorder, displayed an "atypical" spirometric pattern, namely preservation of the $FEV_1$ / FVC ratio (obviously in association with a reduced $FEV_1$). It should be noted that a similar pattern of obstruction among patients with COPD has been described by Stanescu, and he labeled them as having the "small airways obstruction syndrome". Additionally, he reported on another group of individuals having COPD with a similar pattern of dysfunction. Stanescu went on to state that a normal $FEV_1$ / FVC ratio does not exclude the presence of airflow obstruction. As an aside, this same type of phenomenon has been described by Olive among asthmatics. This investigation determined that in response to allergen exposure, airflow obstruction was associated with a reduction of both FVC and $FEV_1$, accompanied by an increase in the residual volume.

J.A. 109

smoking-related COPD where the ratio is decreased. Thus, patterns of airflow obstruction help determine the etiology of a given miner's airway obstruction.

Furthermore, while both coal dust and cigarette smoke can cause emphysema based on similar pathogenic mechanisms, the differences exist between the types of emphysema these agents induce. This is logical, since the characteristics of the inhaled agents are disparate. In order to appreciate this fact as outlined by the Surgeon General (1989) over 4,000 different components are contained within cigarette smoke with an estimated $10^{10}$ particles/ml. In addition, it is estimated that $10^{15}$ free radicals exist in the gas phase of each puff of tobacco smoke with $10^{18}$ free radicals being present per each gram of tar (Tuder). Furthermore, the various particles contained within cigarette smoke are dispersed in a vapor phase, with the particles being a median diameter of between 0.18 to 0.34 microns (Bernstein). Also, the Surgeon General (1984) outlined that 30 to 40% of these predominantly submicron particles end up reaching alveolar structures. The contrasting differences between tobacco smoke and coal mine dust exposures are first illustrated by the characterization of particle size distribution within coal mine dust. In regards to this, Seixas determined that there was a bimodal distribution of particle diameter size within coal dust, centering around 17 microns and 5 microns. Additionally, in the Burkart investigation, the distribution of the particle diameters was assessed in relationship to different mining operations. Overall, it was found that the particle sizes were comparable to that observed by Seixas, with only an extremely small fraction being below 1 micron in diameter. Additionally, coal dust is composed of a heterogeneous inorganic (nonliving) materials composed largely of carbon, hydrogen oxygen and nitrogen with rank being defined by the carbon content in relationship to other components (Parkes). These other components include various minerals, the amount of which decreases as the rank increases. The most common minerals include clays, quartz, pyrite and calcite, with trace metals also being present. In contrast, cigarette smoke is a combustion product of tobacco (an organic or living substance), which contains as noted 1000's of different components in both solid and gaseous phases, coupled with an abundance of free radicals. It should be noted the gases include toluene, benzene and phenol.

Based on the above information, the character of the components contained within coal dust and cigarette smoke are vastly different. As such, it follows that the disruption and alteration of tissue structures by these two agents within the lungs would be quite disparate. The larger coal dust particles would not have the same distribution pattern within the lungs as the submicron particles contained within cigarette smoke. Also, the abundance of free radicals contained within cigarette smoke ($10^{15}$ / puff), along with the abundance of associated submicron particles, readily explains why cigarette smoke penetrates more deeply into alveolar structures than coal dust. This deeper penetration causes an inflammatory response in a different location than coal dust, resulting in a diffuse pattern of emphysema formation, in contrast to a more localized form of emphysema induced by coal mine dust. Furthermore, the diffuse emphysematous process that characterizes that related to cigarette smoking is supported by an associated diffusing capacity (DLCO) reduction, which develops as the emphysema becomes more advanced. The presence of a DLCO reduction indicates there has been a diffuse destruction of the alveolar capillary bed. A decreased DLCO is characteristically seen in relationship to emphysema caused by cigarette smoking (Berend, Baldi, Klein). In contrast, with coal mine dust exposure, generally the diffusing capacity is preserved (Nemery; Morgan, 1972). This supports the fact that a diffuse emphysematous

J.A. 110

destruction of lung tissue is not characteristic of coal mine dust exposure. Furthermore, the diffuse emphysematous process related to cigarette smoking often is associated with large lung volumes (increased total lung capacity), coupled with airtrapping (increased RV/TLC). Lastly, with respect to CWP, mineral dust exposure causes chronic airway scarring (Churg and Wright). As such, luminal diameter is compromised, and in response to bronchodilator administration, this chronic scarring does not allow dynamic changes in the size of the lumen to occur. Thus, a bronchodilator response is not observed.

Specific to Mr. Toler, one can appreciate that his $FEV_1/FVC$ ratio is severely reduced down to around 24% (normal generally 70% or greater), clearly a manifestation of smoking related COPD. Furthermore, he had a bronchodilator response represented by his FVC improvement after the administration of bronchodilators, again a manifestation of smoking related lung disease. In addition, his diffusing capacity is severely reduced, indicative of a diffuse form of emphysema which develops in relationship to cigarette smoking and not past coal dust exposure. This is also consistent with his marked air trapping, as is supported by his increased RV and RV/TLC ratio. When all of the above information is looked at in total, clearly Mr. Toler has classic obstructive lung disease related to his long smoking history. The obstructive lung disease that he has is not caused in whole or part by his past coal mine dust employment. For completeness it should be noted that both his cotinine and nicotine levels are quite elevated indicating Mr. Toler is actively using tobacco products extensively, despite his statements to the contrary.

In **CONCLUSION** , it can be stated with a reasonable degree of medical certainty that Mr. Toler does not have either clinical or legal CWP. While he is disabled from a pulmonary perspective, this relates to the development of severe COPD consequent to his past smoking history. If you have any questions, please feel free to contact me.

Sincerely,

David M. Rosenberg, M.D., M.P.H.
Medical Director
Occupational Health Services at Chagrin Highlands
University Hospitals of Cleveland

DMR/mmw

J.A. 111

## REFERENCES

Ashley, F et al. Pulmonary function: relation to aging, cigarette habit, and mortality. Ann. Intern. Med. 82: 739-45, 1975.

Balchum O. et al. A survey for chronic respiratory in an industrial city. Am. Rev. Respir. Dis. : 86:675-85, 1962.

Attfield, MD and Houdos, TK.  Pulmonary Function of U.S. coal miners related to dust exposure estimates. Am. Rev. Respir. Dis. 145:605-09, 1992.

Baldi, S., et al.  Relationship between extent of pulmonary emphysema by high-resolution computed tomography and lung elastic recoil in patients with chronic obstructive pulmonary disease. Am. J. Respir. Crit. care Med. 164:585-589, 2001.

Bates, DV et al. "A Longitudinal Study of Pulmonary Function in coal Miners in Lorraine, France". Am. J. Indus. Med. 31-32 , 1985

Berend, N., et al. Correlation between the function and structure of the lung in smokers. am. Rev. Respir. Dis. 119:695-705, 1979.

Bernstein, David M., A review of the influence of particle size, puff volume, and inhalation pattern on the deposition of cigarette smoke particles in the respiratory tract.  Inhalation Technology, 16:675-689, 2004.

Burkhart, Joseph, E, et al.  Particle Size distributions in underground coal mines.  Am. Ind. Hyg. Assoc. J., 48:122-126, 1987.

Churg, A. and Wright, TJL.  Small airway lesions in patients exposed to non-asbestos mineral dust. Human pathology. 14:688-93, 1983.

Coates, ES et al. Chronic respiratory disease in postal employees. JAMA 191: 161-66, 1965.

Dimich-Ward and Bates.  Reanalysis of a longitudinal study of pulmonary function in coal miners in Lorraine, France. Am. J. Ind. Med. 25:613-23, 1994.

Fabbri, LM, et al.  COPD guidelines.  The important thing is not to stop questioning. Am. J. Respir. Crit. Care Med., 176:527-528, 2007.

Huhti, E, et al. Chronic respiratory disease in rural men. An epidemiological survey at Hankasalmi, Finland. Ann. Clin. Res. 10: 87-94, 1978

Klein, JS, et al.  High-resolution CT diagnosis of emphysema in symptomatic patients with normal chest radiographs and isolated low diffusing capacity.  Radiology. 182:817-821, 1992.

9

Morgan, WKC, et al. Respiratory impairment in simple coal workers' pneumoconiosis. J. Occup. Med. 14:839-844, 1972.

Morgan WKC, Handelsman L, Kibelstis, J et al, Ventilatory capacity and lung volumes of U.S. coal miners. Arch. Environ. Health, 28:182-189; 1974.

Nemery B, et al. Impairment of Ventilatory Function and Pulmonary Gas Exchange in Nonsmoking Coal Miners. Lancet. 1427-29, (1987).

Olive, JT, and Hyatt, RE. Maximal expiratory flow and total resistance during induced bronchoconstriction in asthmatic subject. Am. Rev. Respir. Dis. 106: 366-376, 1972.

Parkes, W. Raymond. Occupational Lung Disorders, 3rd edition, Butterworth-Heinemann Ltd., 1994.

Pauwels, RA, et al. Global Strategy for the Diagnosis, Management, and Prevention of Chronic Obstructive Lung Disease. NHLBI/WHO Global Initiative for Chronic Obstructive Lung Disease (GOLD). Am. J. Respir. Crit. Care Med. 163:1256-1276, 2001.

Rabe, KF, et al. Global Strategy for the Diagnosis, Management, and Prevention of Chronic Obstructive Pulmonary Disease; GOLD Executive Summary. Am. J. Respir. Crit. Care Med. 176:532-555, 2007.

Seixas, NS, et al. Variability of particle size-specific fractions of personal coal mine dust exposure. Am. Ind. Hyg. Assoc. J., 56, 1995.

Sharafkhaneh, Amir, et al. Pathogenesis of emphysema from the bench to the bedside. Proc. Am. Thorac. Soc., 5:475-477, 2008

Soutar, CH and Hurley JF. Relation between dust exposure and lung function in miners and ex-miners. Br. J. Ind. Med. 34:307-320, 1986.

Stanescu, D. Small airways obstruction syndrome. Chest, 116:231-233, 1999.

Stanescu, D., and Veriter. C. A normal $FEV_1$ / FVC ratio does not exclude airway obstruction. Respiration, 71:348-352, 2004.

Weiss, W. Cigarette smoking and small irregular opacities. Br. J. Ind. Med. 48:841-44, 1991.

J.A. 113

| SOURCE | BURRELL | | | | RASMUSSEN | | ROSENBERG | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | 04-02-08 | | 07-14-08 | | 03-08-93 | | 12-11-09 | | | | | |
| CMB (yrs) | 28 | | | | 27 | | 27 | | | | | |
| Smoking (pck/yrs) | stopped | | | | 38 | | < 37 | | | | | |
| Examination | | | | | decreased | | decreased; hyperresonance | | | | | |
| | B | A | B | A | B | A | B | A | B | A | B | A |
| FVC units/liters | 3.17(103) | | | | 4.28(114) | | 2.40 (79) | 2.69 (89) | | | | |
| FEV$_1$ liters | 0.60 (24) | | | | 2.01 (68) | | 0.58 (24) | 0.60 (25) | | | | |
| FEV$_1$ % | 19 | | | | 47 | | 24 | 22 | | | | |
| MVV l/m | | | | | 78(60) | | 22(20) | 23(21) | | | | |
| TLC liters | | | | | (135) | | | | | | | |
| DLCO; DLCO/VA | | | | | (53); (39) | | | | | | | |
| RV/TLC % pred | | | | | (194) | | | | | | | |
| | R | E | R | E | R | E | R | E | R | E | R | E |
| PH | 7.45 | 7.44 | | | 7.42 | 7.33 | 7.45 | | | | | |
| PCO$_2$ mmHg | 36.2 | 36.1 | | | 37 | 39 | 35.8 | | | | | |
| PO$_2$ mmHg | 70.1 | 49 | | | 18 | 52 | 65.6 | | | | | |
| CO% | | | | | | | 1.2 | | | | | |
| O$_2$ MAX | | | | | | 16.8 | | | | | | |
| VE (liters) | | | | | | | | | | | | |
| VD/VT | | | | | | | | | | | | |
| RQ | | | | | | | | | | | | |
| CAT scan | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Chest X-ray | | | | | | | | | | | | |
| Ahmed | 1/0; s/t | | | | | | | | | | | |
| Wheeler | 0/0 | | 0/0 | | | | | | | | | |
| Miller | | | 1/0; t/s | | | | | | | | | |
| Speiden | | | | | 1/1; p/q | | | | | | | |
| Scott | | | | | | | 0/0 | | | | | |

( ) = % predicted

COPY

**U.S. DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**
**WASHINGTON, D.C.**

| | |
|---|---|
| ARVIS TOLER, ) | |
| ) | |
| Claimant, ) | |
| vs. ) CLAIM NO. XXX-XX-5366 | |
| ) | |
| EASTERN ASSOCIATED COAL, ) | |
| CORP., ) | |
| ) | |
| Employer, ) | |
| ) | |
| and, ) | |
| ) | |
| DIRECTOR, OFFICE OF WORKERS' ) | |
| COMPENSATION PROGRAMS, ) | |
| ) | |
| Party-in-Interest. ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The evidentiary deposition of DAVID ROSENBERG,

M.D., was taken by the Employer pursuant to 29 C.F.R, Section 18.22

in the above-entitled action before David T. Bolin, Court Reporter

and Notary Public within and for the State of West Virginia, on the

23rd day of February, 2010, commencing at 4:30 p.m., pursuant to

notice.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**BILLANTI AND ASSOCIATES**
**COURT REPORTERS**
**1033 RIDGEMONT DRIVE**
**ELKVIEW, WV 25071**
**304-965-7444**

## APPEARANCES


### ON BEHALF OF THE EMPLOYER:

PAUL E. FRAMPTON
Attorney-at-Law
Bowles, Rice, McDavid, Graff & Love, LLP
600 Quarrier Street
Charleston, West Virginia 25301
(304) 347-1163


**NO APPEARANCE ON BEHALF OF CLAIMANT**

# INDEX

**EMPLOYER'S WITNESS:**                    **DIRECT**

David Rosenberg, M.D.                         4
                                          (Frampton)

Reporter's Certificate...............33/34

J.A. 117

1           (Witness sworn.)

2   THEREUPON came;

3       D A V I D   R O S E N B E R G, M. D.,

4   called on behalf of the Employer herein, who,

5   having been first duly sworn to tell the truth,

6   testified as follows:

7               DIRECT EXAMINATION

8       BY MR. FRAMPTON:

9       Q    Would you please state your full

10  name for the record, please?

11      A    David Michael Rosenberg.

12      Q    Dr. Rosenberg, your curriculum

13  vitae will be admitted into the record of this

14  case, but if you would, could you please

15  explain to the court what your background is in

16  pulmonary diseases and specifically coal mine

17  dust-induced lung diseases?

18      A    Sure.  I have a post-graduate

19  education in pulmonary disease with pulmonary

20  fellowship at the National Institutes of Health

21  in Bethesda, Maryland.  Our focus of disease

22  and research and clinical activities at that

1   point in time was in interstitial lung disease.

2            I also have a Master's in public

3   health and occupational medicine and have dealt

4   with issues of epidemiology, the study of

5   diseases in populations, toxicology and

6   biostatistics.

7            I have a background and knowledge

8   of epidemiology specific to coal mine dust

9   related disease and disorders.

10           I have been actively involved in

11  both caring for patients who have been coal

12  miners and are evaluating individuals who are

13  coal miners for the presence of coal workers'

14  pneumoconiosis over the last 30 years.  I am

15  also a certified B reader for interpreting

16  x-rays for the presence of pneumoconiosis.

17       Q    All right.  Do you hold any

18  academic positions?

19       A    Yes, I'm an assistant clinical

20  professor at Case Western Reserve University

21  School of Medicine in Cleveland, Ohio.

22       Q    How long have you been acting as a

1    clinical professor of medicine?

2          A    Since I came back to Cleveland in

3    1979.

4          Q    Does that include pulmonary

5    diseases?

6          A    Yes.

7          Q    Okay.  What board certifications do

8    you hold, Doctor?

9          A    I am board certified in three

10   different areas:  internal medicine, pulmonary

11   disease as well as occupational medicine.

12         Q    Okay.  Does occupational medicine

13   include diseases from occupations such as coal

14   mining?

15         A    Yes.

16         Q    All right.  Doctor, let's turn our

17   attention to the case at hand and that's the

18   case of Arvis Toler.  First of all, I

19   understand that you examined Mr. Toler?

20         A    Yes, I had an opportunity to

21   evaluate him on December 11, 2009.

22         Q    What did your examination involve?

1      A    My evaluation consisted of taking a

2   personal history from Mr. Toler, discussing his

3   present, past, family, social, work and

4   exposure history, conducting a hands-on

5   examination, and ordering various diagnostic

6   tests, including pulmonary function test, chest

7   x-ray as interpreted by Dr. Scott, EKG,

8   arterial blood gas study, carboxyhemoglobin,

9   nicotine and cotinine levels.  I also had

10  various records available to review with

11  respect to him.

12      Q    All right.  In terms of the testing

13  that you just described, why is it that you

14  looked at the nicotine and cotinine levels?

15      A    Because those measurements are

16  objective ways to determine whether or not

17  someone is actively using tobacco products.

18  Obviously, subjectively one can get a history,

19  but objectively these types of measurements are

20  very accurate in determining active usage of

21  tobacco.

22      Q    I think in the case of Mr. Toler,

1   the nicotine level that you took at that time

2   was 9.2?

3          A      That would be correct.

4          Q      What does that indicate in terms of

5   his exposure to nicotine-containing products?

6          A      That means that he has had very

7   recent usage of nicotine.  The nicotine level,

8   the half-life, so to speak, is in several

9   hours.  So shortly after you have used nicotine

10  products or tobacco products, if you don't use

11  any more, the level will quickly come back down

12  to normal.  So the fact that his level of

13  nicotine was high means that he has recently

14  used nicotine products.

15         Q      What about the cotinine levels?

16         A      The cotinine is a measurement of

17  the byproduct of nicotine.  Nicotine is

18  metabolized in the liver to cotinine.  Cotinine

19  has a half-life of 24 hours or so, thereabouts.

20  So a measurement of cotinine is probably the

21  best measurement we have nowadays of

22  determining whether somebody is actively using

1   tobacco products. A level of over 15 or so is

2   indicative of an active user of tobacco

3   products.

4        Q    And how high was his level?

5        A    It was very high. It was 566.

6        Q    Now, did you also take a

7   carboxyhemoglobin measurement?

8        A    Yes, I did. It was 1.2%.

9        Q    Okay. Now, what does it mean in

10   terms of the carboxyhemoglobin level being at

11   that percentage but the cotinine levels being

12   so high?

13        A    Well, carboxyhemoglobin level

14   reflects combustion products of anything that's

15   burning. So obviously if one is smoking

16   actively, the carboxyhemoglobin you would

17   expect to be elevated. The half-life is 4 to 6

18   hours, so it comes down quickly also, similar

19   to the nicotine level.

20        Again, obviously there can be

21   discordance between the two measurements, one

22   may come down quicker than the other, but it

1  also is conceivable that one is using tobacco

2  products that aren't combustible, namely

3  chewing tobacco or snuff, a tobacco product of

4  that sort.

5      Q    Did Mr. Toler indicate that he was

6  using a tobacco product at the time of your

7  examination?

8      A    He told me that he stopped smoking

9  many years before.  In fact, he said that he

10  hadn't smoked since 1996.

11      Q    Okay.  Did he indicate that he used

12  tobacco in any other form?

13      A    No.

14      Q    All right.  How does the 1.2% in

15  the carboxyhemoglobin level compare with the

16  9.2 nicotine level?

17      A    A carboxyhemoglobin level of 1.2%

18  is normal.  And obviously the nicotine level is

19  significantly increased.

20      Q    Is elevated.  All right.  I didn't

21  know whether or not nicotine level was a

22  significant elevation or a slight elevation.

1       A     Yeah.  It would be significant.

2       Q     All right.  You did some pulmonary

3   function testing of Mr. Toler and you also

4   reviewed pulmonary function testing by other

5   physicians; is that correct?

6       A     That is correct.

7       Q     Tell us what your current

8   assessment is of Mr. Toler's pulmonary

9   function?

10      A     They indicate very severe

11  obstructive lung disease with a bronchodilator

12  response as characterized by his increase of

13  the forced vital capacity by 12% after

14  bronchodilator.  He did not have restriction or

15  small lung.  His total lung capacity was

16  actually increased and his vital capacity after

17  bronchodilator was normal.

18          This severe obstruction is

19  associated with a marked decrease in his

20  diffusing capacities, which is a measurement of

21  the alveolar capillary bed.  So by definition,

22  the alveolar capillary bed within his lungs is

1  significantly destroyed and he has what we

2  called marked air trapping.  The residual

3  volume in his lungs is markedly increased in

4  relationship to the size of his lungs, so that

5  the measurement of the RV/TLC was markedly

6  increased.

7       Q    All right.  Did the reduction in

8  the diffusing capacity show itself again in the

9  arterial blood gas testing?

10      A    Yes.  He has an oxygenation

11 abnormality which would correlate with a loss

12 of alveolar capillary beds and the low

13 diffusing capacity, and in fact, it's

14 consistent with an exercise study that was

15 performed in the past where his PO2 actually

16 fell with exercise, which again, all correlates

17 with his low diffusing capacity and loss of

18 alveolar capillary bed.

19      Q    All right.  From the standpoint of

20 his ability to perform his last coal mine work,

21 what is your opinion based on this testing?

22      A    He clearly is disabled from

1   performing his previous coal mine employment.

2         Q    Were the pulmonary function tests

3   that were conducted valid?

4         A    Yes.

5         Q    What is your opinion as to whether

6   or not Mr. Toler has pneumoconiosis?

7         A    Well, as you're aware,

8   pneumoconiosis can be divided into two

9   categories.  One is clinical CWP and the other

10  is legal CWP.  With respect to medical or

11  clinical CWP, his x-ray did not reveal

12  micronodularity that led to coal mine exposure,

13  and this is fairly consistent with the various

14  B-readings that are in the file. Micro

15  modularity was not present overall.

16              In addition, he does not have

17  restriction or small lungs.  In fact, his lungs

18  are bigger than normal, with a total lung

19  capacity of 135% of predicted.  So overall, he

20  clearly does not have clinical CWP.

21              With respect to legal CWP, I mean,

22  there's no question, coal mine dust exposure

1   can cause air flow obstruction.  That's a

2   given.  However, just because a given miner has

3   airway disease, that does not automatically

4   mean that this represents legal CWP.  It may

5   represent legal CWP, but it also could

6   represent obstruction that occurs in the

7   general population.  You really need to look at

8   specific characteristics of a given miner to

9   try and determine the etiology of the

10  obstruction that is present.

11          Bottom line, with respect to Mr.

12  Toler, when you look at his objective data,

13  objective findings, they indicate he does not

14  have legal CWP, rather he has obstructive lung

15  disease of a severe nature related to his past

16  smoking history.

17          The reasoning for that is that

18  first one looks at the characteristic

19  spirometric pattern that Mr. Toler displays.

20  Various research among coal miners has

21  indicated that while there is no question air

22  flow obstruction occurs in miners, when it does

1   occur there is a symmetrical reduction of the

2   FEV1 with the FVC such that the FEV1 divided by

3   the FVC generally is preserved.  This has been

4   shown in various research studies by Morgan,

5   Suter and Hurley, Attfield and Hodous, as well

6   as Cimich-Ward and Bates.

7              A contrast research in smoking

8   related obstructive lung disease indicates that

9   that ratio generally is down with obstructive

10  lung disease.  The normal ratio is 70% or

11  higher.  When you look at Mr. Toler's ratio

12  it's down to around 22 to 24%.  So basically

13  the pattern of the obstruction, the marked

14  decrease in FEV1 with a marked decrease in the

15  FEV1/FVC ratio is classic for a smoke-related

16  form of obstruction.

17             Furthermore, he has a marked

18  decrease in diffusing capacity, which indicates

19  a diffuse destruction of the alveolar capillary

20  bed.  You see this kind of diffuse destruction

21  of the alveolar capillary bed in emphysema that

22  occurs in relationship to smoking.

1     While there is no question coal

2   mine dust exposure can cause emphysema,

3   generally one would not see a decreased

4   diffusing capacity in relationship to his

5   emphysema occurring in coal mine dust exposed

6   individuals.

7     Mr. Toler's diffusing capacity was

8   corrected for the size of his lungs, was

9   severely reduced down to 39%.  Again, this is

10  totally classic for a smoke-related form of

11  emphysema, which was apparent.  This diffuse

12  emphysema is also apparent on his x-rays and

13  consistent with his examination, which revealed

14  hyper-resonance and markedly diminished breath

15  sounds.

16     So all of the findings, along with

17  the air trapping that he had on his RVO or TLC,

18  all this is consistent with a diffuse form of

19  emphysema that one sees with smoking.

20     Lastly, I should mention that the

21  bronchodilator response of the forced vital

22  capacity is also consistent with a smoke

1  related form of obstruction.  When you have

2  obstruction with coal dust exposure, one gets

3  scarring within the airways and one would not

4  expect a bronchodilator response in

5  relationship to the scarring that is present in

6  the airways.

7           Overall, in summary, obstruction of

8  Mr. Toler is characterized by a marked decrease

9  in the FEV1/FVC ratio, the marked decrease in

10  diffusing capacity, the diffuse emphysematous

11  pattern on his x-rays, decreased breath sounds

12  and hyper-resonance on examination compatible

13  with diffuse emphysema and marked air trapping

14  with a bronchodilator response.  All of these

15  findings are totally consistent with a smoke

16  related form of obstruction and not legal CWP.

17       Q    When you say "not legal CWP", are

18  you meaning that everything that you describes

19  is an indication that the obstruction and other

20  abnormalities here are not the result of coal

21  mine dust exposure?

22       A    That is correct.

1     Q     When you talk about the spirometric

2   pattern and the symmetrical reduction, I take

3   it that what you're talking about is what's

4   called either the FEV1 percent or the FEV1/FVC

5   ratio?

6          A     That is correct.  That's what I'm

7   talking about.

8          Q     All right.  In this case you

9   indicated that you had reviewed some x-ray

10  readings by different physicians.  Do you

11  happen to have those x-ray interpretations

12  handy?

13         A     Yes.

14         Q     I would like you to look at the

15  x-ray interpretations by Dr. Ahmed, Dr. Miller

16  and also Dr. Alexander.

17         A     Okay.

18         Q     You can tell me which one you have

19  in front of you first.

20         A     Okay.  I'm just looking here.  Did

21  you say Dr. Alexander?

22         Q     Yes.

1        A    I have his from July 4, 2008.  I

2   have that one.

3        Q    Okay.  Let's talk about that one.

4   The other two I can describe for you since

5   you're having a difficult time finding it.

6        A    Okay.

7        Q    First of all, with regard to Dr.

8   Alexander's interpretation of that x-ray from

9   July of 2008, in my looking at the ILO

10  classification form, as I understand it, he

11  found only irregular opacities; is that

12  correct.

13       A    That is correct.

14       Q    Which means he found no rounded

15  opacities at all?

16       A    That is correct.

17       Q    The other piece of information that

18  he provided in terms of his reading is that it

19  appears that he did not see any opacities on

20  one side of the lung; is that correct?

21       A    He saw opacities only in the left

22  mid and both lower lung zones.  He saw none in

1    the right mid lung zones.

2         Q    Is it unusual to see opacities just

3    in one lung and not the other lung?

4         A    Yes, it would be, plus I just

5    mentioned that the location of the opacities

6    that he noted is not where you would expect CWP

7    to be located.  It begins in the upper lung

8    zones and goes down to the lower lung zones as

9    the condition worsens.  So you really wouldn't

10   expect an absence in the upper lung zones and

11   only be present in the left mid and lower lung

12   zones.

13        Q    Which lung is it that coal mine

14   dust exposure attacks at first?

15        A    Generally the first area of the

16   attack is the right upper lung zone.  And then

17   after that the other areas.

18        Q    What type of pulmonary diseases or

19   problems would result in opacities just in one

20   lung, in the left lung like this?

21        A    It generally is related to old

22   inflammation from an infection or scarring from

1    some kind of insult to the lungs, an old

2    pneumonia.  You wouldn't expect unilateral

3    disease from an inhalation exposure.

4        Q    So even if the court were to accept

5    the interpretation or the findings here by Dr.

6    Alexander, it shows that to the extent that

7    there is any lung abnormalities present, it's

8    from a process not related to coal mine dust

9    exposure?

10        A    Yes.  I should mention, he did mark

11    right lower lung zone and left lower zone.  He

12    is describing it in both lungs, but more in the

13    left because he has left mid zone.  But again,

14    all linear and nothing in the upper lung zones.

15        Q    Okay.  What you're talking about is

16    his narrative report where he indicated he

17    found bulluos changes in the right lung?

18        A    No.  In the ILO form he made X's in

19    the left mid and both lower lung zones on his B

20    reading form from 7/14/08, on his x-ray from

21    7/14/08.

22        Q    Okay.  I'm sorry.  You're right.

1    You're talking about Dr. Alexander's reading?

2            A    Yes.

3            Q    I'm sorry.   That was my fault.

4    I've gotten it confused.  You're talking about

5    Dr. Alexander's reading that he didn't find

6    anything in the upper lobes, but only in the

7    lower lobes and mid lobes; is that correct?

8            A    That's correct.

9            Q    It was with Dr. Miller's reading of

10   that same x-ray from July 14, 2008, where on

11   the ILO classification form Dr. Miller has

12   marked opacities only in the left upper, left

13   middle and left lower lung zones, but nothing

14   in the right upper, middle or lower lung zones.

15           A    That is correct.

16           Q    And that was the abnormality that I

17   wanted to ask you about in terms of seeing

18   something like that where only the left lung

19   has opacities in it and the right lung doesn't.

20           A    Yes.   That's not a pattern of

21   change that is related to dust inhalation.

22   Again, you would not get unilateral lung

1   disease in only the left lung and nothing in

2   the right lung.  That would be unusual.  That

3   wouldn't take place.

4           Q    Okay.  He clearly had a significant

5   mining history?

6           A    Yeah.

7           Q    How long did he work in the mines?

8           A    He reported to me 27 years of coal

9   mine employment which ended around 1993.

10          Q    And you also reviewed the mining

11  histories that he gave to other physicians in

12  terms of doing your report?

13          A    Yes.  Everything was fairly

14  consistent.

15          Q    Okay.  And so in terms of your

16  opinion about whether coal mine dust exposure

17  caused or contributed to his impairment, you

18  have taken into full consideration his length

19  of employment as a coal miner?

20          A    Yeah.

21          Q    And taking into consideration his

22  lengthy employment as a coal miner, as a

1  pulmonary physician, based upon the medical

2  data and what you have described, you feel that

3  you are able to a reasonable degree of medical

4  certainty to rule out coal mining as a

5  contributing cause to his impairment?

6      A    Yes.  He has no characteristics of

7  his impairment or lung disease that he has,

8  which is really of a coal mine dust related

9  disorder.  As I mentioned, he does not have

10 objective findings of clinical CWP, he doesn't

11 have interstitial changes of micronodularities,

12 he doesn't have restriction, and the

13 characteristics of his obstruction as I've

14 outlined are not that of legal CWP.

15     Q    Okay.  In terms of the presence or

16 absence of restriction, do you require the

17 presence of a restriction in order to attribute

18 impairment to coal mine dust exposure?

19     A    No, obviously not.  I just was

20 mentioning that as the general pattern of

21 impairment related to a clinical CWP.  But

22 obviously obstructive lung disease can occur in

1   the setting of a negative x-ray and without

2   clinical CWP related to coal dust exposure.

3          Q    Now, one of the other

4   considerations as you may be aware is the

5   question of whether or not coal mine dust

6   exposure has contributed to or aggravated any

7   of the other pulmonary diseases or conditions

8   that a miner may have.  What's your opinion as

9   to whether or not coal mine dust exposure would

10  have aggravated Mr. Toler's impairment from

11  cigarette smoking?

12         A    Well, obviously coal mine dust

13  exposure can aggravate underlying lung disease

14  generally, but again, the pattern of the

15  impairments that he has, and again, there's a

16  marked decrease in the FEV1 and the FEV1

17  percent of the hyper-resonance, the low

18  diffusing capacity, the diffuse emphysematous

19  findings that he has.  These are so

20  overwhelmingly characteristic of a smoking

21  related type of lung disease that there really

22  is nothing to suggest that coal dust exposure

1   has really aggravated it.

2           Another thing is, I mean, while

3   there is no question coal exposure can cause

4   bronchitis, you would not expect -- you

5   wouldn't have bronchitis related to coal

6   exposure 16 or 17 years after they stop working

7   in the mines.  Any adverse affect of bronchitis

8   from coal dust exposure would dissipate within

9   months of the cessation of coal dust exposure.

10      Q    And in terms of what chronic

11  bronchitis is, what is chronic bronchitis?

12      A    Chronic bronchitis is cough and

13  sputum production on a regular basis for three

14  months of the year for two consecutive years.

15      Q    Okay.  Is it your opinion, based

16  upon what you saw in the test results here,

17  that Mr. Toler has chronic bronchitis?

18      A    The indications are that he had a

19  cough which was not productive of sputum.  So

20  based on the symptom complex that he described

21  to me, he really doesn't have chronic

22  bronchitis occurring at this time.

1          Q     You also mentioned that there was

2     some reversibility on the testing.  That was on

3     your testing?

4          A     Correct.

5          Q     And you mentioned that as perhaps

6     one of the pieces of medical data here that

7     helps you determine whether or not coal mine

8     dust exposure is the cause of the impairment?

9          A     Yeah.

10          Q     In this case, the reversibility is

11     not total reversibility; is that correct?

12          A     No, he's still left with severe

13     obstruction, so he still has severe impairment

14     after the bronchodilator response.

15          Q     Okay.  And your opinion that the

16     impairment here has not resulted from coal mine

17     dust exposure is not entirely based upon the

18     finding of reversibility on that test, is it?

19          A     No, not at all.  It was just one

20     characteristic that's added to the whole

21     variety of other characteristics that I listed.

22          Q     And you are not suggesting that Mr.

1  Toler has asthma, are you?

2        A    No.  His predominant pulmonary

3  finding is diffuse emphysema.

4        Q    Okay.  Now, were there any CT scans

5  that you reviewed or readings of CT scans?

6        A    A CT scan was reviewed by Dr.

7  Wheeler, two CT scans were reviewed by him, and

8  also Dr. Scott reviewed, I think, three CT

9  scans.

10        Q    Are CT scans medically acceptable

11  diagnostic tools?

12        A    Yes.

13        Q    Are they relevant for the diagnosis

14  of coal mine dust-induced lung disease or

15  abnormalities in the lungs?

16        A    Yes.

17        Q    How does a CT scan compare with a

18  conventional chest x-ray?

19        A    It's much more accurate than a

20  conventional chest x-ray for diagnosing of

21  pulmonary diseases generally and included for

22  diagnosing of pneumoconiosis.

1          Q     In this case, what did the CT scan

2    show?

3          A     Moderate to marked emphysema.  He

4    had a diffuse form of emphysema.  He did not

5    have micronodularities.  He had some lung

6    markings that were increased in different

7    areas, some scar tissue that is likely related

8    to the old infections in his lungs, and I'm

9    sure that the scattered scarring is what some

10   interpreters have marked on as linear opacities

11   on his chest x-ray on a predominantly

12   unilateral basis.

13         Q     So in this case, it's your

14   understanding that the CT scans showed no

15   evidence of pneumoconiosis; is that correct?

16         A     Correct.

17         Q     Do they show any evidence of dust

18   deposition?  Is that a different question or

19   the same question?

20         A     Well, there's nothing on the CT

21   scans to suggest his changes are related to a

22   dust disorder.

1    Q    And you also thought that the

2 majority of the x-rays also were negative for

3 clinical pneumoconiosis?

4    A    Yes.

5    Q    Your opinion that the impairment in

6 this case is not related to pneumoconiosis, is

7 that dependent upon your belief that the x-rays

8 are negative for pneumoconiosis?

9    A    No, it's based on the pattern of

10 the functional changes that were observed on

11 the various objective tests that were performed

12 on Mr. Toler.

13    Q    So even if the x-rays were found by

14 the judge to be positive for pneumoconiosis,

15 based upon the pattern and everything else that

16 you've described from the objective test

17 standpoint, it would be your opinion that the

18 impairment here has not resulted from coal mine

19 dust exposure?

20    A    Yes.

21    Q    Dr. Rosenberg, do you have an

22 opportunity in your private practice to treat

1    individuals who have been cigarette smokers?

2            A    Yes, on a regular basis.

3            Q    And you have an opportunity to

4    examine or treat individuals who are coal

5    miners?

6            A    Yes.

7            Q    How does the pattern of impairment,

8    the presentation here of the respiratory and

9    pulmonary condition and disability of Mr. Toler

10   compare with patients that you have who were

11   cigarette smokers but have never been miners?

12           A    The pattern of Mr. Toler's

13   impairment and the findings in him, examination

14   findings and symptoms, are classic for the

15   patients I see on a regular basis with smoke

16   related forms of COPD.  It's not a

17   characteristic pattern of a coal miner who has

18   obstructive lung disease.

19           Q    And it's the same type of thing

20   that you see in cigarette smokers who have

21   never been coal miners?

22           A    Absolutely.

1       Q    If Mr. Toler had never been a coal

2   miner, would his respiratory or pulmonary

3   condition be any different than it is today?

4       A    No.

5       MR. FRAMPTON:  All right, Dr. Rosenberg,

6   I don't think I have any other questions.  You

7   have the right to read the transcript or you

8   can waive the reading.  What would you like to

9   do?

10      THE WITNESS:  I'll waive it.

11      MR. FRAMPTON:  Let's go ahead and close

12  the deposition.

13              (Witness excused.)

14              (WHEREUPON, in the presence of

15              counsel, reading and signature

16              were waived.  The deposition

17              concluded at 5:12 p.m.)

18

19

20

21

22

 **ENVIRONMENTAL OCCUPATIONAL EXPOSURE CONSULTANTS LLC**

439 BUCKEYE ROAD, CORE, WV 26541 • TEL: (304) 879-4618 • FAX: (304) 879-4600 • CELL: (304) 685-5924 • e-mail: jrennill@msn.com

JOSEPH J. RENN III, M.D., F.C.C.P., F.A.C.F.E.
B.C.F.M., B.C.F.E.
NIOSH Certified "B" Reader

## INDEPENDENT MEDICAL REVIEW

### ARVIS RILEY TOLER
### ████-5366
### FEBRUARY 22, 2010

The following are the records submitted to me by the law firm of Bowles Rice which constitute the database upon which I have formed my opinion.

1.  WVOPB findings dated 02-14-91

2.  Independent medical evaluation by D.L. Rasmussen, M.D. dated 03-08-93.

3.  Independent medical evaluation by Dr. John Burrell dated 04-02-08.

4.  Independent medical evaluation by David M. Rosenberg, M.D. dated 01-11-10 for examination of 12-11-09.

5.  Work history records.

6.  Electrocardiographs dated 04-02-08 and 12-11-09.

7.  Pulmonary function tests dated 02-14-91, 04-02-08, 07-14-08, and 12-11-09.

8.  Arterial blood gas tests dated 03-08-93, 04-02-08, 07-14-08, and 12-11-09.

9.  Chest radiograph interpretations for chest radiographs dated 03-08-93, 04-02-08(2), 07-14-08(2), and 12-11-09.

10. CT scan of the lung interpretations dated 12-01-06, 08-15-07, 01-04-08, 09-02-08, and 11-03-08.

Mr. Arvis Riley Toler does not have coal workers' pneumoconiosis (CWP), either medical or legal. When considering only his respiratory system, he is totally and permanently impaired to the extent that he would be unable to perform any of the coal mining jobs listed under his occupational history or any similar work effort. He is so impaired as a result of tobacco smoke-induced chronic bronchitis and bullous emphysema.

J.A. 147

**CARDIOPULMONARY HISTORY:** Between February 14, 1991, and December 11, 2009, he has been examined on four occasions. His symptoms have been shortness of breath which began sometime between 1980 and 2004, and a productive cough which began sometime between 1976 and 1981. He has also had nocturnal wheezing, unspecified wheezing, paroxysmal nocturnal dyspnea, one pillow orthopnea, ankle edema, and chest pain.

He had pleurisy in 1969 and pneumonia on three occasions. In 1990, he had an acute myocardial infarction. He had angioplasty with stent placements in October 1990 and again in 2004 for his ASCVD.

**OCCUPATIONAL HISTORY:** He was a carpenter helper in the U.S. Army from 1956 until 1959. From 1959 until 1963, he was in the U.S. Marine Corp.

From 1963 until 1965, he worked for a utility company.

From 1966 until 1993, he worked in and around underground coal mines. For 3 months in 1957, he was a coal loader. From 1966 until 1969, he was a shuttlecar operator. From 1969 until 1993, he was an electrician at the preparation plant. His job required him to regular load 50-60 pounds.

**TOBACCO HISTORY:** Between March 8, 1993, and December 11, 2009, his tobacco use history was obtained on three occasions. He was said to have smoked 30 years prior to quitting in either 1996 or 1997 (04-02-08). He was also said to have smoked 38 pack-years prior to quitting in 1989 (03-08-93) and to have smoked 37 pack-years prior to quitting in 1996 (12-11-09).

**PAST MEDICAL HISTORY:** His only medical illness, other than as above, has been a duodenal ulcer.

His only surgical procedure, other than as above, has been appendectomy.

His only injury appears to have been to his finger while he was in the U.S. Marine Corps.

**FAMILY HISTORY:** His mother died in her 50s with a kidney malignancy. His father died in his 50s of a cerebral vascular accident. He also had hypertension and black lung. He has a sister who has had lung cancer.

**MEDICATIONS:** As of December 11, 2009, he was taking Symbicort, Spiriva, Combivent, baby aspirin, doxycycline, pravastatin, Mucinex, calcium, Vitamin D, fluticasone

nasal spray, Zyrtec, VEST, flutter valve, nebulizer, and supplemental oxygen at 2 liters per
minute 24/7.

**PHYSICAL EXAMINATIONS:**       Between February 14, 1991, and
December 11, 2009, his respiratory system has been examined on four occasions. His
respiratory system has been found to reveal, variously, increased AP diameter, dorsal
kyphosis, hyperresonant percussion note, prolonged expiratory phase, bilateral wheezes,
and diminished breath sounds.

**LABORATORY DATA:**    Electrocardiographs (2) reveal poor R wave
progression and non-specific ST changes.

His serum nicotine level December 11, 2009, was 9.2 ng/ml ( normal less than 2.0
ng/ml). His serum cotinine level 566.1 ng/ml ( normal less than 20 ng/ml).

Attached to this report is a one-page chart titled "Pulmonary Function and Gas
Exchange Data" containing all such available. The four spirometry studies are
accompanied by graph tracings for review and application of American Thoracic
Society/European Respiratory Society (ATS/ERS) criteria of validity. Graph tracings
accompanying the studies reveal all to have been performed with good cooperative effort
thereby rendering them valid. Only the spirometry study of December 11, 2009, was
performed both before and after inhaled bronchodilator. The ventilatory function
represented by the earliest study is moderate obstruction. The ventilatory function
represented by the subsequent studies is very severe obstruction. The December 11,
2009, study reveals significant bronchoreversibility.

The MVVs correlate well with the contemporaneously performed FEV1.

Lung volumes were performed on one occasion by nitrogen washout the results of
which are contained in the chart titled "Pulmonary Function and Gas Exchange Data".
The study reveals hyperinflation with air trapping exceeding the degree of hyperinflation.

Diffusing capacity (DLCO) studies were performed on two occasions the results of
which are contained in the chart titled "Pulmonary Function and Gas Exchange Data".
The study of December 11, 2009, is invalid by ATS/ERS criteria. It was not performed at
equal to or greater than 85% of the observed FVC. The DLCO of February 14, 1991, was
moderately reduced.

Resting arterial blood gases were performed on two occasions and resting and
exercise arterial blood gases on two occasions the results of which are contained in the
chart titled "Pulmonary Function and Gas Exchange Data". The resting studies are
normal for his age at the time each was performed . The exercise studies reveal relative
exercise-induced hypoxemia. That the resting study of March 8, 1993, was normal for his
age may be appreciated from the barometric pressure of 691 mmHg and the alveolar-
arterial oxygen gradient (AaDO2). The normal AaDO2 gradient for a 55 year-old is 25 +/-

8.2 mmHg.

February 14, 1991, his oxygen saturation at rest was normal, i.e. 96%/95%.

February 14, 1991, his carboxyhemoglobin level was elevated at 3.5%. December 11, 2009, his carboxyhemoglobin level was consistent with background levels at 1.2%.

Also attached to this report is a one-page chart titled "Chest Radiography" containing physicians' interpretations of the various chest radiographs performed. The chart is self-explanatory; however, it is necessary to comment on the interpretations. Dr. Speiden found small rounded opacities in all lung zones whereas Dr. Ahmed found only irregular opacities in the mid and lower lung zones. Dr. Miller found only irregular opacities in the left lung. He found none in the right lung. Thus, the interpretations, considered in conjunction with the interpretations by Drs. Wheeler and Scott indicate that a radiographic pneumoconiosis does not exist. What is noteworthy is the very consistent interpretation of emphysema, including the type of emphysema known as bullous.

Thoracic CT scans dated December 1, 2006, January 4, 2008, and September 2, 2008, have been interpreted by Dr. Scott. Dr. Wheeler interpreted thoracic CT scans dated August 15, 2007 and November 3, 2008. Both Drs. Scott and Wheeler found moderate-marked emphysema, the absence of any opacities that would suggest a pneumoconiosis, and the presence of various other abnormalities of mostly insignificant consequence.

**IMPRESSION:** Mr. Arvis Riley Toler is a 72 year-old who has chronic bronchitis and bullous emphysema resulting from his years of tobacco smoking. He does not have a pneumoconiosis.

**DIAGNOSES:**

I.  RESPIRATORY SYSTEM
    1.  Chronic bronchitis owing to tobacco smoking.
    2.  Bullous emphysema owing to tobacco smoking.
    3.  A pneumoconiosis does not exist.
    4.  Very severe, but significantly bronchoreversible obstructive
        ventilatory defect owing to #1 and #2 above.

II. CARDIOVASCULAR SYSTEM
    1.  ASCVD manifested by
    2.  old myocardial infarction and the necessity for
    3.  angioplasty (twice) and
    4.  stent placements (twice).

III. GASTROINTESTINAL SYSTEM

J.A. 150

1.        H/O duodenal ulcer.

Mr. Arvis Riley Toler does not have coal workers' pneumoconiosis (CWP), either
medical or legal.  When considering only his respiratory system, he is totally and
permanently impaired to the extent that he would be unable to perform any of the coal
mining jobs listed under his occupational history or any similar work effort.  He is so
impaired as a result of tobacco smoke-induced chronic bronchitis and bullous
emphysema.

All of the above is stated within a reasonable degree of medical certainty.

**DISCUSSION:**        That he does not have medical CWP may be appreciated from
the following:

- The various physical examinations are inconsistent with CWP but
  consistent with tobacco smoke-induced chronic bronchitis and bullous
  emphysema.
- The DLCO is too low to have resulted from CWP.  His DLCO was only
  41% of predicted February 14, 1991.  In tobacco smokers without
  radiographic CWP, Wang, Yano, Nonaka et al. found the lowest DLCO to
  be 82.7% of predicted.[1]  In tobacco smokers with radiographic CWP the
  lowest DLCO was found to be 73.8% of predicted.
- Lung volumes demonstrated the TLC, even by nitrogen washout, to be
  greater than that found in radiographically mild simple CWP.  The nitrogen
  washout method of determining lung volumes underestimates the TLC, in
  the presence of an obstructive ventilatory defect, such as emphysema.
- There is serious disparate agreement among the interpreters finding
  radiographic changes they believe are consistent with a pneumoconiosis.
  The disagreement is so serious that not one of the three is in agreement
  with another.
- The $FEV_1$/FVC ratio, in CWP, is preserved whereas, in tobacco smoke-
  induced bronchitis and emphysema, it is not.  Mr. Toler's ratio is
  far too low to have occurred from coal mine dust.
- There is significant bronchoreversibility demonstrated in the only study
  performed both before and after bronchodilator.  That occurs in various
  bronchoreversible airway obstructions but not in CWP.
- The presence of bullous emphysema is indicative of tobacco smoke-induced
  emphysema rather than coal mine dust induced.  Bullous emphysema does
  not occur in CWP.
- The average yearly decline in $FEV_1$ between February 14, 1991, and April
  2, 2008, was 77.1 ml/yr.  That is consistent with observations of $FEV_1$

---

[1] Wang X, Yano E, Nonaka K., et al. *Respiratory Impairments Due to Dust Exposure: A
Comparative Study Among Workers Exposed to Silica, Asbestos, and Coalmine Dust.* Am J Ind
Med 1997;31:495-502.

**ARVIS RILEY TOLER**
**5366**

decline in those with tobacco smoke-induced emphysema, especially if they have continued to smoke. It is inconsistent with observations of $FEV_1$ decline in those with CWP.

All of the above is stated within a reasonable degree of medical certainty.

Respectfully submitted,

Joseph J. Renn, III, M.D., F.C.C.P.,
F.A.C.F.E.I., B.C.F.E., B.C.F.M.

JJR/rlr
Attachments: 2

ARVIS TOLER,                          )
                                      )
        Claimant,                     )
vs.                                   )    CLAIM NO. XXX-XX-5366
                                      )
EASTERN ASSOCIATED COAL,              )
INC.,                                 )
                                      )
        Employer,                     )
and                                   )
                                      )
DIRECTOR, OFFICE OF WORKERS'          )
COMPENSATION PROGRAMS,                )
                                      )
        Party-in-Interest.            )

*************************************

        The telephonic evidentiary deposition of

JOSEPH RENN, M.D., was taken by the Employer pursuant

to 29 C.F.R, Section 18.22 in the above-entitled action

before David T. Bolin, Court Reporter and Notary Public

within and for the State of West Virginia, on the 9th

day of  March, 2009, commencing at 11:05 a.m., at the

office of Dr. Renn, 439 Buckeye Road, Core, West

Virginia, pursuant to notice.

*********************************************
BILLANTI AND ASSOCIATES
COURT REPORTERS
1033 RIDGEMONT DRIVE
ELKVIEW, WV 25071
304-965-7444

## APPEARANCES

### ON BEHALF OF THE EMPLOYER:

PAUL E. FRAMPTON
Attorney-at-Law
Bowles, Rice, McDavid, Graff & Love, LLP
600 Quarrier Street
Charleston, West Virginia  25301
(304) 347-1163

### NO APPEARANCE ON BEHALF OF THE CLAIMANT

3

I N D E X

**EMPLOYER'S WITNESS:**          **DIRECT**

Joseph Renn, M.D.                    4

                              (Frampton)



Reporter's Certificate...............40/41

1                    (Witness sworn.)

2    THEREUPON came;

3            J O S E P H    R E N N,    M. D.,

4    called on behalf of the Employer herein, who,

5    having been first duly sworn to tell the truth,

6    testified as follows:

7                    DIRECT EXAMINATION

8            BY MR. FRAMPTON:

9            Q    Dr. Renn, would you please state your

10   full name for the record?

11           A    Joseph John Renn, III.

12           Q    Dr. Renn, your curriculum vitae will

13   be admitted into the record of this case, but if

14   you would, would you please explain to the court

15   what your background is in pulmonary diseases and,

16   specifically, coal mine dust related lung

17   diseases?

18           A    Yes.  After an honorable discharge

19   from the U.S. Navy in 1969, I returned to West

20   Virginia University Medical Center where I entered

21   the senior residency in internal medicine.

22                    After completing the senior residency

1  in internal medicine, I completed two years of

2  pulmonary fellowship and then eventually became

3  board certified in pulmonary diseases.

4          While in my pulmonary fellowship I

5  studied under two of the people who have been

6  pioneers in coalworkers' pneumoconiosis,

7  specifically Dr. W. K. C. Morgan and Dr. Leroy

8  Lapp.  I also assisted with the research that was

9  ongoing at Appalachian Laboratory for occupational

10  and respiratory diseases, now known as NIOSH in

11  Morgantown.

12          I have assisted with some of the

13  research done by the physicians and the Ph.D.s who

14  were at Alford, such as John Hankinson who is a

15  Ph.D, Bob Rigger, Lee Petsak, Jack Parker, many

16  others that I can't recall their names right now.

17  But I assisted in their research as a way of also

18  studying and learning.

19          Since I got my boards or actually

20  finished my pulmonary fellowship, I started

21  practice in Morgantown, West Virginia where I was

22  in private practice for many years, finally

1   finishing private practice and retiring from

2   active patient care in January 2003.

3               During that time I also was on the

4   faculty, full time faculty at West Virginia

5   University for two years, and I continue to be on

6   the faculty at West Virginia University where I am

7   an Emeritus full professor in medicine.  I teach

8   at West Virginia University now six to eight hours

9   each week.  Sporadically I also give lectures to

10  the pulmonary fellows, and then sporadically

11  otherwise.

12              At least 25 percent of my practice

13  over the years has either been coal miners,

14  ex-coal miners, retired coal miners, et cetera.

15  So I have kept abreast of literature in

16  coalworkers' pneumoconiosis, as well as many other

17  occupational respiratory diseases.

18      Q    Thank you, Dr. Renn.  As I understand

19  it, you are board certified in internal medicine?

20      A    I'm board certified in internal

21  medicine, pulmonary diseases, forensic medicine,

22  and as a forensic medical examiner.  I'm also a

1    NIOSH certified B-reader.  I first certified

2    successfully in 1981.  I've successfully

3    recertified on every occasion since then.  My

4    certified is now good until February 2011.

5           Q    Can you explain what forensic

6    medicine is?

7           A    Forensic medicine is the

8    investigation, either by records or by actual

9    hands-on evaluation of, in my case a medical legal

10   problem.

11          Q    We're here in the case of Arvis

12   Toler.  As I understand it, you did not examine

13   Mr. Toler; is that correct?

14          A    That's correct.

15          Q    As a physician who has reviewed

16   medical records, medical reports, medical tests,

17   medical data on Mr. Toler, are you in as good a

18   position to render an opinion concerning what

19   respiratory pulmonary diagnoses Mr. Toler has, as

20   is somebody that examined Mr. Toler?

21          A    I believe so because I liken it to

22   the forensic examination of a prosector who only

1    has a diseased body to examine and must gain a

2    number of clues from that.

3           If the medical records are

4    sufficient, then yes, I believe that I am in as

5    good or even better a position than a person who

6    has examined an individual only on one occasion.

7           This particular occasion I had at

8    least four examinations to evaluate, as well as

9    multiple radiographic interpretations and

10   ventilatory function studies.

11        Q    So you actually end up having more

12   medical data on a person like Mr. Toler than

13   somebody that just examined him one time, but not

14   reviewing the medical records?

15        A    Yes.

16        Q    In this case, let's start by talking

17   about the chest x-rays.  You reviewed the various

18   chest x-ray interpretations that you listed in

19   your report of February 22, 2010.  Maybe we should

20   take a step back.

21           Have you reviewed any additional

22   materials since you did your report of February

1   22nd?

2           A    Yes.  I had a letter that was written

3   by Dr. Di Meo, D-I M-e-o, dated June 19, 2009.  I

4   had a pulmonary function test, arterial blood gas

5   test of March 16, 2009; an interpretation of the

6   July 14, 2008 chest radiograph by Dr. Alexander;

7   and there was also a record from the Reaches

8   Community Health Center.

9           Q    In your report you indicated that it

10  was your opinion that Mr. Toler did not have any

11  coalworkers' pneumoconiosis, and did not have any

12  impairment that was caused, contributed to, or

13  aggravated by coal mine dust exposure.  Is that

14  still your opinion after reviewing the additional

15  materials?

16          A    Yes.

17          Q    With regard to the x-rays, there were

18  some physicians who interpreted chest films as

19  positive for pneumoconiosis.  You reviewed those?

20          A    Yes, I did.

21          Q    In your report you indicated that the

22  opacities that they reported, I'm looking at page

1   4 of your report, were not opacities that were of

2   the type that would be caused by coal mine dust

3   exposure.

4              I was wondering if you could perhaps

5   address some of those reports.  First of all, you

6   noted that Dr. Ahmed found only irregular

7   opacities and he found them only in the mid and

8   lower lung zones.  What is the significance of

9   that type of a finding?

10         A    Well, let me say first of all that

11  that's not the way the characterization of that

12  paragraph that I intended.  The characterization

13  of the paragraph is intended to point out that

14  there is a very wide disagreement among the three

15  interpreters, and that that disagreement speaks to

16  the fact that they could not have been seeing a

17  pneumoconiosis if they are so widely in

18  disagreement regarding not only the type of

19  opacity, the shape of the opacity, the perfusion

20  of the opacity, and the location of the opacity.

21             Dr. Ahmed found irregular opacities

22  in the mid and lower lung zones.  Coalworkers'

1   pneumoconiosis is well known to affect the upper

2   lung zones first.  It affects primarily the right

3   upper lung zone first, and only later will spread

4   to the other lung zones.

5              The fact that Dr. Speiden saw rounded

6   opacities in all lung zones, and then Dr. Ahmed

7   didn't find any opacities of any type in the upper

8   lung zones shows that they're in disagreement.

9   The fact that Dr. Ahmed found irregular opacities

10  only and Dr. Speiden found rounded opacities only

11  also speaks to the very wide disagreement

12  regarding this chest radiograph.

13             Dr. Miller interpreted the x-ray.  He

14  found irregular opacities but only in the left

15  lung.  That would be very difficult to fathom that

16  a pneumoconiosis could be present only in one

17  lung, when we actually breathe with both of our

18  lungs.

19             And so because of the fact that Dr.

20  Miller found them only in the left lung, Dr. Ahmed

21  found them in the mid and lower lung zones, Dr.

22  Speiden different shape opacities in all lung

1   zones tells you that there's something very, very

2   wrong with these interpretations.

3                    When you add that to the

4   interpretations of Drs. Wheeler and Scott who did

5   not find any radiographic pneumoconiosis, it

6   suggests that indeed there is no radiographic

7   pneumoconiosis.

8                    Now there's been another

9   interpretation by Dr. Alexander which was in those

10  records that I received subsequently, and Dr.

11  Alexander, he is in disagreement with the other

12  three that found that there was a -- consistent

13  with a pneumoconiosis.  He found only irregular

14  opacities.  He found them in the two lower lung

15  zones and only in the left mid lung zone.  He

16  didn't find any in the upper lung zones.  He

17  didn't find any in the right mid lung zone.

18                   So once again we have a very serious

19  disagreement regarding that film sufficiently so

20  that you need to assume that in reality there is

21  no pneumoconiosis, because whatever they're seeing

22  they're in disagreement about and there shouldn't

1    be a disagreement about the shape, the location,

2    et cetera of the pneumoconiotic opacities.

3            Q    These two interpretations that only

4    found opacities in the lower lung zones, is that a

5    finding that would be consistent with a coal mine

6    dust-induced pneumoconiosis?

7            A    Ordinarily it is not.  Irregular

8    opacities are usually found in pneumoconiosis such

9    as asbestosis, and they're usually found in the

10   lower lung zones.  There are some few coal workers

11   who can have irregular opacities, but they are

12   generally not only in the lower lung zones.

13           Q    In this case there were also some CT

14   scan interpretations that you reviewed.  First let

15   me ask you, are CT scans a valid and acceptable

16   diagnostic tool used in the pulmonary disease

17   profession?

18           A    Yes, we use them all the time, many

19   times every day.  They are of the quality that

20   gives you a three dimensional picture, rather than

21   the plain x-ray which gives you only a two

22   dimensional picture.

1       Q     Are CT scans relevant and useful

2   specifically for the identification of

3   abnormalities from coal mine dust exposure?

4       A     Yes, they are.

5       Q     How do they compare as a diagnostic

6   tool with a conventional chest x-ray?

7       A     They're not only more sensitive, but

8   they're also more specific.  In fact, at the last

9   joint meeting of the American College of Radiology

10  and National Institute of Occupational Safety and

11  Health outside of D.C. down in Maryland where they

12  give the pneumoconiosis radiographic

13  interpretation course, they held it there this

14  past time, they divulged that they are now working

15  on and hope to have within two years digital

16  x-rays that can be used for interpretation of

17  pneumoconiosis and get away from analog films.

18  They are also working on an ILO classification

19  system for CT scans.

20      Q     Even though there's no current ILO

21  classification for CT scans, are CT scans still

22  valid for identifying the presence or absence of

1   pneumoconiosis?

2          A    Yes.  They're not only more

3   sensitive, but also more specific.

4          Q    In this case what did the chest CT

5   scan show?

6          A    They showed only that there was a

7   fair degree of emphysema which was classified as

8   moderate to marked, and there were no opacities

9   that suggested a pneumoconiosis.

10         Q    In this case, what are the

11  conclusions that you came to about the status of

12  pulmonary function?

13         A    In Mr. Toler, he had a very severe,

14  significantly bronchoreversible obstructive

15  ventilatory defect.

16         Q    Would you conclude that he has COPD?

17         A    Yes.  He has specific types of COPD.

18         Q    What do you mean by that?

19         A    COPD is really a term that

20  encompasses chronic bronchitis from any reason,

21  emphysema from any reason, and also asthma.

22         Q    In this case, what diagnoses did you

1   come to?

2        A    He has chronic bronchitis and he has

3   bullous emphysema.  The one thing that was

4   consistent in the radiographic interpretations was

5   emphysema, and some of the interpreters

6   interpreted the type as being bullous emphysema.

7   Dr. Alexander, when he interpreted the July 14,

8   2008 x-ray also interpreted that there was bullous

9   emphysema.  That's an important finding because it

10  helps differentiate the etiology.

11       Q    In this case, what are the risk

12  factors of that diagnosis that you made?

13       A    The risk factors could be for the

14  chronic bronchitis.  It could be exposure to coal

15  mine dust. It could be his tobacco smoking.  I

16  didn't detect any other risk factors in him.

17       Q    What about for the emphysema?  What

18  are the risk factors?

19       A    For that type of emphysema, the only

20  risk factor is tobacco smoking.

21       Q    Coal mine dust exposure also will

22  cause a type of emphysema.  Is that correct?

1          A     Yes, it causes focal emphysema which

2     is the same as centrilobular emphysema but with

3     the presence of a coal macule in proximity to it.

4     And it can also cause centrilobular emphysema;

5     however it does not cause bullous emphysema and

6     does not cause panlobular emphysema.

7          Q     Let me ask you some general

8     questions.  Obviously coal mine dust exposure can

9     cause emphysema and it can cause obstructive

10    impairment.  Is that correct?

11         A     Yes.

12         Q     And it can cause chronic bronchitis

13    as you already indicated.  As a pulmonary

14    specialist and also as a physician that's board

15    certified in forensic medicine, is it possible to

16    distinguish in a given individual such as Mr.

17    Toler whether or not his obstructive lung disease,

18    his chronic bronchitis, his emphysema is due to

19    smoking or coal mine dust exposure or a

20    combination of the two?

21         A     Yes, you can distinguish and make

22    that distinction among all three particular cases.

1        Q    Can you perhaps walk the court

2    through how you are able in this particular case,

3    in the case of Mr. Toler, to rule out his coal

4    mine dust exposure as a cause or contributing

5    factor to the disease and impairment that he has?

6            Let me preface this by a question.

7    You are familiar with Mr. Toler's work history?

8        A    Yes.

9        Q    I think that on page 2 of your report

10   you had indicated what his occupational history

11   was.  So in terms of the conclusions that you have

12   reached, you have fully taken into consideration

13   the time that he spent as a coal miner and the

14   exposures he had?

15       A    Yes.

16       Q    With that in mind, perhaps you could

17   explain how you are able to analyze the medical

18   data in this case and come to a conclusion about

19   the causation of the impairments.

20       A    He worked 27 years with exposure of

21   coal mine dust.  He had either 37 or 38 pack years

22   of tobacco smoking before he quit in 1996.

1         If we go back to the history, the

2    four histories, if we look at them individually,

3    there's only one of those histories that states

4    approximately when his productive cough began, and

5    that is the first one that was obtained February

6    14, 1991.  It states that his cough was of 10 to

7    15 years duration, so that would have begun

8    sometime in 1976 or 1981.

9         The rest of the histories are, for

10   instance in 1993 he had a morning productive

11   cough.  In 2008 it was just that he had a cough

12   with light colored sputum.  And in 2009 it was

13   that he had a cough with sputum production.

14         Either on physical examination or by

15   history, wheezing is noted by all of the

16   physicians.  And so that is a prominent system

17   that has to be taken into consideration.

18         If you have chronic bronchitis or

19   industrial bronchitis as a result of exposure to

20   coal mine dust, then it begins very early on after

21   exposure to any noxious fume, gas, or dust that

22   will cause it, and it lasts throughout the time of

1    exposure and then it disappears after the person

2    is no longer exposed, it disappears within six

3    months to a year after they're no longer exposed.

4    That is not the history of Mr. Toler.

5              Mr. Toler's productive cough, the

6    earliest we can date it was 1976 or at least ten

7    years after he was first exposed to coal mine

8    dust.  And indeed it was longer than that.  It was

9    19 years taking into consideration the three

10   months in 1957 when he was a coal loader, unless

11   that's a typographic error, maybe it was 1967 when

12   he was a coal loader.  Let me check my notes on

13   that.  For some reason I have 1957 he worked as a

14   coal loader for three months.

15             Now in a person who smokes tobacco

16   and develops chronic bronchitis as a result of

17   smoking tobacco, if the chronic bronchitis becomes

18   established, it will never disappear even though

19   they quit smoking.

20        Q    May I interrupt you, Doctor, and I'll

21   show you a letter from Eastern Associated Coal

22   from February 5, 1993.  It indicates that in 1957

J.A. 172

1    that in fact he did work for about a two month

2    period for Eastern.  It indicates that he worked

3    as a conveyor loader during that period.  Does

4    that sync with what Mr. Toler told you?

5         A    Well, he didn't tell me anything.  I

6    got this out of the records somewhere.

7         Q    All right.

8         A    And so, yes, he was exposed first in

9    1957.  So it would be 19 years actually before he

10   developed or at the earliest that he developed

11   this productive cough.

12        But once tobacco smoke-induced

13   chronic bronchitis develops, if it becomes

14   established, even though the person quits smoking,

15   it will continue unabated throughout the remainder

16   of their life.  That happens to be the history in

17   this case, that he quit in 1996 and was no longer

18   exposed to coal mine dust in 1993.

19        So you would have expected his

20   productive cough to have disappeared by the time

21   he was examined on the three occasions that he was

22   examined, which were after 1991.  He was examined

1    in '93. He was examined in 2008 and 2009. By

2    2008, 2009, you would have expected the cough to

3    have disappeared completely if it were due to coal

4    mine dust. Since it did not disappear completely,

5    even though he quit smoking in 1996, it should be

6    tobacco smoke-induced.

7              That is in all the medical literature

8    that I know regarding both industrial bronchitis

9    from coal mine dust exposure and chronic

10   bronchitis developing from tobacco smoke.

11             Further, the chronic bronchitis from

12   tobacco smoke can have a reversible component to

13   it. It won't be completely reversible, but it

14   will reverse somewhat with bronchodilator therapy.

15   And he has been demonstrated to have a reversible

16   component with bronchodilator therapy; whereas,

17   the industrial bronchitis associated with exposure

18   to coal mine dust does not have a reversible

19   component. Further, it is not manifested by any

20   diminished FEV1. It's only manifested by a

21   diminished peak expiratory flow rate.

22             We have a diminished FEV1 which

1   occurs in tobacco smoking.  We do not have a

2   problem with the FEV1 from exposure to coal mine

3   dust and industrial bronchitis.

4          When you have even a reversible

5   component of chronic bronchitis, it will not be

6   completely reversible because of what's known as

7   remodeling.  There's remodeling that takes place

8   in the airway to the point where, although in the

9   beginning you can have complete reversibility, but

10  as time goes on, even in the asthmatic individual

11  who is a lifelong nonsmoker there will be enough

12  of en element of inflammation that eventually

13  there will be an irreversible component to it.

14         The American Thoracic Society, in

15  fact one of its definitions of asthma is that it

16  is a bronchoreversible airway obstruction at least

17  in the beginning.  Then later on it becomes only

18  partially reversible because of the remodeling

19  effect, and there is a host of scientific

20  literature on the remodeling effect of

21  bronchospastic airways disease.

22         The other thing is that when you look

1  at the 1995 criteria document from NIOSH, you find

2  that they determined that the FEV1/FVC ratio was

3  preserved in coalworkers' pneumoconiosis, whereas

4  in tobacco smoke induced chronic bronchitis and

5  emphysema, it's not.

6          In the case of Mr. Toler his FEV1/FVC

7  ratio was way too low to be associated with

8  anything other than tobacco smoking.  His FEV1/FVC

9  ratio was 47 percent in 1991 and then it was in

10  the low 40 percent range in 2008 and 2009.

11          The diffusing capacity that was

12  performed in 1991 was 41 percent, and the

13  diffusing capacity that was performed in 2009,

14  although it was 53 percent, that diffusing

15  capacity was not valid.  It was not valid because

16  for a valid diffusing capacity, it has to be at

17  least 85 percent on inhalation of the vital

18  capacity that's already been recorded, and it was

19  not that.  The 1991 diffusing capacity at 41

20  percent of the predicted is far too low to have

21  resulted from coalworkers' pneumoconiosis.

22          There's a study that was done in

1   1997, appeared in The American Journal of

2   Industrial Medicine, and in that study they

3   studied individuals who had been exposed to

4   asbestos, individuals who had been exposed to

5   silica, and those who had been exposed to coal

6   mine dust.

7            They also did the chest radiographs

8   and they broke it down into those that had

9   radiographic evidence of one of those

10  pneumoconioses and those that did not.  They also

11  broke it down into smokers and nonsmokers.

12           So I took the -- remember Mr. Toler

13  was a tobacco smoker, and so he would fit in one

14  of the categories, whichever you believe.  Either

15  he has radiographic evidence of coalworkers

16  pneumoconiosis, which I do not believe, or he does

17  not have radiographic evidence of coalworkers'

18  pneumoconiosis, which I do believe.

19           Anyhow, the tobacco smokers that did

20  not have radiographic evidence of coalworkers'

21  pneumoconiosis, the very lowest diffusing capacity

22  that was found was 82.7 percent of predicted.  In

1    the tobacco smokers that did have radiographic

2    coalworkers' pneumoconiosis, the very lowest

3    diffusing capacity that was found was 73.8 percent

4    of predicted.

5                And so this demonstrates that

6    although Mr. Toler was a tobacco smoker, also,

7    there is disjuncture between a tobacco smoker that

8    either has or doesn't have radiographic evidence

9    of pneumoconiosis and a tobacco smoker that, or a

10   person who did not smoke, and has this result, a

11   low, very low diffusing capacity.

12               Now this type of diffusing capacity

13   is seen commonly in tobacco smokers who have

14   developed obstructive airway disease as a result

15   of their tobacco smoking.  So that was a further

16   differentiating factor.

17               Then we have the presence of bullous

18   emphysema.  Bullous emphysema results from the

19   progression of tobacco smoke-induced emphysema.

20   The most common emphysema found in tobacco smoking

21   is centrilobular.  It cannot be distinguished

22   histologically from a coal mine dust-induced

1    centrilobular emphysema.

2             However, when it goes on, if the

3    tobacco smoke-induced centrilobular emphysema will

4    progress to panacinar and eventually to bullous

5    emphysema; whereas the centrilobular emphysema

6    caused by exposure to coal mine dust does not

7    progress to panacinar and does not progress to

8    bullous emphysema.

9             That has been found mainly by

10   pathology studies done by Ruckley and others.  In

11   fact, the Institute of Occupational Medicine

12   published a, it's almost a 200 page tome on all

13   the evidence showing this.  It's without question

14   that coalworkers or coal mine dust type of

15   centrilobular emphysema does not progress beyond

16   that point.

17            So bullous emphysema caused by

18   tobacco smoke is obviously a defining difference

19   between tobacco smoke-induced emphysema and coal

20   mine dust-induced emphysema.

21            The other point is I looked at the

22   average yearly decline of Mr. Toler's FEV1 between

1    1991 and 2008.  That was 77.1 milliliters per

2    year.  That is consistent with a tobacco smoke

3    induced emphysema, especially if they continue to

4    smoke.  It's not consistent with the decline that

5    has been observed in those with either

6    coalworkers' pneumoconiosis or coal mine dust

7    exposure.

8              I want to go back to the point that I

9    started out with, and the point that I started out

10   with was the physical examinations being

11   inconsistent with coalworkers' pneumoconiosis,

12   especially the wheezing.  Wheezing is not found in

13   coalworkers' pneumoconiosis.  It is found in

14   tobacco smoke-induced chronic bronchitis with an

15   asthmatic component which he has, bronchospastic

16   component.

17             And then the last ventilatory

18   function study, the lung volumes study showed that

19   his total lung capacity was more than that found

20   and even radiographically files of coalworkers'

21   pneumoconiosis.  All the interpreters in the

22   perfusion category has either categorized it as

1    1/1 or 1/0.

2              So that's mild, simple coalworkers'

3    pneumoconiosis if you believe the interpretations

4    are accurate.  I've already said I don't believe

5    they are accurate because of the wide disparity

6    among them, both in the shapes and location, or

7    anatomic location.

8              But the lung volumes study is too

9    high.  It has never been found to be that high in

10   mild simple coalworkers' pneumoconiosis.  The lung

11   volumes study that was performed show that the

12   total lung capacity was 135 percent of predicted,

13   and the residual volume 259 percent of predicted.

14             If this were from coalworkers'

15   pneumoconiosis, there would be a proportionate

16   elevation of the residual volume, but not above

17   120 percent of predicted.  And there would

18   actually be a reduction in the total lung capacity

19   down to approximately 90 percent of predicted.

20             These are actually underestimated because

21   he has obstructive airway disease. This was done

22   by the nitrogen washout method.  That method

1    underestimates lung volume studies in the presence

2    of obstructive lung disease. And so, therefore, he

3    probably has even more hyperinflation and air

4    trapping as a result of his tobacco smoke induced

5    chronic bronchitis and emphysema.

6            Q    Dr. Renn, I noticed that in your

7    explanation that you just gave and also in your

8    report you often talk, for instance, about the

9    various examinations being inconsistent with CWP,

10   the diffusing capacity being too low to have

11   resulted from CWP, the FEV1/FVC ratio in CWP being

12   preserved, whereas here it's not, consistent with

13   tobacco smoke.

14           When you're talking about CWP,

15   coalworkers' pneumoconiosis, are you referring

16   only to clinical pneumoconiosis or are you also

17   referring to what's been called legal

18   pneumoconiosis?

19           A    The legal pneumoconiosis is a

20   respiratory disease that's either caused or

21   contributed to or affected by exposure to coal

22   mine dust.

1          In this particular case the only

2     things that could be affected by coal mine dust in

3     Mr. Toler would be, number one, the bullous

4     emphysema  Coal mine dust cannot affect bullous

5     emphysema; therefore, it doesn't rise to the level

6     of the legal pneumoconiosis.

7          The other thing is that he has an

8     asthmatic component.  Coal mine dust could have

9     contributed to his asthmatic or bronchospastic

10    component that has been demonstrated.  What we

11    know is that it cannot do this because in order to

12    have a bronchospastic reaction to, let's say

13    anything that would cause bronchospasm in the

14    airway, there has to be a complete protein and

15    coal mine dust does not form a complete protein.

16    Therefore, it cannot cause that type of reaction

17    or bronchospastic reaction.  And so that doesn't

18    rise to the level of the pneumoconiosis.

19          And I've already eliminated

20    industrial bronchitis from exposure to coal mine

21    dust because of the pattern, because of how it

22    developed and the fact that it has not

1    disappeared, that is not consistent with exposure

2    to coal mine dust, but it's consistent with

3    tobacco smoke induced chronic bronchitis.

4            Q    As I understand what you're saying

5    then is that the impairment here is not

6    significantly related to or aggravated by the coal

7    mine dust exposure?

8            A    That's correct.

9            Q    Just so I understand, as you

10   indicated earlier as a forensic specialist, you're

11   able to distinguish the possible risk factors or

12   causes and determine the actual risk factors or

13   causes in the case of Mr. Toler.

14           In this case you have been able to

15   determine that the impairment has resulted from

16   smoking and not coal mine dust exposure for

17   several reasons.  One is the FEV1 reduction here

18   that you addressed.  The other is the FEV1/FVC

19   ratio which is reduced here such as you would see

20   in smoking, but not in coal mine dust exposure.

21           The diffusing capacity here as you

22   explained was reduced far below what you would see

1   with coal mine dust-induced reduction of diffusing

2   capacity, but consistent with what cigarette

3   smoking would cause.

4                The type of emphysema he has here you

5   say is bullous emphysema which is a type resulting

6   from tobacco smoke and not coal mine dust

7   exposure.  The lung volumes here are higher than

8   what you would find even with somebody that has

9   mild clinical pneumoconiosis, but consistent with

10  what you would have with smoking.

11               You also have a partial

12  bronchoreversibility here which you would not have

13  from a coal mine dust induced condition.  And you

14  have the average yearly decline of the FEV1 as

15  consistent with smoking and not with a coal mine

16  dust-induced reduction.

17               And also the physical exams themselves

18  showed some symptomology, such as wheezing that

19  was consistent with smoking and not with coal mine

20  dust-induced lung disease.

21               Did I miss anything, Dr. Renn, or are

22  those basically the medical data that you're able

1  to look at to distinguish whether or not coal mine

2  dust exposure caused, contributed to, or

3  aggravated the impairment of Mr. Toler?

4         A    You didn't miss anything.  I'll just

5  amplify that last point about the fact that his

6  annual decline of the FEV1 far exceeds what's been

7  found in scientific literature, especially by

8  NIOSH researchers.  Well, specifically Attfield

9  and Hodous.  There are others.  There's Seixas,

10  there's Soutar and Hurley.  But Attfield and

11  Hodous, for instance, in one of their papers found

12  that there was an 11 milliliter per year FEV1

13  decline in those exposed to coal mine dust.

14         That's far below what Mr. Toler had,

15  77.1 milliliters per year.  As I said, the decline

16  is too great.  It's consistent with tobacco

17  smoke-induced, especially emphysema and also

18  chronic bronchitis from tobacco smoke.

19         Q    With tobacco smoking is there a dose

20  response correlated where the more somebody

21  smokes, the more likely they are to develop an

22  obstruction from smoking?

1        A     Yes, there is.  There is also a,

2    what's thought to be individual susceptibility.

3    The statistics that are bantered around somewhat

4    are that anywhere between 15 and 25 percent of

5    tobacco smokers will develop obstructive airway

6    disease.  That's being questioned quite a bit now

7    because it's based on them having developed

8    symptoms and signs with objective testing that

9    shows they have an obstructive airway disease.

10            Whereas now it's thought that most

11   tobacco smokers are going to develop obstructive

12   airway disease.  Pathologically that's been shown.

13   Radiographically it's been shown that they develop

14   what's called respirator bronchiolitis

15   interstitial lung disease from tobacco smoking,

16   and every smoker develops that.

17            And so there's rethinking about these

18   percentages and that the tobacco smokers, almost

19   all of them are really going to develop

20   obstructive airway disease.  The degree of it is

21   different in individuals, and it may be the dose,

22   it may be susceptibility, the individual's

1   susceptibility.

2        Q    We may have covered this before but

3   just out of an abundance of caution, clearly in

4   making these, rendering these opinions about

5   causation, you have taken into consideration the

6   lengthy coal mining history that Mr. Toler had and

7   are nevertheless able to eliminate coal dust as a

8   cause of his chronic bronchitis and also the other

9   abnormalities and impairments that you have

10  identified?

11       A    Yes.  I know that he had 27 years of

12  coal mine dust exposure.  He had that two month

13  period back in 1957 in addition to that.  I took

14  that in consideration as well as his 37 or 38

15  years, pack years of tobacco smoking.

16       Q    Just one other question in the way of

17  clarification.  I realize that this is only one of

18  the many items of medical data that you looked at.

19  But in this case, as you indicated, the

20  bronchoreversibility on that testing in 2009 did

21  not reverse all the way back to normal.  Is that

22  correct?

1          A    That's correct.

2          Q    How is it that you are able to

3    eliminate coal mine dust exposure as the cause of

4    that residual impairment that is present even

5    after the bronchodilator is applied?

6          A    You take into consideration the

7    pattern of all the ventilatory function studies.

8    You take into consideration the diffusing

9    capacity, the pattern from the lung volume study,

10   and the pattern within the spirometry itself.

11              For instance, back in 1991 where we

12   have a peak flow and a FEF 25/75, you see that

13   there's a disproportionate reduction of the FEF

14   25/75 compared to the peak expiratory flow rate.

15              If it were due to, any portion of it

16   due to coal mine dust, then it would be a

17   proportionate reduction and you would not have

18   that marked disproportionate reduction.

19              We come over to again where we have a

20   peak flow in July 14 of 2008, as well as an FEF

21   25/75, and again we see the same exact pattern.

22   So this pattern has lasted throughout that period

1   of time, that fifteen year period.

2              And so that helps you to distinguish

3   as well as the entire pattern of all the

4   ventilatory function studies.

5        Q    I take it, Dr. Renn, that as a

6   pulmonary specialist you have the opportunity to

7   hear and treat individuals who are cigarette

8   smokers?

9        A    Yes.  They comprise practically all

10  of a pulmonologist's practice.

11       Q    From the standpoint of the clinical

12  presentation here of Mr. Toler, how does that

13  compare with the cigarette smokers that you have

14  treated who have never been coal miners?

15       A    It compares exactly; one for one.

16       Q    With regard to Mr. Toler, how would

17  his respiratory or pulmonary condition diagnoses,

18  impairment be different if he had never been a

19  coal miner?

20       A    If all else remained the same, it

21  would be exactly the same.

22       MR. FRAMPTON:  All right, Dr. Renn.  I

1    don't think I have any other questions.

2              Dr. Renn, you have the right to read

3    the transcript to correct any errors or you can

4    waive the reading.  What would you like to do?

5         THE WITNESS:  I'll waive.

6         MR. FRAMPTON:  With that we can end the

7    deposition.

8              (WHEREUPON, in the presence of

9              counsel, reading and signature were

10             waived.  The deposition concluded at

11             11:55 a.m.)

12

13

14

15

16

17

18

19

20

21

22

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2014, copies of the foregoing Joint Appendix were served on the following parties electronically through the CM/ECF notification system:

> Mr. Sean Gregory Bajkowski
> blls-sol@dol.gov, bajkowski.sean@dol.gov
>
> Mr. Jeffrey Steven Goldberg
> BLLS-SOL@dol.gov, goldberg.jeffrey@dol.gov
>
> Mr. Evan Barret Smith
> evan@appalachianlawcenter.org

> s/Laura Metcoff Klaus
> Laura Metcoff Klaus